# ATTACHMENT  1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: Application of PQ Corporation for *Ex Parte* Order to Obtain Discovery for Use in Foreign Proceedings ) ) ) ) ) | Misc. Case No.: _____ |

DECLARATION OF JOHN LAU
IN SUPPORT OF
APPLICATION OF PQ CORPORATION FOR
AN *EX PARTE* ORDER PURSUANT TO 28 U.S.C. §1782(a)
TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

John Lau, declares as follows:

1.      I am President of PQ Corporation's Catalysts Group. I make this declaration as a representative of PQ Corporation based on my personal knowledge and upon information known or reasonably available to PQ Corporation.

2.      Thomas J. Pullukat was employed by PQ Corporation as Manager of Research and Development and Commercial Director for PQ's Silica Catalysts business unit, from August 15, 1991, until August 31, 2006. Toward the end of his tenure at PQ, Mr. Pullukat assumed a senior commercial role with the company. After retiring, Mr. Pullukat worked as a consultant for PQ and was rehired in January 2007.

3.      Mr. Pullukat signed an Employment Agreement with PQ. A true and correct copy of Mr. Pullukat's 1991 Employment Agreement is attached hereto as Exhibit A. The attached copy of Mr. Pullukat's Employment Agreement is a corporate record of PQ. It was recorded at or about the time indicated on the document by persons with knowledge of its contents, and has been maintained as a corporate record of PQ Corporation since that time.

4.     Mr. Pullukat agreed to keep confidential and not to disclose to others or use for his own benefit any PQ confidential information. Mr. Pullukat's August 15, 1991 Employment Agreement provides:

> 3.     Without the written consent of Corporation, Employee agrees that he/she will *not use for his/her own benefit or publish or disclose* to others than Corporation or its employees (a) the subject matter of any invention contemplated by this Agreement or of any invention of another employee of Corporation prior to the issue of letters patent therefore, or (b) *any trade secrets or confidential data* relating to Corporation, its products, prospective products, processes, machines, methods, operations or business.

Exhibit A (emphasis added.) Mr. Pullukat executed this Employment Agreement on August 15, 1991, and his notarized signature appears on the attached Exhibit A.

5.     In his capacity as Manager of Research and Development and Commercial Director for PQ's Silica Catalysts business unit, Mr. Pullukat had access to PQ confidential information including the formulations and recipes for PQ's proprietary chrome-on-silica catalysts. In his commercial role with PQ, Mr. Pullukat had access to highly-sensitive customer information of PQ.

6.     PQ's chrome-on-silica catalyst technology is a trade secret of PQ. Information relating to the method of making and using PQ's proprietary chrome-on-silica catalyst was not generally known outside of PQ and was maintained by PQ as confidential and proprietary information. Only those individuals within PQ who needed access to this information were given access to the technical details of PQ's chrome-on-silica catalyst technology. This proprietary and confidential information provided PQ a competitive advantage by virtue of being maintained as a trade secret.

7.     While he was employed by PQ, Mr. Pullukat was responsible for technical development work at PQ. This included interfacing with PQ's suppliers. One of PQ's suppliers at

the time Mr. Pullukat was employed by PQ was, and remains, KD Corporation ("KD"). KD is a Korean supplier of silica substrates. PQ has used silica substrates supplied by KD in making various PQ catalysts, including PQ's proprietary chrome-on-silica catalysts.

8.      In his capacity as Manager of Research and Development and Commercial Director for PQ's Silica Catalysts business unit, Mr. Pullukat had numerous communications and contacts with KD. These included travelling to KD, as a representative of PQ, to visit KD's facilities in Korea. PQ contracted with KD for KD to serve as a toll-manufacturer for PQ for several years while Mr. Pullukat was an employee of PQ.

9.      During the time Mr. Pullukat was employed by PQ, Kukdong did not make or sell a chrome-on-silica catalyst.

10.     Chrome-on-silica catalyst technology is challenging. Different methods of preparing the chrome-on-silica catalyst can result in high-density polyethylene plastics having different and possibly undesirable properties. Developing the chrome-on-silica technology required a substantial investment of time and resources by PQ. To make the chrome-on-silica catalyst, the metal ingredients (chrome, aluminum, and boron) must be added to the silica support in such a way that the metals are retained in the pores of the silica support and are available to catalyze chemical reactions. Only through substantial effort and investment of time and effort was PQ able to develop these chrome-on-silica catalysts and commercialize them.

11.     During the time Mr. Pullukat was employed by PQ, PQ maintained a "Code ofConduct." A true and correct copy of PQ's Code of Conduct is attached hereto as Exhibit B. The attached copy of PQ's Code of Conduct is a corporate record of PQ. It was made at or about the time indicated on the document—August 27, 2004—by persons with knowledge of its contents and has been maintained as a corporate record of PQ Corporation since that time.

12.     PQ's Code of Conduct required Mr. Pullukat to use confidential information only for the Company's benefit and not to use it in any other way. PQ's Code of Conduct provides, in pertinent part:

> ## Use of Company Property and Information
>
> Directors, officers and employees are obligated to protect the Company's assets and to use them efficiently. Those assets include tangible and intangible assets, such as confidential Company information. ***Confidential information*** may include, but is not limited to, information concerning pricing, products and services that are being developed, formulae, processes, plans, financial data, production information, customer lists, marketing strategies, employee records and other such trade secrets, including information pertaining to any prospective Company acquisition or divestiture. This information ***must not be used in any way other than as required in the performance of an employee's duties***.

Exhibit B at 3 (emphasis added).

13.     Mr. Pullukat retired from PQ on August 31, 2006. Mr. Pullukat began a consulting business under the name SilCat Consultants, Inc., and/or SilCat Consultants LLC. After his retirement, Mr. Pullukat continued consulting for PQ.

14.     Mr. Pullukat signed a consulting services agreement with PQ on November 14, 2006. A true and correct copy of Mr. Pullukat's PQ Corporation Consulting Services Agreement is attached hereto as Exhibit C. The attached copy of Mr. Mr. Pullukat's Consulting Services Agreement is a corporate record of PQ. It was made at or about the time indicated on the document—November 2006—by persons with knowledge of its contents and has been maintained as a corporate record of PQ Corporation since that time.

15.     Mr. Pullukat's Consulting Services Agreement includes confidentiality provisions requiring him to use PQ's confidential information only for the benefit of PQ. It requires him not to disclose of publish PQ confidential information. It also prohibits him from assisting any other

4

**ATTACHMENT 1**

person involved in the manufacture, sales or marketing of silica supported catalysts that are

competitive with PQ. The Consulting Services Agreement provides, in pertinent part:

> 7.      Confidentiality/Non-Compete (Limitations in this section and in
> the prior section 6 apply to SILCAT Consultants, LLC and to all
> references in this Agreement which refer to "Consultant")
>> a.      The terms of this agreement shall be held confidential by
>> both Consultant and PQ.
>> b.      The performance of the Consultant services contracted for
>> herein may require PQ to disclose to Consultant
>> information that is proprietary and or confidential to PQ
>> Corporation or its affiliates ("Information"). ***Consultant
>> agrees to use the Information only for the benefit of PQ,
>> and not to directly or indirectly publish or disclose the
>> Information to any third party without the prior written
>> consent of PQ.*** The foregoing restrictions against use and
>> disclosure of information shall likewise apply to any
>> reports, memoranda, designs, drawings or summaries
>> prepared by Consultant for PQ in connection with the
>> performance of services hereunder, whether written or
>> stored on electronic media or in whatever form. These
>> obligations of confidentiality shall extend for a period of
>> three (3) years after the termination of this Agreement.
>> c.      The ***Consultant*** agrees that while this agreement is in
>> place, it ***will not engage in or participate with or assist
>> another person or entity involved in the manufacture,
>> sales and marketing of silica–supported catalysts that are
>> competitive with PQ.*** Said provision does not preclude the
>> consultant from working with other companies including
>> companies that use silica–supported catalysts during the
>> time it is working with PQ, as long as such work is not with
>> persons or entities involved directly in the manufacture of
>> silica–supported catalysts.

Exhibit C at 2 (emphasis added). The PQ chrome-on-silica catalysts involved in this

application are silica-supported catalysts.

     16.      In January of 2007, PQ re-hired Mr. Pullukat as an employee. PQ and Mr.

Pullukat agreed to terminate their Consulting Services Agreement in favor of the confidentiality

obligations of a new Employee Agreement. A true and correct copy of a letter from Kevin

Doran, Vice President of Human Resources at PQ, to Thomas Pullukat is attached hereto as

Exhibit D. The attached copy of Mr. Doran's January 15, 2007, letter is a corporate record of PQ. It was made at or about the time indicated on the document by persons with knowledge of its contents and has been maintained as a corporate record of PQ Corporation since that time.

17.     In his 2007 Re-Employment Letter, Mr. Pullukat expressly agrees to execute a new Employee Agreement acknowledging his responsibilities with respect to PQ's confidential information. Exhibit D.

18.     Mr. Pullukat signed another Employee Agreement with PQ on January 22, 2007. A true and correct copy of Mr. Pullukat's 2007 Employee Agreement is attached hereto as Exhibit E. The attached copy of Mr. Pullukat's 2007 Employee Agreement is a corporate record of PQ. It was made at or about the time indicated on the agreement—January 22, 2007—by persons with knowledge of its contents and has been maintained as a corporate record of PQ Corporation since that time.

19.     Mr. Pullukat's 2007 Employee Agreement also requires him to maintain the confidentiality of PQ's proprietary and confidential information. The 2007 Employee Agreement provides, in pertinent part:

> 3.     Without the written consent of Corporation, Employee agrees that he/she *will not use for his/her own benefit or publish or disclose* to others than Corporation or its employees (a) the subject matter of any invention contemplated by this Agreement or of any invention of another employee of Corporation prior to the issue of letters patent therefore, or (b) *any trade secrets or confidential data* relating to Corporation, its products, prospective products, processes, machines, methods, operations or business, or (c) any trade secrets or confidential information of third parties received by the Corporation under confidentiality agreement.

Exhibit E (emphasis added). Mr. Pullukat executed this Employment Agreement on January 22, 2007, and his signature appears on the attached Exhibit E.

6

**ATTACHMENT 1**

20.     In addition to signing a new Employee Agreement, Mr. Pullukat signed a copy of PQ's Code of Conduct on January 22, 2007. His signature appears at page 7 of Exhibit B.

21.     Mr. Pullukat resigned from his 2007 employment with PQ on September 30, 2007. PQ paid Mr. Pullukat through December 31, 2007.

22.     PQ also owns patents and patent applications for its chrome-on-silica catalyst technology in several countries. PQ filed its first application for international patents on these proprietary catalysts on October 26, 2007.

23.     PQ has filed two Korean patent applications on its chrome-on-silica catalyst technology. Application Serial Nos. 10-2010-7011247, and 10-2011-7022339. Both claim priority back to PQ's October 26, 2007, priority date. Both have now been allowed as registered patents by the Korean Intellectual Property Office. The first covers various methods for deposition the metals on the support and the second covers simultaneous deposition of the metals on the support. Attached hereto as Exhibit F is a true and correct copy of a translation of the allowed Korean claims on PQ's registered patent covering simultaneous deposition of the metals.

24.     PQ Corporation considers these Korean patents to be valuable intellectual property of PQ. PQ plans to proceed with a Korean district court patent infringement and trade secret misappropriation action against KD.

25.     It appears that, by December 2008, Mr. Pullukat was also consulting with KD. PQ did not authorize KD to have access to PQ's proprietary and confidential chrome-on-silica catalyst technology. Before consulting with Mr. Pullukat, KD was not selling a chrome-on-silica catalyst. Yet, after it consulted with Mr. Pullukat, KD developed a chrome-on-silica catalyst product. PQ believes that Mr. Pullukat may have disclosed to KD PQ's confidential and

proprietary information which enabled KD to reproduce and use—without PQ's authorization—PQ's proprietary chrome-on-silica catalyst technology.

26.     PQ has analyzed samples of KD's chrome-on-silica catalyst. PQ's analysis establishes that KD is using PQ's proprietary technology in making KD's chrome-on-silica catalyst. PQ believes that when Mr. Pullukat began consulting with KD after he retired from PQ, he transferred some, if not all, of this highly confidential and proprietary technical information relating to PQ's chrome-on-silica catalyst to KD. This information enabled KD to make a commercially viable chrome-on-silica catalyst product and to enter the market for this product. PQ believes that KD has misappropriated PQ's trade secrets and is infringing PQ's allowed Korean patent claims for its chrome-on-silica catalyst formulation and method of making the chrome-on-silica catalyst.

27.     PQ believes that KD is infringing PQ's allowed Korean patent claims and PQ's proprietary trade secret technology. PQ intends to take action in Korea against KD for patent infringement and trade secret misappropriation.

28.     PQ understands that pre-trial discovery in not available in Korea.

29.     Mr. Pullukat lives in Lake Mary, Florida, within the jurisdiction of this court.

30.     KD's website lists U.S. offices. Attached as Exhibit G is a true and correct copy of a page from KD's website, listing KD's U.S. office address as Lake Mary, Florida, the same city where Mr. Pullukat resides. Based on the information available to PQ, this appears to be based on Mr. Pullukat's consulting work for KD.

31.     PQ respectfully requests this court's assistance in securing discovery from Mr. Pullukat regarding his involvement with KD regarding the subject matter of PQ's trade secrets and registered Korean patents to assist PQ in enforcing its patent and trade secret rights in Korea.

ATTACHMENT 1

Thomas J. Pullukat has certain information that is relevant to PQ Corporation's foreign claims against KD.

The foregoing is true and correct to the best of my personal knowledge and to the best of the information available to PQ Corporation with respect to those statements that are based on the information available to the corporation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 21, 2013

_____
JOHN LAU
President, Catalysts Group
PQ Corporation

9

**ATTACHMENT 1**

# EXHIBIT  A

# The PQ Corporation

**Employee Agreement**

WHEREAS, the undersigned hereinafter referred to as "Employee", is or is about to be employed by PQ Corporation, hereinafter referred to as "Corporation", in a capacity such that the performance of his/her duties may involve the exposure to, handling, or acquiring of confidential data and information classified as "trade secrets", which may lead to inventions or suggestions by him/her helpful in the conduct of Corporation's business and to his/her knowledge of confidential data relating to such business.

NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) to Employee in hand paid by Corporation, receipt whereof is hereby acknowledged by Employee, and in consideration of the salary heretofore or hereafter paid to Employee by Corporation, Employee, intending to be legally bound and to bind as well his/her heirs, executors and administrators, agrees that:

1. Employee shall promptly, fully and completely disclose to Corporation every invention made, conceived or developed by him/her solely or jointly with another or others in the course of his/her employment by Corporation, and Employee shall also make such disclosure of every invention so made, conceived or developed during the period of his/her employment by Corporation and which relates to methods, processes, products, apparatus, machines, equipment, compositions of matter or articles of manufacture used or useful in any plant, branch or department of Corporation, or of a character heretofore or hereafter manufactured, used, sold or dealt in by Corporation.

2. At the request of an officer of Corporation, Employee, either during or after termination of his/her employment, forthwith shall execute or shall join in executing applications for letters patent in such countries and for such inventions contemplated by paragraph 1 hereof as Corporation may direct, which applications shall be prosecuted at the expense of the Corporation by solicitors chosen by it; and Employee shall execute and deliver or join in executing and delivering assignments to Corporation of the entire right, title and interest in and to said inventions and the applications and letters patent therefor, and shall execute or join in executing all papers necessary or desirable in the opinion of Corporation to carry out the spirit and intent hereof and shall give all reasonable assistance in establishing, protecting and maintaining the rights of Corporation in said inventions, applications and letters patent in accordance with the spirit of the agreement.

3. Without the written consent of Corporation, Employee agrees that he/she will not use for his/her own benefit or publish or disclose to others than Corporation or its employees (a) the subject matter of any invention contemplated by this Agreement or of any invention of another employee of Corporation prior to the issue of letters patent therefore, or (b) any trade secrets or confidential data relating to Corporation, its products, prospective products, processes, machines, methods, operations or business.

4. Employee covenants and agrees that he/she will not directly or indirectly, whether as a principal, agent, employee, consultant, stockholder, partner, venture, lessor, lessee, or in any other capacity, engage or participate in a business competitive with that of Corporation for a period of one (1) year from the date of termination of his/her employment with Corporation. Where the Employee's activities on behalf of Corporation have been in a limited geographical area, the restrictions shall be applicable in those areas which Employee served during the last two (2) years of employment with Corporation. It is agreed that if Employee's duties involve assignment at Corporate Headquarters or at the Research and Development facilities, the geographical area of Employee's involvement is in the United States.

5. No change in the amount of salary hereafter paid Employee by Corporation or in the nature of the services and duties required from or assigned to him/her by it or in the department or plant to which Employee is assigned shall in any way affect the obligation of Employee to Corporation under any of the provisions of this Agreement.

6. Employee's employment is terminable at will, either by Employee or by Corporation, and the termination of the Employee's employment shall not release Employee from his/her obligations hereunder; and, in the event of Employee's subsequent reemployment by Corporation, this Agreement and all the provisions thereof shall, without further act on the part of the Corporation or Employee, continue in full force and effect.

IN WITNESS WHEREOF, the said Employee has hereunto set his/her hand and seal this _15_ day of _August_, 19 _91_.

_Thomas J. Pullukat_ _____ (SEAL)

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF _CHESTER_                ss

Before me, this day, personally appeared the aboved named _T. J. PULLUKAT_, who acknowledged the execution

of the foregoing instrument to be _HIS_ act and deed.

Witness my hand and notarial seal this _15th_ day of _AUGUST_ A. D. 19 _91_

_Louise H. Miller_ _____

Notarial Seal
Louise H. Miller, Notary Public
Tredyffrin Twp., Chester County
My Commission Expires May 5, 1994

PQ—1072

ATTACHMENT 1
EXHIBIT A

# EXHIBIT  B

# Code of

# Conduct

 PQ Corporation

# CONTENTS

**GENERAL PRINCIPLES**..................................................................................... 1
**PURPOSE**........................................................................................................ 1
**COMPLIANCE**................................................................................................. 1
**POLICIES AND PROCEDURES**................................................................ ....... 2

**HUMAN RESOURCES AND EMPLOYEE MATTERS**
    Employment Policies .............................................................................. 2
    Avoidance of Conflicts of Interest .............................................................. 3
    Gifts and Entertainment .......................................................................... 3
    Use of Company Property and Information ................................................ 3
**HEALTH, SAFETY & ENVIRONMENT**
    Compliance with Health, Safety and Environment Policies .......................... 3
**FINANCE, ACCOUNTING AND TREASURY**
    Maintaining Accurate Financial Books and Records ..................................... 4
**INFORMATION AND TECHNOLOGY MANAGEMENT**
    Compliance with Information Technology and Related
    Services Policies ..................................................................................... 4
**LEGAL**
    Company Political Involvement and Contributions ..................................... 4
    Avoidance of Insider Trading .................................................................... 4
    Foreign Corrupt Practices Act ("FCPA").... ............................................... 5
    Compliance with Competition Laws .......................................................... 5
    Conduct of International Operations .......................................................... 5
    Compliance with Sanctions and Trade Embargoes ..................................... 5
    Information and Records Management ...................................................... 6
**ENFORCEMENT** ............................................................................................ 6
**REPORTING SUSPECTED NON-COMPLIANCE** .................................................... 6
**REQUIREMENTS FOR CONFIRMING COMPLIANCE WITH THE CODE** ................. 7
**ACKNOWLEDGMENT** .................................................................................... 7

ATTACHMENT 1
EXHIBIT B

## GENERAL PRINCIPLES

The directors, officers and employees of PQ Corporation, its subsidiaries and affiliated companies worldwide (the "Company") shall adhere to ethical standards of conduct when dealing with each other and with the Company's customers, vendors, suppliers, competitors and other third parties. They will always act in a manner that reflects the Company's values and attitudes as a responsible member of the communities in which we operate. It is the Company's policy to be lawful, highly principled and socially responsible in all of its business practices.



### PURPOSE

Our Code of Conduct (the "Code") has been designed to communicate the Company's commitment to ethical business conduct and to provide guidance to employees so that they may apply these principles in the daily performance of their job responsibilities. It summarizes the principles and policies created to deal with issues such as hiring and employment practices, conflicts of interest, harassment, bribery, political contributions, environmental and health/safety issues.

The purpose of this Code is to provide basic guidelines for situations in which ethical issues arise. It is not intended to address every specific situation. As such, nothing in the Code prohibits or restricts the Company from taking any disciplinary action on any matters pertaining to employee conduct, whether they are expressly discussed in this document. The Code is not intended to create any express or implied contract with any employee or third party.

## COMPLIANCE

The Company, throughout the world, has a reputation for conducting business honestly and with integrity. Directors, officers and employees are responsible for understanding the legal and policy requirements that apply to their jobs and for applying those requirements in the daily performance of their jobs.

It is the policy of the Company to comply with all applicable laws, including, without limitation, employment, competition, securities and environmental laws. No director, officer, or employee of the Company has the authority to violate any law or to direct another employee or any other person to violate any law on behalf of the Company.

Employees should contact the Legal Department if they have questions about any provision of this Code. Failure to comply with any of the provisions of this Code may subject the employee to disciplinary measures, including possible termination of employment.



## POLICIES AND PROCEDURES

The following topics may have a Company Policy and/or Company Procedure in place. Refer to these Company Policies and Procedures on the PQ intranet for additional and/or more specific information.

Copies of all applicable policies and procedures are also available upon request from the Human Resources Department or the Legal Department.

## HUMAN RESOURCES AND EMPLOYEES

Employment Policies

Employees are entitled to fair and respectful treatment by their supervisors, managers, subordinates and peers.

The Company has established procedures to ensure that all personnel actions, such as hiring, compensation, benefits, transfers, company-sponsored training and educational assistance, social and recreational programs, and the use of all company facilities and services are administered on a nondiscriminatory basis.  Those procedures are specifically set forth in the various Company policies which can be found on the Company Intranet.

Employees have a responsibility to maintain a workplace free from violence, harassment and discrimination of any sort on the basis of race, religion, national origin, gender, sexual orientation, disability, age or any other basis prohibited by law. An employee may not interfere with or retaliate against another employee who seeks to invoke their rights under the laws governing labor and employee relations, or who voluntarily participates in a company investigation of alleged improper conduct.

## Avoidance of Conflicts of Interest

It is the Company's policy that no director, officer, or employee place themselves in a position where their actions, personal interests, or activities are in conflict with the interests of the Company.

Directors, officers and employees may not have any direct or indirect controlling interest (as investor, lender, employee or other service provider) in any enterprise that competes with the Company or which has current or prospective business with the Company when that individual may be able to influence such business with the Company, except when the interest has been fully disclosed to and approved by the Company.

## Gifts and Entertainment

Gifts (products, merchandise, personal services or favors) of nominal value are considered to be acceptable activity in the ordinary course of doing business. Specific guidelines are set forth in the Gifts and Favors Policy and Procedures, which can be found on the Company Intranet.

## Use of Company Property and Information

Directors, officers and employees are obligated to protect the Company's assets and to use them efficiently.  Those assets include tangible and intangible assets, such as confidential Company information. Confidential information may include, but is not limited to, information concerning pricing, products and services that are being developed, formulae, processes, plans, financial data, production information, customer lists, marketing strategies, employee records and other such trade secrets, including information pertaining to any prospective Company acquisition or divestiture.  This information must not be used in any way other than as required in the performance of an employee's duties.


## HEALTH, SAFETY & ENVIRONMENT (HSE)

The Company is committed to operating in a responsible manner that safeguards the health and safety of its employees, customers, the community and other stakeholders and protects the environment.

All employees are expected to act in accordance with the PQ Corporation HSE Mission Statement and Guiding Principles and abide by the guidelines set forth in the Health, Safety and Environmental (HSE) Responsibilities Pamphlet.

Failure to comply with health, safety and environmental laws and regulations, permit requirements and Company HSE policies or failure to accurately and timely report HSE information to the appropriate authorities is considered a major violation of Company policy and is of such a degree of seriousness that the continued employment of the offender will be evaluated.

## FINANCE, ACCOUNTING AND TREASURY

The Company's financial statements and the books and business records on which they are based must accurately and completely reflect all corporate transactions. All receipts and disbursements of corporate funds must be properly recorded, and records must disclose the nature and purpose of corporate transactions. One of the duties of auditors is to ensure that the Company strictly follows these rules. Directors, officers and employees are expected to fully cooperate with the auditors and under no circumstances withhold or conceal information from them.

Employees with supervisory duties should establish and implement appropriate internal accounting controls over all areas of their responsibility to ensure the safeguarding of the assets of the Company, the accuracy of its financial records and reports, and ensure that no false or intentionally misleading entries are made in the Company's accounting records.

Employees are expected to immediately report any improper transaction or accounting practice to their supervisor, a member of the audit committee or the PQ Concern Line.

## INFORMATION AND TECHNOLOGY MANAGEMENT

Information technology equipment and services (such as computers, e-mail, telephones, and the Internet) are provided by the Company for use by its employees, and they remain the property of the Company. They are intended to be used for Company business and, as such, the Company retains the right to review and monitor all such systems and services at any time, without warning. Employees are expected to comply with the guidelines set forth in the Company's Internet Usage, Electronic Media and Services Policy and Procedures.

## LEGAL

Company Political Involvement and Contributions

The Company must comply with campaign finance laws and regulations that prohibit improper activities by Company employees and others acting on the Company's behalf, both on and off company property. The Company also prohibits use of its facilities or equipment for political campaigning, fundraising or partisan political purposes.

Avoidance of Insider Trading

No person affiliated with the Company may directly or indirectly effect securities transactions on the basis of "insider information" until that information is fully disseminated to the public. Insider information is any information about a company or its business about which an employee may learn in connection with their employment, which is not generally known to the public, and which could affect a decision to buy, sell or hold the

stock of a company.   Use of insider information, as well as "tipping," which is communicating such information to anyone who might use it to purchase or sell securities, are prohibited.

## Foreign Corrupt Practices Act ("FCPA")

All employees must conduct business in a way which will assure compliance with the Foreign Corrupt Practices Act (FCPA), a United States law that prohibits giving money or any other thing of value to a government official with the intention of corruptly influencing the official's actions. No payments will be authorized, offered or made, nor gifts or anything of value be promised, directly or indirectly, to any foreign official, political party or official of that political party, or to any candidate for political office, which is intended to corruptly influence an official act or decision of such a person. Every Company employee, agent and contractor must properly account for the use of Company funds and assets. Failure to comply with this policy may subject an employee to discipline.

Any questions concerning a transaction that could be construed as bribery, kickback or fraud should be directed to the Legal Department.

## Compliance with Competition Laws

The governments of most countries in which the Company conducts business have enacted antitrust or "competition" laws.  Their purpose is to ensure that markets for goods and services operate competitively and efficiently so customers enjoy the benefit of open competition among their suppliers. Sellers similarly benefit from competition among their purchasers. In the United States and some other jurisdictions, violations of the competition laws can lead to substantial civil liability – triple the actual economic damages.  Moreover, violations of the competition laws may be treated as criminal acts that can result in criminal liability for both corporations and individuals.
It is the policy of the Company to engage in fair competition, in compliance with global antitrust and competition laws.  Employees must be alert to avoid even the appearance of conduct which may be considered anti-competitive or a restraint of trade.

It is important that employees consult the Legal Department whenever their business activities might be regulated by these laws.

## Conduct of International Operations

All employees must uphold the integrity of the Company in all nations in which we do business.  Laws and customs vary throughout the world, so it is imperative that employees be sensitive to local customs and legal requirements that apply when conducting business.

Compliance with Sanctions and Trade Embargoes

Employees must abide by all economic sanctions or embargoes that the United States has adopted, whether they apply to foreign countries, political organizations, or particular foreign individuals and entities.  Inquires regarding whether a transaction on behalf of the Company complies with applicable sanction and trade embargo programs should be directed to the Legal Department.

Information and Records Management

All employees are required to comply with the procedures sets forth in the Company's Records Retention Policy as it applies to documents generated and/or accumulated in connection with his or her job responsibilities.

## ENFORCEMENT AND DISSEMINATION

The Chief Executive Officer of the Company has the ultimate responsibility for ensuring compliance with the Code.  The General Counsel is responsible for the administration of the Code.  The Presidents of the Company's business units and subsidiary companies are responsible for ensuring that their business units are operated in compliance with the Code.  Company managers are responsible for ensuring that each of his or her employees have read and understand and will be required to comply with the Code.

## REPORTING NON-COMPLIANCE

Employees are encouraged to report to their management any suspected violations of the Code, unlawful, unethical or improper business practices or violations of Company policies. Such suspected violations may include improper trade practices, health, safety or environmental concerns, improper employment practices, or misuse of Company property.

Suspected violations may also be reported to your local Human Resources Department, or the Legal Department at Company headquarters in Valley Forge, Pennsylvania, U.S.A. The Company will maintain confidentiality to the fullest extent possible.  If you are not comfortable with these options, you may also report suspected violations anonymously through the PQ/Potters Concern Line ("Concern Line").

The Concern Line is a service provided to the Company by an independent contractor.  Its employees are professional and are trained to handle all calls confidentially. The information callers provide will be reported to the Company's Legal Department for investigation and appropriate action. Callers will be assigned a confidential identification number which will enable them to inquire as to the status of an investigation.

The Company will not retaliate against or impose any other form of retribution on any employee as a result of their report of a suspected violations or improper activity.

## REQUIREMENTS FOR CONFIRMING COMPLIANCE WITH THE CODE

The Code is to be followed at all levels of our organization. If you have received this Code, it has been determined that your job classification is of such a nature that you must verify compliance with the Code.

After you have completed reading the Code and any related policies and procedures, please print out this Acknowledgment page, sign it and return it to the Legal Department at PQ Valley Forge Headquarters, 1200 W. Swedesford Road, Berwyn, PA 19312.

### ACKNOWLEDGMENT

By signing below, I certify that I have received, read, understand and will abide by the Company's Code of Conduct and I am not aware of any violations of the Code.

Name:  THOMAS J. PULLUKAT
PRINT YOUR NAME

Signature:  _Pullukat_

Title: Global Commercial Director, Silica Catalysts

Location: _____

Date: 1/22/07

# EXHIBIT  C

## *PQ CORPORATION CONSULTING SERVICES -- TERMS AND CONDITIONS*

The following terms and conditions apply to and are incorporated in Appendices A+B

1.  PQ engages SILCAT Consultants, LLC (hereafter named in this agreement and the in the Appendices "Consultant") to provide consulting services as set forth in the Appendix A.  PQ and "Consultant" agree that the terms and conditions herein, along with the terms and conditions set forth in Appendix A + B, constitute the complete agreement between "Consultant" and PQ ("Agreement").

2.  Consultant will act as an independent contractor and not as an agent or employee of PQ. Classification as an independent contractor renders Consultant, and its employees, agents or representatives, ineligible for any PQ employee benefit coverage, participation or service credit, including without limitation medical, life and disability, pension, retirement, bonuses or other incentives, paid or unpaid leave, worker's compensation, unemployment, and statutory disability or family leave.  PQ shall have no obligation to provide such benefits to Consultant or any employee, agent or representative of Consultant, or any dependent or beneficiary of the foregoing, and no such right or entitlement is created by this Agreement, regardless whether such benefits are made available to individuals classified by PQ as employees.  If any governmental agency should reclassify Consultant's status, such re-classification shall have no effect on Consultant's continuing ineligibility to participate in any PQ benefit program, and shall not cause Consultant to be eligible to participate retroactively in any PQ benefit program.

3.  This Agreement requires the personal services of Consultant (as defined in Appendix A) for a period of 2 years beginning November 15, 2006 and is not assignable by Consultant.  The services performed under this Agreement shall accomplish the results as set forth in Appendix A; the manner in which the consulting services are performed will be determined by Consultant after consultation with PQ staff. This Agreement shall be freely assignable by PQ.

4.  Consultant hereby assigns to PQ the sole ownership and all rights and title to the results of the services, including any inventions, innovations, or product or process improvements created by Consultant; any written materials, analyses, reports, drawings or plans; any computer software or code; and other tangible and intangible results of the services.  As sole owner of such right and title, PQ shall be entitled to patent, register, assign, copy, use, disclose, commercially market or otherwise deal with all or any part thereof as it may choose, without any further obligation to Consultant.

5.  Consultant shall accurately complete all federal, state and local forms relating to compensation, including IRS Form W-9, required by PQ for tax purposes.  Consultant shall accept sole responsibility for timely, accurate and complete reporting of and withholding from such compensation. Consultant shall pay all employment taxes and benefits, including without limitation worker's compensation, statutory disability insurance and unemployment insurance applicable to Consultant and his/its employees.

6.  Consultant will not directly or indirectly, solicit for employment, or hire, any of the employees of PQ during the term of this Agreement and for a period of one (1) year after termination of services.



ATTACHMENT 1
EXHIBIT C

7.    Confidentiality/ Non-Compete (Limitations in this section and in the prior section 6 apply to SILCAT Consultants, LLC and to all references in this Agreement which refer to "Consultant")

    a.    The terms of this Agreement shall be held confidential by both Consultant and PQ.

    b.    The performance of the Consultant services contracted for herein may require PQ to disclose to Consultant information that is proprietary and or confidential to PQ Corporation or its affiliates ("Information").  Consultant agrees to use the Information only for the benefit of PQ, and not to directly or indirectly publish or disclose the Information to any third party without the prior written consent of PQ.  The foregoing restrictions against use and disclosure of information shall likewise apply to any reports, memoranda, designs, drawings or summaries prepared by Consultant for PQ in connection with the performance of services hereunder, whether written or stored on electronic media or in whatever form. These obligations of confidentiality shall extend for a period of three (3) years after the termination of this Agreement.

    c.    The Consultant agrees that while this agreement is in place, it will not engage in or participate with or assist another person or entity involved in the manufacture, sales and marketing of silica- supported catalysts that are competitive with PQ. Said provision does not preclude the consultant from working with other companies including companies that use silica-supported catalysts during the time it is working with PQ, as long as such work is not with persons or entities involved directly in the manufacture of silica - supported catalysts.

8.    SILCAT Consultant, LLC shall indemnify PQ and its agents and employees against any claims by third parties as a result of willful misconduct or negligence on the part of Consultant. The parties agree, however, that Consultant's indemnification obligation does not include liability arising from any decision made by PQ based on Consultant's advice or recommendation(s). Consultant represents that it is not party to any agreement that would prohibit or restrict the services it is going to provide to PQ.

9.    Consultant acknowledges that the restrictions contained in paragraphs 6 and 7 of this agreement are reasonable and necessary in view of the nature of PQ's businesses and in order to protect its legitimate business interests.

10.    Either party shall have the right to terminate its obligations under the Agreement at any time in the event of a breach of any of its terms by the other party. In the event of a breach, the party alleging the breach will provide to the breaching party written notice of such breach, giving that party 10 business days to cure such breach. Failure to cure the breach will result in the party being able to exercise their right to terminate the Agreement.

Agreed to by Consultant and PQ

SILCAT Consultants LLC: _____

BY:     THOMAS  J. PULLUKAT



ATTACHMENT 1
EXHIBIT C

TITLE: _Managing Director_____

DATE: ____11/14/06_____

**PQ CORPORATION**

BY:    Bill Sichko_____WJSichko_____

TITLE: Chief Administrative Officer_____

DATE: 11/7/06



**Appendix – A**
**Consulting Activities – Tom Pullukat/SILCAT Consultants, LLC**

- Activities of the consultant will be focused on two main areas:  Manufacturing and Strategy for Silica Catalyst market development, specifically Asia.
- All assignments to "Consultant" and associated discussions will be directed to/through John Lau or his designee.

## Manufacturing

1.) Provide technical support to Silica catalyst operations in New Jersey and Kansas City, focused on improving quality and production rate and cost reduction opportunities without affecting catalyst quality.

2.) Provide on-site technical support to KC plant during expansion of SC unit.

## Strategy Planning

1.) Identify new potential partners in Asia for silica catalyst venture and business growth.

2.) Active in the evaluation new partners/customers on aspects of technical feasibility, potential competitive technologies and market potential.

- Activities noted above may require periodic travel, inclusive of International travel.

 11/14/06

ATTACHMENT 1
EXHIBIT C

### Appendix B
### Consulting Agreement Terms – Tom Pullukat/ SILCAT Consultants, LLC

1.) Term of agreement - 24 months starting November 15, 2006 and ending November 14, 2008.

2.) Consultant fees- Consultant to paid at a rate of $1,250 per day gross, with a minimum Guarantee of 40 days or minimum annual fee of $50,000. A 1099 will be issued at YE. Fees are paid on a monthly basis, per number of days worked for a given month as requested by PQ and worked by Consultant.

3.) Consultant will invoice PQ on a monthly basis, with payments to consultant to be made within two weeks of invoice receipt.

4.) Consultant is responsible for filing and reporting the taxes associated with the fees they receive as part of this agreement.

4.) Consultant will receive reimbursement for any travel related expenses it incurs while performing any of the activities noted in Appendix A. All expenses will be reimbursed under the same conditions as the PQ T+E policy, these include business-class airfare for International Travel..

5.) Consultant will submit all requests for expense reimbursement to the attention of Joanne Kreckmann for Bill Sichko's signature and approval.

6.) Consultant's reports and recommendations related to any of their work will be submitted to Bill Sichko and John Lau concurrently.

7.) The maximum number of days the consultant will perform services will normally not exceed 8 days per month, except on the occasion of International work. In any case the work requested of the "Consultant" will not exceed, 60 days per year.


11/14/06

ATTACHMENT 1
EXHIBIT C

# EXHIBIT  D

 **The PQ Corporation**

Corporate Headquarters
P. O. Box 840
Valley Forge, PA 19482-0840
(610) 651-4200

Dr. Thomas Pullukat
1613 Cherry Ridge Drive
Heathrow, Florida 32746

January 15, 2007

Dear Tom:

As we have discussed, you recently received an offer of re-employment from PQ that is set to begin on or around January 16, 2007. In accepting such offer, both parties agree to terminate the Consulting services agreement without prejudice and acknowledge that the conditions regarding confidentiality no longer apply, having been replaced by the conditions in the employee agreement signed as part of the re-employment offer.

Once the employment offer is officially accepted a formal cancellation of the current consulting agreement will be issued.

Sincerely,

Kevin Doran
Vice President Human Resources

ATTACHMENT 1
EXHIBIT D

# EXHIBIT  E

 **The PQ Corporation**                                    **Employee Agreement**

WHEREAS, the undersigned hereinafter referred to as "Employee", is or about to be employed by PQ Corporation, hereinafter referred to as "Corporation", in a capacity such that the performance of his/her duties may involve exposure to, handling, or aquiring of confidential information, which may lead to inventions or suggestions by him/her helpful in the conduct of Corporation's business, and to his/her knowledge of confidential information relating to such business.

NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) to Employee in hand paid by Corporation, receipt whereof is hereby acknowledged by Employee, and in consideration of the salary heretofore or hereafter paid to Employee by Corporation, Employee intending to be legally bound and to bind as well his/her heirs, executors and administrators, agrees that:

1. Employee shall promptly, fully and completely disclose to Corporation every invention made, conceived or developed by him/her solely or jointly with another or others during the period of his/her employment by Corporation and which relates to methods and equipment of production, products and their uses, and methods of conducting business used by, useful to, or made by the Corporation.

2. At the request of an officer of Corporation, Employee, either during or after termination of his/her employment, shall execute or shall join in executing applications for letters patent in such countries and for such inventions contemplated by paragraph 1 hereof as Corporation may direct, which applications shall be prosecuted at the expense of the Corporation by attorney or agent chosen by it; and Employee shall execute and deliver or join in executing and delivering assignments to Corporation of the entire right, title and interest in and to said inventions and the applications and letters patent therefore, and shall execute or join in executing all papers necessary or desirable in the opinion of Corporation to carry out the spirit and intent hereof and shall give all reasonable assistance in establishing, protecting and maintaining the rights of Corporation in said inventions, applications and letters patent in accordance with this agreement.

3. Without the written consent of Corporation, Employee agrees that he/she will not use for his/her own benefit or publish or disclose to others than Corporation or its employees (a) the subject matter of any invention contemplated by this Agreement or of any invention of another employee of Corporation prior to the issue of letters patent therefore, or (b) any trade secrets or confidential data relating to Corporation, its products, prospective products, processes, machines, methods, operations or business, or (c) any trade secrets or confidential information of third parties received by the Corporation under confidentiality agreement.

4. Employee covenants and agrees that he/she will not directly or indirectly, whether as principal, agent, employee, consultant, stockholder, partner, venture, lessor, lessee, or in any other capacity, engage or participate in a business competitive with that of Corporation for a period of one (1) year from the date of termination of his/her employment with Corporation. Where the Employee's activities on behalf of Corporation have been in a limited geographical area, the restrictions shall be applicable in those areas which Employee served during the last two (2) years of employment with Corporation. It is agreed that if Employee's duties involve assignment at Corporate Headquarters or at the Research and Development Facilities, the geographical area of Employee's involvement is the United States.

5. No change in the amount of salary hereafter paid Employee by Corporation or in the nature of the services and duties required from or assigned to him/her by it or in the department or plant to which Employee is assigned shall in any way affect the obligation of Employee to Corportion under any of the provisions of this Agreement.

**6. EMPLOYEE'S EMPLOYMENT IS TERMINABLE AT WILL, EITHER BY EMPLOYEE OR BY CORPORATION, AND THE TERMINATION OF THE EMPLOYEE'S EMPLOYMENT SHALL NOT RELEASE EMPLOYEE FROM HIS/HER OBLIGATIONS HEREUNDER; AND IN THE EVENT OF EMPLOYEE'S SUBSEQUENT REEMPLOYMENT BY CORPORATION, THIS AGREEMENT AND ALL THE PROVISIONS THEREOF SHALL, WITHOUT FURTHER ACT ON THE PART OF THE CORPORATION OR EMPLOYEE, CONTINUE IN FULL FORCE AND EFFECT.**

IN WITNESS WHEREOF, the employee has hereunto set his/her hand and seal this _22nd_ day of _January_, _2007_.

_____
Witness

_____
Signature

                              THOMAS J. PULLUKAT
                    _____
                    Name (Please Print)

ATTACHMENT 1
EXHIBIT E

PQ-1072-B

# EXHIBIT  F

Registered patent 10-1211924

*WHAT IS CLAIMED IS:*

Claim 1
A method for preparing a catalyst precursor for an olefin polymerization catalyst, the catalyst precursor comprising an silica xerogel inorganic support material that includes $SiO_2$ having 90% ~ 100% by weight, said silica xerogel carrying a chromium salt, aluminum carboxylate and boric acid within the pore structure of the inorganic support material, said method comprising:

i) a step of providing a silica xerogel inorganic support material containing 90% ~ 100% by weight with porosity of 0.5 ~ 4.0 $cm^3/g$;

ii) a step of providing a solution containing chromium salt, aluminum carboxylate and boric acid in the solvent which is water, $C_1$~ $C_4$ aliphatic alcohol, or a mixture thereof

iii) a step of depositing said solution onto said inorganic support material; and

iv) a step of removing said solvent to form the catalyst precursor containing chromium salt, aluminum carboxylate and boric acid within said silica xerogel pore structure

Claim 2
A method for preparing a catalyst precursor according to claim 1, wherein said solvent is removed by evaporation

Claim 3
A method for preparing a catalyst precursor according to claim 1, wherein said silica xerogel is prepared by evaporating water from silica hidrogel

Claim 4
A method for preparing a catalyst precursor according to claim 1, wherein Said silica xerogel is prepared by evaporating water from silica hydrogel by solvent exchange with a water-miscible solvent and removal of said water-miscible solvent

Claim 5
A method for preparing a catalyst precursor according to claim 1, wherein said aluminum carboxylate is aluminum acetate

Claim 6
A method for preparing a catalyst precursor according to claim 5, wherein said chromium salt is carboxylate, sulphate, chloride or a mixture thereof

Claim 7
A method for preparing a catalyst precursor according to claim 6, wherein said chromium salt is chromium carboxylate

Claim 8
A method for preparing a catalyst precursor according to any of claims 1 through 7, wherein said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element

- 2 -

Claim 9
An olefin polymerization catalyst precursor including silica xerogel having 90% ~ 100% by weight of $SiO_2$ and comprising within said silica xerogel pore structure chromium salt, selected from chromium carboxylate, chromium sulphate, chromium chloride, or mixtures thereof; aluminum carboxylate; and boric acid.


Claim 10
An olefin polymerization catalyst precursor according to claim 9, wherein
said aluminum carboxylate is aluminum acetate


Claim 11
An olefin polymerization catalyst precursor according to claim 10, wherein
said chromium carboxylate is chromium carboxylate


Claim 12
An olefin polymerization catalyst precursor according to claim 11, wherein
said chromium salt is chromium acetate


Claim 13
An olefin polymerization catalyst precursor according to any of claims 9 through 12, wherein
said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element


Claim 14
A method of preparing an olefin polymerization catalyst that includes heating of the catalyst precursor according to claim 13 for 30 minutes ~ 15 hours at 200 ~ 1,200°C in a non-reducing atmosphere


Claim 15
Method of polymerizing one or more $C_2$ ~ $C_8$ α-alken, wherein
said polymerization process is carried out in the presence of the olefin polymerization catalyst prepared with a method according to claim 14


Claim 16

Deleted


Claim 17

Deleted


Claim 18

Deleted


Claim 19

Deleted


- 3 -

# EXHIBIT  G



# ⊙ KD Corporation

**KD Corporation** is a leading producer of silica gel products such as Catalysts, HPLC & LC gel, Anti-Blocking Agent, Matting Agent and Dynamic drying in Asia. We strive for customer satisfaction through our Research and Development capability and state of the art technology. Our products are certified by ISO 9002 and are exported globally.

We are very pleased to receive favorable feedback from overseas buyers as well as customers in Korea.

| | |
|---|---|
| Company Name | KD Corporation, Ltd. |
| Established | Aug 1, 1973 |
| Head Office & Plant | Sihwa Industrial Complex Chemical Zone 1 Da 102 (1235-3, Jeongwang-dong, Siheung-si, Gyeonggi-do, Korea ) |
| Songdo Plant | Incheon Free Economic  Zone (IFEZ) (13-43, Songdo-dong, Yeonsu-gu, Incheon , Korea) |
| USA Branch office | Drive Lake Mary, FL 32746 USA |
| EU Branch office | Panningen The Netherlands |
| Business Focus | Manufacture and Sale of Silica Catalysts & Silica gel |

# ATTACHMENT  2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| In re: Application of PQ Corporation for Ex Parte Order to Obtain Discovery for Use in Foreign Proceedings | ) ) ) ) ) | Misc. Case No.: _____ |

DECLARATION OF HWAN SUNG PARK
IN SUPPORT OF
APPLICATION OF PQ CORPORATION FOR
AN EX PARTE ORDER PURSUANT TO 28 U.S.C. §1782(a)
TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

Hwan Sung Park, declares as follows:

1.      I am a partner in the law firm of Lee & Ko in Seoul, Korea. I am registered to practice law in the Republic of Korea and am licensed to practice patent law. I make this declaration based on my personal knowledge.

2.      The laws of the Republic of Korea do not provide for pre-trial discovery of factual information in the possession of a third party, except under limited circumstances.  Korean courts permit a pre-trial discovery process in cases where there is a threat that evidence may become unavailable unless an evidentiary preservative measure is taken before or during the pre-trial stage of litigation is taken.  For example, a pre-trial discovery process is generally available in medical lawsuits where it is necessary to take evidence (such as vital signs) right away. In order to conduct a pre-trial discovery by a Korean court, the relevant evidence/witness must be located in Korea.  Pre-trial discovery, as it is conducted in the United States, is not available in Korea.

3.      Nor do the laws of the Republic of Korea provide for compulsory discovery from a resident of the United States.

**ATTACHMENT 2**

4.      The laws of the Republic of Korea do not prohibit use of information obtained from discovery in the United States. Rather, such information is treated as any other evidence that a party may submit to the Korean courts.

5.      PQ has informed us that they are interested in pursuing an action for trade secret misappropriation and patent infringement against Kukdong Corporation (KD Corporation) in the Republic of Korea. Upon information and belief, a former PQ employee and U.S. resident, Thomas J. Pullukat, may have information relevant to these claims.

6.      PQ has informed me that it has two registered Korean patents. Attached as Exhibits A and B are true and correct copies of PQ's two registered Korean patents.

7.      Information available from Mr. Pullukat regarding his communications with Kukdong relative to PQ's trade secrets and the subject matter of PQ's allowed Korean patent claims would be welcomed by the Korean courts.

8.      Although the issue of the admission of such evidence would be in the discretion of the trial court, based on the high level of relevance and materiality of this information to PQ's trade secret and patent infringement claims against Kukdong, it is highly likely that the Korean courts would welcome such information and would receive it in evidence in any trade secret and patent infringement action between PQ and KD.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 7, 2013

HWAN SUNG PARK
Attorney at Law
Lee & Ko

# EXHIBIT  A

Registered patent 10-1095944



**(19) Korea Intellectual Property Office (KR)**
**(12) Registered Patent Publication (B1)**

(45) Publication Date:   December 19, 2012
(11) Registration No.:   10-1095944
(24) Registration Date:   December 13, 2012

(51) International Patent Classification (Int. Cl.)
*C08F 4/22*   (01. 2006)   *C08F 4/12*   (01. 2006)
*C08F 10/00* (01. 2006)   *C08F 210/16* (01. 2006)
(21) Application No.       10-2010-7011247
(22) Application date (Int'l)              October 15, 2008
    Date requested for examination      January 21, 2011
(85) Translation submission date         May 24, 2010
(65) Laid-open publication No.           10-2010-0093529
(43) Laid-open publication date          August 25, 2010
(86) International application No.        PCT/GB2008/003488
(87) International laid-open No.          WO 2009/053672
    International Laid-open date          April 30, 2009
(30) Priority claim
    0720983.6  October 26, 2007  Great Britain (GB)
(56) Prior art research references
    EP0055864 A2*
    KR1020020047149 A*
* References cited by the examiner

(73) Patentee
    PQ Silicas UK Limited
    4 Liverpool Road, Bank Quay, Warrington
    WA5 1AB, Chelshire, England
(72) Inventor
    Christine Elizabeth Marsden
    4 Lime Wood Close, Chester, 4HD CH2,
    England
    Robert Joseph Parker
    226 Warrington Road, Penketh, Warrington,
    Cheshire, WA5 2RX, England
(74) Agent
    YOU ME Patent & Law Firm

Total number of claims: 4

Examiner: Hee Mahn Kang

(54) Title of the Invention: **Catalyst precursor particles, their preparation and use**

**(57) ABSTRACT**

A method for preparing a catalyst precursor for an olefin polymerization catalyst involves the use of aqueous solutions or alcoholic solutions of a chromium salt and of boric acid and aluminum carboxylate for deposition onto an inorganic support material, such as a silica xerogel. Said chromium salt, aluminum carboxylate and boric acid are sufficiently soluble for deposition from a single solution to be effective. Said catalyst precursor can be activated by calcination to form a catalyst for homo- or co-polymerization of α-olefins having productivity and melt flow index for the resulting polymer or copolymer which is comparable to the results obtained with catalysts prepared by the organometallic routes of the prior art. The activation of said catalyst precursor generates reduced levels of toxic or noxious fumes during activation compared to the use of organometallic sources of chromium or aluminum.
.

*WHAT IS CLAIMED IS:*

Claim 1
Deleted


Claim 2
Deleted


Claim 3
Deleted


Claim 4
Deleted


Claim 5
Deleted


Claim 6
Deleted


Claim 7
Deleted


Claim 8
A method of preparing the catalyst precursor for an olefin polymerization catalyst that comprises an inorganic support material carrying chromium  salt, aluminum carboxylate and boric acid, said inorganic support material is silica xerogel containing 90% ~ 100% by weight of $SiO_2$ comprising:

i) a step of providing an inorganic support material;

ii) a step of depositing chromium salt onto said inorganic support material from the first solution that contains chromium salt in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof;

iii) a step of depositing aluminum carboxylate and boric acid onto said inorganic support material from the second solution that contains aluminum carboxylate and boric acid in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof; and

iv) a step of removing said solvent to form the catalyst precursors that contain chromium salt, aluminum carboxylate and boric acid,

Here, said chromium salt is deposited onto said inorganic support material from said first solvent, and the solvent is removed before said aluminum carboxylate and boric acid are deposited onto said inorganic support material from said second solution.


Claim 9
A method of preparing the catalyst precursor for an olefin polymerization catalyst that comprises an inorganic support material carrying chromium  salt, aluminum carboxylate and boric acid, said inorganic support material is silica xerogel containing 90% ~ 100% by weight of $SiO_2$ comprising:

i) a step of providing an inorganic support material;

ii) a step of depositing chromium salt onto said inorganic support material from the first solution that contains chromium salt in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof;

- 2 -

iii) a step of depositing aluminum carboxylate and boric acid onto said inorganic support material from the second solution that contains aluminum carboxylate and boric acid in the solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or mixtures thereof; and

iv) a step of removing said solvent to form the catalyst precursors that contain chromium salt, aluminum carboxylate and boric acid,

Here, after said step i), a step is carried out in which said aluminum carboxylate and boric acid in said step ii) are deposited in the first place onto said inorganic support material from said second solution.

Then, the solvent is removed from said second solution.

Subsequently, a step is carried out in which said chromium salt in said step ii) is deposited onto said inorganic support material from said first solution.


Claim 10
Deleted


Claim 11
A method of preparing a catalyst precursor according to claim 8 or claim 9, wherein
said solvent is removed by evaporation


Claim 12
A method of preparing a catalyst precursor according to claim 8 or claim 9, wherein
said inorganic support material is silica xerogel that is prepared by evaporating water from silica hydrogel


Claim 13
Deleted


Claim 14
Deleted


Claim 15
Deleted


Claim 16
Deleted


Claim 17
Deleted


Claim 18
Deleted


Claim 19
Deleted


Claim 20
Deleted


- 3 -

Claim 21
Deleted


## SPECIFICATION


### FIELD OF ART

[0001]   The present invention relates to porous inorganic particles, particularly silica particles, carrying chromium and aluminum compounds, and the preparation methods thereof. Said particles, particularly silica particles, may be activated so as to form catalyst particles for use in the polymerization of olefins (α-alkenes).

### BACKGROUND ART

[0002]   Typical activated catalysts for use in the polymerization process of olefins comprise chromium oxide carried on a porous inorganic support. For many uses, it is desirable if aluminum oxide is also present, either as part of the inorganic support itself (for instance in cases where the support is a silica-alumina co-gel support), or carried in the pore structure of the porous inorganic support.

[0003]   The incorporation of mixtures of oxides into the molecular structure of the inorganic support tends to weaken said structure and make it more difficult to achieve high porosities for the inorganic porous support material. For this reason, it is desirable to have alumina included along with the chromium oxide within the pore structure (i.e. deposited on the pore surfaces) of the inorganic porous support material.

[0004]   U.S. Patent 3,984,351 discloses olefin polymerization catalysts prepared by depositing a chromium compound and an aluminum compound on an inorganic support material and heating said support material in a non-reducing atmosphere at a temperature above 300℃. The resulting material is then combined with a metal or non-metal reducing agent, preferably a boron-containing compound, to provide a catalyst to be used in the polymerization of olefins. Silica xerogels are presented as preferred support materials. Said catalysts are prepared by depositing chromium and aluminum compounds on the inorganic support. The compounds presented are organic compounds and said deposition is made from an inert, organic solvent. The disclosed catalyst system provides improved olefin polymer characteristics, such as improved melt indexes.

[0005]   GB 1 575 352 discloses the preparation method and use of supported, chromium-containing catalysts to be used for polymerization of one or more α-alkenes. In the process disclosed, a chromium 1, 3-diketo compound such as chromium acetyl acetonate is reacted with an organometallic compound of a Group IIA or Group IIIA metal, preferably with aluminum or magnesium, from the periodic table of elements. For instance, tri-isobutyl aluminum may be used. If the organometallic compound is added to the chromium compound, the chromium compound is melted in aliphatic or cycloaliphatic solvents such as heptane, making it possible to use the resultant solution for impregnation of a porous inorganic support material. The chromium and metal compounds can then be deposited on surfaces within the pore structure of the inorganic support material by evaporation of the solvent. Preferred porous inorganic support materials are silicas.

[0006]   After removal of the solvent, the impregnated particles (i.e., inorganic porous support particles impregnated with chromium and metal compounds) need to be activated in order to make them useful as catalyst particles. In general, since the carrier particles are sold and transported in unactivated form (referred to in this specification as unactivated catalyst particles), they require activation prior to being used as catalyst particles for olefin polymerization. Activation is carried out by heating the unactivated catalyst particles at a high temperature such as 200℃ ~ 1200℃ for a few seconds, but typically for several hours in a non-reducing atmosphere such as nitrogen, inert gas or carbon dioxide such that the chromium is converted to a chromium VI state. Once activated, the catalyst is used at once, or stored in a dry, inert atmosphere until it is used.

[0007]   According to the process of GB 1 575 352, a porous inorganic carrier material can be simultaneously impregnated with both chromium compound and aluminum compound.  However, said method requires that the chromium and aluminum compounds be dissolved in an aliphatic and/or cycloaliphatic solvent, leading to potential flammability and solvent recovery problems when evaporating the solvent following impregnation. Furthermore, the chromium and aluminum compounds present on the unactivated catalyst particles are complex organometallic compounds. When the unactivated catalyst particles are subjected to activation by heating in a non-reducing or an oxidizing atmosphere, the degradation of these compounds leads to the formation of odorous and potentially toxic fumes, leading to a requirement for containment, scrubbing and emission control. Furthermore, we the inventors have found that some solutions of chromium and aluminum compounds have high viscosities, and so are unsuitable for impregnation of the solution into the pore structure of an inorganic porous support material.

- 4 -

[0008]   WO 99/12978 discloses catalysts prepared by a process comprising a first stage in which a porous inorganic oxide support is impregnated with a chromium compound and am optional second stage in which the product obtained from the first stage is impregnated with either a titanium or an aluminum compound. Said chromium compound is a chromium oxide or a chromium compound, which can be converted to chromium oxide by calcining such as chromium nitrate, sulphate, carbonate, acetate, acetyl acetonate, aluminum chromate or tert-butyl chromate. The aluminum compounds presented are acetyl acetate, acetyl acetonate, alkoxy or alkyl types. The solvents to be used are not specified, but the aluminum compounds presented would not be significantly soluble in polar solvents. There are potential problems, which may arise from carrying out chromium compound impregnation and aluminum compound impregnation as separate steps by a method such as that disclosed in WO 99/12978. The first impregnation, which follows solvent removal, may lead to partial or complete blocking of the pore structure of the inorganic porous carrier material, possibly making it more difficult, or impossible, for a second impregnation to be carried out effectively. Furthermore, even though such pore blocking does not take place, the catalytic behavior of the mixture of chromium and aluminum may be modified because the chromium and aluminum are not co-mingled at the atomic level in the catalyst precursor. Instead, separate particles of aluminum compound may be deposited onto the chromium compound already present. This may lead to a change in the catalyst activity and a possible reduction in the melt index for the polymer produced using the activated catalyst.

[0009]   U.S. Patent 4,814,308 discloses a supported catalyst containing chromium, phosphorus and aluminum, each being in an oxide form, used in combination with a co-catalyst. The supported catalyst is formed by means of impregnating the porous support particles using chromium and aluminum organometallic compounds in an organic solvent. Said co-catalyst is lithium alkyl and boron alkyl. In the comparative example, which uses aluminum nitrate, phosphoric acid and chromium nitrate to deposit chromium and aluminum onto a porous silicate carrier, a catalyst precursor is produced having low productivity and low melt flow index compared to the organometallic route, when activated and used for polymerization of olefins.

[0010]   Hence, in order to form catalyst precursors that overcomes some or all of the problems of the prior art, there is a need for a method for impregnation of chromium and aluminum compounds onto inorganic porous support materials. There is also a need for the activated catalyst formed from the precursors in order to provide the melt flow index and productivity similar to that of the prior art catalysts that are prepared using organometallic compounds deposited from non-polar solvents, when the activated catalyst is used for homo-polymerization or co-polymerization of olefins. It is desirable to use an aqueous, or lower aliphatic alcohol, solution of chromium and aluminum compounds for impregnation of the inorganic support material. If such solvents are used instead of higher-grade aliphatic, non-polar compounds such as heptane, the process-related problems associated with solvent removal would be reduced just as the harmful substances are reduced during the evaporation process, particularly, in cases where water is used as a solvent. Although chromium salts such as nitrate, carboxylates (e.g., acetates and oxalates) and sulphate are soluble in water, lower aliphatic alcohols or their mixtures, it has been identified that dissolution of aluminum compounds along with the chromium compounds in order to form a mixed solution is generally not possible at the concentrations needed for deposition onto an inorganic support. It has also been identified that, in cases where a few soluble aluminum salts are used for deposition of aluminum onto an inorganic catalyst, the resulting activated catalyst, when used for olefin polymerization, provides reduced HLMI compared to a catalyst prepared from organometallic chromium and aluminum compounds.

[0011]   Hence there is a need to identify a method for including aluminum in a dissolved form in the solutions that contains chromium salts dissolved in water, $C_1 \sim C_4$ aliphatic alcohol, or mixtures thereof, which does not lead to the precipitation of insoluble chromium or aluminum salts. There is also a need to identify a method of depositing aluminum salts from water, $C_1 \sim C_4$ aliphatic alcohol, or mixtures thereof onto an inorganic carrier, along with chromium salts contained on the same inorganic carrier, so that the resulting activated catalyst has similar properties to prior art catalysts prepared using organometallic compounds deposited from non-polar solvents.

[0012]   Furthermore, many of the chromium and/or aluminum compounds used in the prior art, particularly organometallic compounds, can generate noxious or toxic fumes during the activation or calcination of catalyst precursor in order to form activated catalyst. This may require complex fume treatment equipment at the site where the catalyst precursor is activated.

### *DESCRIPTION OF THE INVENTION*

### *TECHNICAL PROBLEMS TO BE SOLVED BY THE PRESENT INVENTION*

[0013]   Above all, it is an object of the present invention to provide a method for preparing catalyst precursors by deposition of chromium and aluminum from aqueous or alcoholic solvent-based solutions. It is another object of the present invention to provide a method for preparing catalyst precursors which can avoid the formation of noxious or toxic fumes during catalyst activation.

It is yet another object of the present invention to provide catalyst precursors which, when activated, can provide catalysts for homo-polymerization or co-polymerization of α-alkenes (olefins) having activities similar to prior art catalysts prepared by organometallic method, and which can be used to form polymers with melt indexes equal to or greater than the values achieved with such prior art catalysts.

### *MEANS FOR SOLVING THE PROBLEMS*

[0014]   Surprisingly, it has been found that solutions of chromium and/or aluminum compounds in water, $C_1 \sim C_4$ aliphatic alcohol, or mixtures thereof can be prepared with sufficiently high concentrations of chromium and/or aluminum to be useful for coating or impregnating inorganic support material in order to form unactivated catalyst particles (i.e., catalyst precursor particles) comprising chromium and aluminum compounds deposited on the inorganic support material. Said solutions can have sufficiently low viscosity for penetrating the pore structure of porous inorganic support materials. Since the solvent can be easily removed by evaporation to form the catalyst precursor, the problems relating to loading the atmosphere with volatile organic compounds or flammability are reduced, particularly in cases where the solvent is water or includes water. Moreover, the selected compounds are such that their decomposition, along with the decomposition of any and all residual solvent, during the activation of the catalyst, does not generate toxic or noxious fumes like those formed by some organometallic compounds and solvents used in the prior art.

[0015]   Moreover, sequential deposition of chromium compounds and then aluminum compounds, or sequential deposition in the reverse order, yields acceptable catalyst precursors having properties equivalent to those in which the chromium and aluminum compounds are deposited together.

[0016]   A first aspect of the present invention provides a catalyst precursor for an olefin polymerization catalyst comprising an inorganic support material that carries chromium salt, aluminum carboxylate and boric acid.

[0017]   A second aspect of the invention provides a method for preparing a catalyst precursor according to the first aspect of the present invention for an olefin polymerization catalyst comprising:

[0018]   i) a step of providing the inorganic support material;

[0019]   ii) a step of depositing a chromium salt onto said inorganic support material from a first solution comprising a chromium salt in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof;

[0020]   iii) a step of depositing an aluminum carboxylate and boric acid onto said inorganic support material from a second solution comprising an aluminum carboxylate and boric acid in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof; and

[0021]   iv) a step of removing solvent to form the catalyst precursor comprising chromium salt, aluminum carboxylate, and boric acid,

[0022]   *[Note: The source text at 0022 is included in 0017 due to the nature of the Korean sentence structure.]*

[0023]   Said chromium salt may be deposited onto the inorganic support material from the first solution. And solvent of the first solution may be removed before the aluminum carboxylate and boric acid are deposited from the second solution. Also, said process may be carried out by depositing the aluminum carboxylate and boric acid from the second solution to begin with, and by removing the solvent of the second solution before chromium salt is deposited from the first solution.

[0024]   Preferably, for process simplicity, the method of the second aspect of the present invention is executed using a single solution comprising chromium salt, aluminum carboxylate and boric acid.

[0025]   Hence, a preferred method of the second aspect of the present invention comprises:

[0026]   i) a step of providing the inorganic support material;

[0027]   ii) a step of providing a solution comprising chromium salt, aluminum carboxylate and boric acid in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof;

[0028]   iii) a step of depositing said solution onto said inorganic support material; and

[0029]   iv) a step of removing said solvent to form the catalyst precursor comprising chromium salt, aluminum carboxylate and boric acid.

[0030]   *[Note: The source text at 0030 is included in 0025 due to the nature of the Korean sentence structure.]*

- 6 -

[0031]   By "removing the solvent", those skilled in the art would understand that sufficient amount of solvent is removed in order to form a dry and free-flowing easy-to-transport catalyst precursor. This may mean that a portion of the residual solvent may remain as part of the catalyst precursor. For instance, the catalyst precursor may contain 15% or less residual solvent, preferably 10% or less, and still behave as a free-flowing powder. Any such residual solvent will be removed when the catalyst precursor is activated to form an activated catalyst. Alternatively, the solvent may be substantially fully removed from the catalyst precursor such that no unbound solvent may remain after solvent removal.

[0032]   The preferred aspects and embodiments of the present invention detailed below apply to both the first and second aspects of the present invention, where appropriate.

[0033]   A "catalyst precursor" means a product, which is suitable for handling and transporting to a site where it can be activated in order to be used as a catalyst, particularly as an olefin polymerization catalyst. Generally, such catalysts are activated by means of heating in a non-reducing atmosphere shortly before use as described below. Hence the catalyst precursor is a commercially useful material that can be used to form catalysts simply by activation or calcination.

[0034]   Carboxylate, nitrate, sulphate, chloride or a mixture thereof are suitable as chromium salt, but any appropriate chromium salt may be used. Chromium sulphates, chlorides or carboxylates are particularly preferred salts. Among those, carboxylates are particularly preferred as they do not generate toxic or noxious fumes during activation of the catalyst precursor. In addition to such a reason, chromium acetate is particularly preferred because of its high solubility in the solvents used in the method of the second aspect of the present invention. Suitably, the chromium salt should have solubility in the solvent such that said solution may comprise at least 1% by weight of chromium expressed as the element, preferably 2% or higher, and yet more preferably 4% or more.

[0035]   Suitably, the inorganic support material is a porous inorganic oxide.

[0036]   Typically, said inorganic support material is in the form of particles having a weight mean particle diameter ($D_{[4, 3]}$) of $1 \sim 300\mu m$. This typical mean diameter also applies to the catalyst precursor particles and to the activated catalyst particles, which have essentially the same particle diameter as the support material. This is measured by analyzing the particle size by means of light scattering Malvern Mastersizer™ model S having 300RF lens (measurement range $0.05 \sim 900\mu m$), Malvern Mastersizer™ software v. 2.18, and a DIF 2012 dispersion unit. This instrument made by Malvern Instruments, located in Worcestershire, Melbourne in Australia uses a Mie theory to calculate the particle size distribution. The Mie theory predicts how light is scattered by spherical particles and takes into account the refractive index of the particles. The real value used for silica refractive index is 1.4564. And  the real value is 0.1 for the imaginary refractive index of the particle (the absorption of light) when the refractive index of water dispersant is 1.33.

[0037]   Suitably, said particles have a $d_{90}$ of $500\mu m$ or less, preferably $400\mu m$ or less. Said particles may have a $d_{50}$ of $300\mu m$ or less. Said particles may have a $d_{10}$ of $1\mu m$ or more, preferably $10\mu m$ or more. (For the sake of clarity, $d_{90}$ is the diameter at which 90% by weight of the particles have a diameter less than $d_{90}$ and this definition applies to $d_{50}$ and $d_{10}$ as well). Preferably, said particles have a $d_{50}$ of $1 \sim 300\mu m$, more preferably $5 \sim 250\mu m$, and even more preferably $25 \sim 150\mu m$.

[0038]   Said particles may be prepared by comminution, which is optionally combined with size classification by a means such as sieving. Or said particles may be prepared by a method such as spraying-drying.

[0039]   Another advantage of the second aspect method of the present invention is that the chromium and aluminum are found to be more evenly distributed over particles of varying diameters when the inorganic support material is of a particulate form. Prior art methods such as the method described in GB 1 575 352 may lead to smaller particles of inorganic material that carries higher concentrations of the chromium and aluminum, thereby leading to potentially less effective utilization of the catalytically active surfaces during polymerization. Also, when the activated catalysts are used to catalyze polymerization, polymerization at active sites within the catalysts tends to lead to fragmentation of the support material. This fragmentation of the catalyst particles during polymerization is an important and advantageous characteristic as it means that the catalyst particles do not have to be removed from the polymer. However, if large un-fragmented catalyst particles remain in the polymer, they can form defects in the articles formed from the polymer. If large catalyst particles have fewer active sites, this can lead to poor fragmentation of these particles and consequent downstream process defects. The present invention provides larger catalyst particles having active sites with the same concentration as the active site of smaller particles, facilitating fragmentation of these larger particles and reducing or eliminating such process defects.

[0040]   Suitable inorganic support materials include oxides such as silica, alumina, mixed silica-alumina or oxides of zirconium, thorium or magnesium. Oxides of other elements may also be present as part of the atomic lattice structure of the inorganic support material. Suitably, the support material is in the form of an inorganic oxide gel, preferably a silica gel.

[0041]   When xerogel is the inorganic support material, xerogel may be prepared by means of spray drying by evaporating water from a hydrogel. Or, for example, it may be prepared by removing water from a hydrogel by solvent exchange with a water-miscible solvent such as, methanol, ethanol, ethyl acetate, isopropyl alcohol or some other suitable solvent, along with removal of the exchanging solvent from the resulting solvent-exchanged gel obtained by evaporation. Another method for removing solvent is by azeotropic distillation with a partially water-miscible solvent such as ethyl acetate. The solvent is added to the hydrogel and the mixture is distilled. A solvent-rich condensate is returned to the distilling mixture while the water-rich distillate is discarded, leading to replacement of the water in the hydrogel with the solvent. The resulting gel may then have the solvent removed by evaporation or other suitable means to form xerogel.

[0042]   For xerogels, which is prepared by water removal by means of water evaporation, said process generally leads to lower final pore volumes for the resulting xerogels than would a solvent exchange process to remove water. However, a xerogel prepared by a solvent exchange method is more prone to partial structural collapse (i.e., loss of porosity) than is a xerogel formed by evaporative drying of a hydrogel, when an aqueous or alcoholic solution (such as the chromium salt and/or aluminum salt solution or solutions of the present invention) enters the pore structure.

[0043]   In case of spray-drying, typically a hydrogel is comminuted to produce a dispersion in a solvent -- usually water -- which is fed to a spray dryer to flash off the solvent from slurry droplets by evaporation. This forms agglomerated -- typically spheroidal -- particles of dried or partially dried gel, depending on the drying conditions. Partially dried gel may be further dried to form xerogel by, for instance, evaporative drying or by solvent exchange as described above. Other combinations of said processes are possible. An example includes a further comminution step after spray drying. Freeze-drying is another suitable process, which may be used for the preparation of dried gel (where frozen solvent in a solid form, e.g., water as ice is removed by sublimation under vacuum).

[0044]   The second aspect method of the present invention is applicable to highly porous inorganic carriers such as those dried by solvent exchange, azeotropic distillation, or freeze-drying as well as to less porous inorganic carriers with lower porosities such as xerogels prepared by water evaporation.

[0045]   Hence, it was found that the second aspect method of the present invention can produce catalyst precursors, which can be activated to form effective olefin polymerization catalysts, without the need to use complex solvent removal methods such as solvent exchange in order to produce highly porous silica xerogels. Moreover, it was found that xerogels produced by simple water evaporation are less susceptible to pore collapse than more porous xerogels produced by complex drying processes when contacted with an aqueous or alcoholic solution of chromium salt such as carboxylate and/or aluminum carboxylate for deposition of the salts. Hence the present invention not only makes it possible to use a simple xerogel preparation process along with a solvent or solvents for loading or depositing chromium and aluminum that do not cause pore structure to collapse, but allows to load chromium and aluminum at a high level from the solution without an excessive risk of noxious, toxic or flammable fumes generated when the solvent in said solution is removed, or when the resulting catalyst precursor is activated by calcination.

[0046]   It should be emphasized that the second aspect of the present invention is also effective when used to form catalyst precursors from xerogels or other inorganic carrier particles made by other methods such as solvent exchange, azeotropic distillation, freeze drying, etc., and that it is not limited to use with xerogels formed by evaporative drying from a hydrogel.

[0047]   Silica xerogel is a suitable porous inorganic support material. Other oxides such as titanium or aluminum or mixtures of such oxides may be included in the atomic lattice structure of the silica xerogel, but these may not be present, either. Suitably, silica xerogels used in the present invention comprise 90% or more by weight of $SiO_2$, expressed as percentage by weight of the xerogel. This is because the presence of other oxides may lead to weakening of the silica skeletal structure, making it potentially more difficult to achieve high porosity in the pore structure of the inorganic support material. More preferably, the silica xerogels comprise 95% or more by weight of silica, more preferably 98% or more by weight of silica. The $SiO_2$ level in the xerogel is appropriately measured by an elemental analysis using XRF as described below.

[0048]   In this specification, unless otherwise explained, percentages by weight refer to percentages as measured by an elemental analysis using XRF. In other words, percentages are expressed in relation to the total material measured by XRF. The high temperatures used in sample preparation for XRF mean that all the volatile materials such as water will have been lost prior to measurement and will not be included. In case of boron, which is not measurable by XRF, percentages are calculated on the basis of a material dried at 500°C for 4 hours.

- 8 -

[0049]   Suitably, the inorganic support material has porosity of $0.5 \sim 4.0$ cm$^3$/g or $0.5 \sim 3.0$ cm$^3$/g, preferably of $1.0 \sim 3.0$ cm$^3$/g or $0.8 \sim 2.5$ cm$^3$/g, and more preferably of $1.0 \sim 2.0$ cm$^3$/g.

[0050]   Suitably the surface area of the inorganic support material is $100 \sim 1000$ m$^2$/g, for instance $200 \sim 800$ m$^2$/g, preferably $200 \sim 700$ m$^2$/g, for instance from 250 to 700 m$^2$/g, and more preferably $250 \sim 500$m$^2$/g. Said surface area, along with the pore volume, is measured by nitrogen porosimetry using an ASAP2420 analyzer (supplied by Micromeritics Ltd. located in Dunstable, Bedfordshire in UK). Samples are first outgassed at 270°C for at least 1 hour on said instrument's outgassing station prior to measurement. The sample tube (containing the outgassed sample) is transferred to the analysis station, submerged in liquid nitrogen and a nitrogen isotherm is determined. A multipoint surface area is calculated using a BET theory that takes data points in the $P/P_0$ range of $0.08 \sim 0.20$. The measurements of the pore volumes are recorded at $P/P_0$ of 0.98 on the desorption leg.

[0051]   When porosity and surface area measurements are carried out on the catalyst precursors, the samples are held in air at 500°C for 4 hours prior to measurement.

[0052]   The second aspect of the present invention may also be implemented by using a solution comprising chromium salt, aluminum carboxylate and boric acid in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof as the solvent used in a solvent exchange process to remove water from a hydrogel of the inorganic support material. The exchanged and hence loaded gel is then heated to have the solvent evaporated and the catalyst precursor is formed, loaded with chromium salt, aluminum carboxylate and boric acid. This process is suitable for use with hydrogels such as silica hydrogels and it provides the advantage that no additional drying step is needed such as is required when organometallic compounds are used in organic solvents for impregnation.

[0053]   In another method for implementing the second aspect of the present invention, the inorganic support material may be substantially free of unbound solvent prior to carrying out the method of the second aspect of the present invention. An unbound solvent means a solvent that can be removed by heating the inorganic support material in a vacuum oven at 140°C for 1 hour.

[0054]   Chromium salt, aluminum carboxylate and boric acid are suitably carried within a pore structure of the inorganic support material.

[0055]   For example, this may be achieved by spraying a solution comprising chromium salt, aluminum carboxylate and boric acid in a solvent, onto the porous inorganic support material, followed by the removal of the solvent. For example, if the porous inorganic support material is in a particulate form, the particles may be tumbled in a mixer such as a double cone blender while the solution is sprayed onto them. Subsequently, the particles may be dried in an oven or using a fluidized bed apparatus, or passed through a flash drier to remove solvent. Another method is to spray said solution onto the fluidized particles in a heated fluidized bed, whereby loading of said materials to the pore structure takes place concurrently with the solvent removal. As another method, for example, it is appropriate to disperse the particulate material in an excess solution, which is filtered to remove the excess solution, and then heat the particles by a suitable means such as an oven or in a fluidized bed apparatus in order to remove the solvent. Preferably, incipient wetting of porous carrier particles is used as the impregnation method, with the solution being drawn into the pore structure of the carrier particles by capillary forces. When the method of the present invention is carried out using two solutions (a first chromium salt solution and a second solution comprising aluminum carboxylate and boric acid), the same process described above may be used for the first solution, followed by repetition of the process for impregnation with the second solution (or vice versa).

[0056]   Carboxylate means a salt of an alky carboxylate. Suitable alkyl carboxylates include mono-, di-, and tricarboxylic acids with 6 or fewer carbon atoms per molecule, preferably 4 or fewer, and more preferably 2 or fewer. It was found that such carboxylates decompose upon activation of the catalyst precursor without excessively generating noxious or toxic fumes.

[0057]   Preferred monocarboxylates include formate, acetate, lactate and propionate. Preferred dicarboxylates include oxalate, malate, aleate [*sic. maleate*], malonate, glutarate, and succinate. And a preferred tricarboxylates is citrate. Mixtures of carboxylates may also be employed.

[0058]   Preferably, when the chromium salt is a carboxylate, it is chromium acetate. Preferably, the aluminum carboxylate is aluminum acetate.

[0059]   It was found that, if boric acid exists along with aluminum carboxylate, solubility of aluminum carboxylate in the aqueous and/or alcoholic solution is increased, which does not lead to precipitation of aluminum carboxylate at the concentrations needed for deposition onto the inorganic support material from the solution.

- 9 -

It was found that, if boric acid exists in a solution of the chromium salt and aluminum carboxylate, solubility of the aluminum carboxylate in the aqueous and/or alcoholic solution is increased, which does not lead to precipitation of the chromium salt or of the aluminum salt. Hence it facilitates loading of the inorganic support material from the solution. As a result, the inorganic support material contains boric acid as well after removal of the solvent.

[0060]   The levels of salts present in a solution will be selected by taking into account the pore volume of the inorganic support material in order to obtain desired loading levels for the catalyst precursor and the eventual activated catalyst. The levels needed depend upon the impregnation method used and porosity of the inorganic support material. The solution comprising chromium salt, aluminum carboxylate and boric acid suitably comprises 0.05% ~ 2% by weight of chromium expressed as the element, for instance, 0.1% ~ 1%. Said solution suitably comprises 0.1% ~ 4% by weight of aluminum expressed as the element, for instance, 0.2% ~ 2%. Said solution suitably comprises 0.01% ~ 0.4% by weight of boron expressed as the element, for instance, 0.02% ~ 0.2%. The upper limit of the chromium, aluminum or boron in the solution is not particularly important. Suitably, the ratio of aluminum to boron in the solution, expressed as aluminum/boron by weight, is 50/1 ~ 3/1, preferably 40/1 ~ 4/1, and more preferably 30/1 ~ 5/1. Suitably, the ratio of aluminum to chromium in the solution, expressed as aluminum/chromium by weight, is 25/1 ~ 1/2, preferably 8/1 ~ 2/3, and more preferably 4/1 ~ 1/1. When the solution for chromium salt, solution for aluminum carboxylate and solution for boric acid are separately used, typical and preferred levels are used, which are the same as those described above.

[0061]   A suitable means for incorporating boric acid into the solution involves the use of commercially available basic aluminum acetate stabilized with boric acid as the source of the aluminum carboxylate of the present invention. Preferably, basic aluminum acetate stabilized by boric acid is used as a source of aluminum carboxylate and of boric acid for the present invention. For example, this material is commercially available from Sigma Aldrich in the form of a white powder typically comprising 16 ~ 20% by weight of aluminum and 2.5% by weight of boron expressed as the elements.

[0062]   The catalyst precursor of the first aspect of the present invention or the catalyst precursor prepared by the second aspect of the present invention suitably comprises, as carried material, deposited on the surfaces of said catalyst precursor, of 0.01 ~ 3% by weight of chromium expressed as the element, preferably 0.1 ~ 2%, and more preferably 0.25 ~ 1.5%. Said catalyst precursor suitably comprises, as carried material, deposited on the surfaces of the catalyst precursor, of 0.1 ~ 8% of aluminum expressed as the element, preferably 0.2 ~ 4%, and more preferably 0.5 ~ 2.5%. Said catalyst precursor suitably comprises, as carried material, deposited on the surfaces of the catalyst precursor, of 0.005 ~ 2% of boron expressed as the element, preferably 0.05 ~ 0.5%, and more preferably 0.1 ~ 0.3% by weight. The term "on the surfaces" is meant to include the surfaces within any pore structure of the catalyst precursor in addition to any external surfaces. The levels of chromium and aluminum are suitably measured by means of XRF (X-ray fluorescence method) using a Phillips PW2400 instrument. Samples for analysis are prepared as fused beads using a lithium borate flux. Fusion is typically between 1000°C and 1250°C.

[0063]   Boron, which cannot be measured by XRF, is suitably measured in solution using ICP (Inductively Coupled Plasma) spectrometry. Typically an extract is generated by adding 10cm$^3$ of nitric acid to 1g of catalyst sample, boiling and subsequently diluting to 250 cm$^3$. Prior to analysis of the solution by ICP, this extract is filtered using a 0.45μm filter. Boron values are determined by comparison with boron standards in a matched acid matrix using a Varian ICP-OES (Inductively Coupled Plasma--Optical Emission Spectrometer). The value obtained is corrected to a dry basis value by measuring the weight equilibrium weight loss at 500°C for a catalyst precursor sample of the same provenance. The boron level is expressed as the weight of boron relative to the weight of 500°C-dried material.

[0064]   The amounts of chromium, aluminum and boron present as carried materials (i.e., typically, deposited on the surfaces of the catalyst precursor) are determined by comparison with the measured levels in the inorganic support material prior to impregnation to form the catalyst precursor. The levels present as carried material are obtained by subtracting any contribution from Cr, Al or B already existing in the structure of the inorganic support material. The terms "present as carried material" and "deposited on the surfaces" include the material on surfaces contained within all the pore structures of the inorganic support material.

[0065]   The solvent used to provide the solution of chromium salt, aluminum carboxylate and boric acid is preferably water, $C_1$ ~ $C_4$ aliphatic alcohol, or a mixture thereof. This is to avoid noxious, flammable or toxic fumes when the solvent is removed. Water, methanol, ethanol, isopropanol and mixtures thereof are preferred solvents. And water, methanol and ethanol and their mixtures are particularly preferred. And water, methanol and mixtures thereof are especially preferred. Water is particularly useful because of its lack of toxicity and flammability. Other solvents may also be used or incorporated into said preferred solvents at the levels such that they do not interfere with the performance of the present invention.

- 10 -

Registered patent 10-1095944

[0066]   Preferably, the solvent is removed by evaporation in order to leave the chromium salt, aluminum carboxylate and boric acid deposited in the inorganic support material. As described above, "removal" means that sufficient amount of solvent is removed such that a free-flowing and easily-transportable catalyst precursor is obtained. And as much as 15% or 10% or less by weight of solvent may still be present, expressed as percent by weight of the catalyst precursor, after solvent removal. Alternatively, solvent may be substantially removed such that there is no unbound solvent. An unbound solvent means a solvent, which can be removed by heating the inorganic support material in a vacuum oven at 140°C for 1 hour.

[0067]   A third aspect of the present invention provides an olefin polymerization catalyst obtained or obtainable by heating a catalyst precursor according to the first aspect of the present invention or prepared according to the method of the second aspect of the present invention in a non-reducing atmosphere at a temperature of 200 ~ 1200°C, preferably 300 ~ 1100°C, and more preferably 400 ~ 900°C for a time period of 30 minutes to 15 hours, preferably up to 8 hours, and more preferably up to 6 hours.

[0068]   Preferably, said non-reducing atmosphere is an oxygen-containing atmosphere such as air, oxygen or mixtures thereof. This process is known as activation or calcination of the catalyst precursor in order to form the active olefin polymerization catalyst.

[0069]   For catalysts of the prior art, particularly those where the catalyst precursor was loaded with organometallic chromium and aluminum compounds delivered from aliphatic solvents, this activation process could lead to generation of noxious and/or toxic volatile components as the chromium and aluminum compounds decomposed during the activation process. The present invention avoids generation of such undesirable by-products of activation.

[0070]   Typically, the activated olefin polymerization catalyst comprises chromium, aluminum and boron at the levels similar to the preferred levels described above for the catalyst precursor. The measurement techniques for Cr, Al and B include pre-treatment before or during analysis such that the measured levels for catalyst precursor and activated catalyst are practically the same. Thermally activated diffusion during the activation / calcination process for the catalyst may lead to the carried Al and Cr diffusing into the structure of the inorganic support material, rather than being present on its surfaces. The levels of chromium and aluminum are suitably measured by means of XRF as described above. Boron is also measured as described above. The amounts present as carried material on the catalyst are obtained by subtracting the measured amounts of Cr, Al and B already existing in the inorganic support material prior to impregnation to form a catalyst precursor.

[0071]   A fourth aspect of the present invention relates to a method for polymerization of one or more $C_2 ~ C_8$ α-alkenes characterized in that polymerization is carried out in the presence of an olefin polymerization catalyst according to the third aspect of the present invention. Mixtures of alkenes or alkenes in combination with other monomers may be employed. The use of the catalysts prepared from the catalyst precursors of the present invention according to the method of the present invention is not particularly restricted to alkene polymerization, but it is particularly suitable for that purpose. Co-catalyst prepared from the precursors of the present invention or co-catalyst in combination with the catalyst prepared in accordance with the method of the present invention may be used. Typically, after activation of the catalyst, it is cooled to the ambient temperature and stored ready for use in polymerization. The catalyst prepared according to the present invention may be used in a variety of homo- or co-polymerization routes, for instance, for production of polyethylenes, by the process routes such as solution, slurry-loop, solution CSTR (continuous flow stirred tank) or gas phase polymerization.

### EFFECT OF THE INVENTION

[0072]   According to the present invention, it is possible to prepare catalyst precursors for olefin polymerization by depositing chromium and aluminum from a solution based on aqueous or alcoholic solvent. Use of the catalyst precursors according to the present invention does not lead to generation of toxic or noxious fumes during activation of catalyst. Also, according to the present invention, it is possible to prepare a catalyst that can form polymers having activation similar to the catalyst of the prior art prepared in a method that employs organometals and having melt indexes higher than the values obtained by the catalyst of the prior art.

### DETAILED DESCRIPTION FOR REDUCING THE INVENTION TO PRACTICE

[0073]   Specific embodiments of the present invention will now be described only as the examples.

[0074]   Embodiment

[0075]   In the embodiments described below, high load melt index (HLMI) and melt index (MI) were determined in accordance with ASTM D-1238 using loads of 21.6 kg and 2.16 kg respectively at 190°C.

[0076]   It was found that the silica xerogel support materials used contain no measurable amounts of chromium, aluminum or boron when measured by the methods described above, prior to carrying out the deposition experiments described below.

- 11 -

Registered patent 10-1095944

[0077]   Embodiment 1 (Comparative example - Organometals from Heptane – Homopolymerization - 700°C)

[0078]   100g of a silica xerogel support (pure silica) was prepared by evaporative drying of a hydrogel. When measured as described above using a Micromeritics ASAP 2420 analyzer, said support had a surface area of 381m$^2$/g and the pore volume of 1.76cm$^3$/g by nitrogen porosimetry.

[0079]   When measured with Malvern Mastersizer™, said support particles had the following particle diameter distribution: $d_{90}$ of 169.3μm, $d_{50}$ of 114.6μm and $d_{10}$ of 63.4μm. ($d_{90}$ is the diameter at which 90% by weight of the particles have a diameter less than $d_{90}$ and the definitions apply to $d_{50}$ and $d_{10}$ as well.)

[0080]   100 g of the silica xerogel support (pre-dried at 140°C) was added to a dry reaction flask fitted with a stirrer. 600 cm$^3$ of heptane were added to said flask to form a silica/heptane slurry. 6.78 g chromium acetylacetonate was added to another cleansed dry flask containing a magnetic stirrer. 500cm$^3$ of heptane was added to said chromium acetylacetonate and 64.3cm$^3$ of triisobutyl aluminum solution (1.0 molar solution in heptane) was added while stirring the chromium acetylacetonate slurry. This reaction mixture was allowed to cool. Then the Cr/Al complex solution was transferred to the flask containing silica and heptane. The resulting slurry was stirred for one additional hour and then 6.4cm$^3$ methanol was added to the slurry. Stirring was stopped and the catalyst precursor particles were left to settle. The slurry was filtered to remove excess heptane and the residual filter-cake, which was wet with solvent, was dried in a drying oven at 140°C to obtain a free flowing green powder. The resulting catalyst precursor contained 1.06% chromium and 1.76% aluminum expressed as the respective elements. The surface area and the pore volume were determined for the catalyst precursor using the ASAP 2420instrument, and the results were 358m$^2$/g and 1.66 cm$^3$/g respectively.

[0081]   10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 700°C for 5 hours before cooling and switching to nitrogen. 0.148g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor, which was tested under the homopolymerization conditions of using ethylene. Total reactor pressure was 40.3 atm and the ethylene partial pressure was 16.0 atm. The reactor was maintained at 104°C. 370 g of polyethylene was prepared and the catalyst activity was calculated to be 2,640 g/g.hr. Said polymer had a melt index (MI) of 0.22 g/10 min, a high load melt index (HLMI) of 19.7g/10 min and a density of 0.9611 g/cm$^3$.

[0082]   Embodiment 2 (According to the present invention - Homopolymerization -700°C)

[0083]   A methanolic solution of chromium acetate and aluminum acetate was prepared by adding 1.15g of chromium acetate and 2.84g of boric acid stabilization basic aluminum acetate to a beaker containing a magnetic stirrer. Approximately 50cm$^3$ of methanol was added and said composition was stirred for 1 hour for all chromium and aluminum salts to be dissolved. This chromium and aluminum solution was added to 30g of the dried silica xerogel support, same as the one used in Embodiment 1, such that the chromium and aluminum species were impregnated into the support. The catalyst precursor thus formed was dried in a vacuum oven at 140°C for 3 hours to remove methanol.  The resulting blue/green catalyst precursor powder had chromium and aluminum contents of 0.93% and 1.87% by weight expressed as the respective element. Boron content was determined at 1,720 ppm by weight. The surface area and the pore volume determined with the Micromeritics ASAP 2420 were 364 m$^2$/g and 1.67cm$^3$/g, respectively.

[0084]   10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 700°C for 5 hours before cooling and switching to nitrogen.

[0085]   0.172g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the homopolymerization conditions (i.e., using ethylene as monomer) as was the case in Embodiment 1. Total reactor pressure was 40.3atm and the ethylene partial pressure was 16.0 atm. The reactor was maintained at 104°C. 431g of polyethylene was prepared and the catalyst activity was calculated to be 2,839 g/g.hr. Said polymer had MI of 0.22 g/10 min, HLMI of 19.4g/10 min and a density of 0.9606 g/cm$^3$.

[0086]   Embodiment 3 (Comparative example - Sequential Cr - Al impregnation - Homopolymerization - 700°C)

[0087]   An aqueous solution of chromium acetate was prepared by diluting a chromium acetate solution that contains 7.68% by weight of chromium with additional 2,201 cm$^3$ of water. This solution was added to 1,500g of silica xerogel described in Embodiment 1. Water was removed to yield a free flowing catalyst having a chromium content of 0.97%. The surface area and the pore volume were 380m$^2$/g and 1.62cm$^3$/g (ASAP 2420), respectively.

- 12 -

[0088]  70g of said Cr-containing silica was pre-dried at 140°C for 4 hours and placed in a sealed flask. 250cm$^3$ of heptane was added. 1.0 molar triisobutyl aluminum solution in heptane was added while purging with nitrogen. After stirring for 30 minutes, said composition was filtered and the resulting filter cake was dried in a vacuum oven at 140°C. The pale blue/green catalyst precursor powder generated contained chromium and aluminum contents of 0.95% and 1.71% expressed as the respective elements. The surface area and the pore volume of said catalyst precursor measured with ASAP 2420 were 375 m$^2$/g and 1.61 cm$^3$/g, respectively.

[0089]  10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 700°C for 5 hours before cooling and switching to nitrogen.

[0090]  0.172g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the homopolymerization conditions used in Embodiment 1. Total reactor pressure was 39.9 atm and the ethylene partial pressure was 15.9 atm. The reactor was maintained at 104°C. 447 g of polyethylene was prepared and the catalyst activity was calculated to be 2,997g/g/hr. Said polymer had MI of 0.14 g/10 min, HLMI of 14.4 g/10 min and a density of 0.9602 g/cm$^3$.

[0091]  Embodiment 4 (According to the present invention - Copolymerization - 600°C activation)

[0092]  An aqueous solution of chromium acetate and aluminum acetate was prepared by adding 33.5g of chromium acetate and 96.4g of boric acid stabilized basic aluminum acetate to a beaker. Approximately 1.44 liters of water was added and said composition was stirred for 1 hour for both chromium and aluminum salts were dissolved. This chromium aluminum solution was added to 1kg of silica support having a surface area of 377 m$^2$/g and a pore volume of 1.75 cm$^3$/g, both parameters being determined using the ASAP 2420 instrument.

[0093]  Water was removed from the resulting catalyst precursor, yielding blue/grey catalyst powder which had chromium and aluminum contents of 1.00% and 1.98% by weight of the respective elements. Boron content was determined to be 2,130 ppm. The surface area and the pore volume determined with ASAP 2420 were 354m$^2$/g and 1.63cm$^3$/g, respectively. Particle diameter distribution was determined for this catalyst by Malvern Mastersizer™ which indicated: d$_{10}$ of 75.1µm, d$_{50}$ of126µm and d$_{90}$ of 180.6µm. 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0094]  0.180g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions using 15cm$^3$ hexene. Total reactor pressure was 40.1 atm and the ethylene partial pressure was 15.8 atm. The reactor was maintained at 100°C. 468 g of copolymer was prepared and the catalyst activity was calculated to be 2,643g/g/hr. Said copolymer had HLMI of 10.8g/10 min and a density of 0.9487g/cm$^3$.

[0095]  Embodiment 4 (Comparative example - no Al used - copolymerization - 600° C activation)

[0096]  An aqueous solution of chromium acetate was prepared by adding 33.5g of chromium acetate to a beaker. Approximately 1.44 liters of water was added and said composition stirred for 1 hour so that all chromium acetate was dissolved. This chromium solution was added to 1kg of silica support as described in Embodiment 4.

[0097]  Water was removed from the resulting catalyst precursor, yielding blue/grey catalyst powder which had a chromium content of 1.03%. The surface area and the pore volume determined with ASAP 2420 were 376m$^2$/g and 1.69cm$^3$/g, respectively. Particle diameter distribution was determined for this catalyst by Malvern Mastersizer™ which indicated: d$_{10}$ of 75.4µm, d$_{50}$ of 126.2µm and d$_{90}$ of 181.3µm. 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0098]  0.178g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions using 15cm$^3$ hexene. Total reactor pressure was 40.0 atm and the ethylene partial pressure was 15.8 atm. The reactor was maintained at 100°C. 459g of copolymer was prepared and the catalyst activity was calculated to be 2,630g/g/hr. Said copolymer had HLMI of 5.7g/10 min and a density of 0.9466 g/cm$^3$.

[0099]  Embodiment 6 (According to the present invention - Copolymerization - 600°C activation)

[0100]  A methanolic solution of chromium acetate and aluminum acetate was prepared by adding 5.14g of chromium acetate and 13.67g of boric acid stabilized basic aluminum acetate to a beaker containing a magnetic stirrer. Approximately 240cm$^3$ of methanol was added and said composition stirred for 1 hour so that all chromium and aluminum salts were dissolved. This chromium aluminum solution was added to 150g of silica support having a surface area of 383m$^2$/g and the pore volume of 1.75cm$^3$/g, both parameters being determined by ASAP2420 instrument, so that the chromium and aluminum species were impregnated into the silica. Excess methanol was removed from said catalyst by drying in a vacuum oven at 140°C for 3 hours.

- 13 -

The resulting blue/grey catalyst powder had chromium and aluminum contents of 1.03% and 1.92% by weight of the respective elements. Boron content was determined to be 1,600 ppm. The surface area and the pore volume determined using ASAP 2420 were $361 m^2/g$ and $1.63 cm^3/g$, respectively. Particle diameter distribution was determined by Malvern Mastersizer™ and indicated: $d_{10}$ of 65.5μm, $d_{50}$ of 118.4μm and $d_{90}$ of 176.4μm.

[0101] 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0102] 0.193g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions using $15 cm^3$ hexene. Total reactor pressure was 40.0 atm and the ethylene partial pressure was 15.8 atm. The reactor was maintained at 100°C. 490g of copolymer was prepared and the catalyst activity was calculated to be 2,340g/g/hr. Said copolymer had HLMI of 8.6g/10 min and a density of $0.9503 g/cm^3$.

[0103] Embodiment 7 (Comparative example - Organometals from Heptane - Copolymerization - 600°C activation)

[0104] 150g of silica support (pre-dried at 140°C) with a surface area and a pore volume of $393 m^2/g$ and $1.73 cm^3/g$, respectively, measured by ASAP 2420 were added to a dry reaction flask fitted with a stirrer. $900 cm^3$ of heptane was added to said flask to form a silica/heptane slurry. 9.51g of chromium acetylacetonate was added to another cleansed dry flask containing a magnetic stirrer. $80 cm^3$ of heptane was added to said chromium acetylacetonate and $100.1 cm^3$ of triisobutyl aluminum solution (1.0 molar in heptane) was added while stirring the chromium acetylacetonate slurry. This reaction mixture was left to cool. Then, the Cr/Al complex solution was transferred to the flask containing silica and heptane. The resulting slurry was stirred for one additional hour and then $9.6 cm^3$ of methanol was added to the slurry. Stirring was stopped and catalyst particles were left to settle. The slurry was filtered to remove excess heptane and the residual solvent wet filter-cake was dried in a drying oven at 140°C to obtain free flowing green powder. The resulting catalyst precursor contained 0.99% chromium by weight and 1.86% aluminum by weight as the respective elements. Surface area and pore volume measured with an ASAP 2420 instrument were $375 m^2/g$ and $1.63 cm^3/g$, respectively.

[0105] 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0106] 0.190g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions (using $15 cm^3$ hexene). Total reactor pressure was 40.1 atm and the ethylene partial pressure was 15.9 atm. The reactor was maintained at 100°C. 484g of copolymer was prepared and the catalyst activity was calculated to be 2,215 g/g/hr. Said copolymer had HLMI of 8.0g/10 min and a density of $0.9508 g/cm^3$.

[0107] Embodiment 8 (Comparative example - chromium and aluminum nitrates used - copolymerization - 600°C activation)

[0108] A methanolic solution of chromium nitrate and aluminum nitrate was prepared by adding 7.54g of $Cr(NO_3)_3 \cdot 9H_2O$ and 25.71g of $Al(NO_3)_3 \cdot 9H_2O$ to a beaker containing a magnetic stirrer. Approximately $143 cm^3$ of methanol was added and said composition was stirred for 1 hour so that all chromium and aluminum salts were dissolved. Said chromium/aluminum solution was added to 100g of silica having a surface area of $377 m^2/g$ and a pore volume of $1.75 cm^3/g$, both parameters being determined using an ASAP2420 instrument.

[0109] Excess methanol was removed from the catalyst by drying said catalyst in a vacuum oven at 140°C for 3 hours. The resulting blue/green catalyst precursor had chromium and aluminum contents of 1.06% and 1.96% by weight of the respective elements. The surface area and the pore volume measured with ASAP2420 were $362 m^2/g$ and $1.64 cm^3/g$, respectively.

[0110] Particle size distribution measured by Malvern Mastersizer™ indicated: $d_{10}$ of 73.8μm, $d_{50}$ of 125.2μm and $d_{90}$ of 180.4μm.

[0111] 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0112] 0.185g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions (using $15 cm^3$ hexene). Total reactor pressure was 40.1 atm and the ethylene partial pressure was16.0 atm. The reactor was maintained at 100°C. 485 g of copolymer was prepared and the catalyst activity was calculated as 2,666 g/g/hr. Said copolymer had HLMI of 6.4g/10 min and a density of $0.9508 g/cm^3$.

[0113] Embodiment 9 (Comparative example - Organometals from heptane)

- 14 -

[0114]   100g of a silica xerogel support (pure silica) was prepared by freeze drying of hydrogel. When measured by a Micromeritics ASAP 2420 analyzer as described above, said support had a surface area of $321m^2/g$ and a pore volume of $2.32cm^3/g$ by nitrogen porosimetry.

[0115]   Said support particles had the following particle diameter distribution measured by a Malvern Mastersizer™: $d_{90}$ of 182.8µm, $d_{50}$ of 76.5µm and $d_{10}$ of 12.9µm. 25 g of silica xerogel support (pre-dried at140°C) was added to a dry reaction flask fitted with a stirrer. $150cm^3$ of heptane was added to said flask to form a silica/heptane slurry. 1.82g of chromium acetylacetonate was added to another cleansed dry flask containing a magnetic stirrer. $20cm^3$ of heptane was added to said chromium acetylacetonate and $17.3cm^3$ of triisobutyl aluminum (1.0 molar solution in heptane) was added while stirring the chromium acetylacetonate slurry. This reaction mixture was left to cool. Then, the Cr/Al complex solution was transferred to the flask containing silica and heptane. The resulting slurry was stirred for a one additional hour and then $1.7cm^3$ of methanol was added to the slurry. Stirring was stopped and catalyst precursor particles were left to settle. The slurry was filtered to remove excess heptane and the residual filter-cake, which was wet with solvent, was dried in a vacuum oven at140°C to obtain a free flowing green powder. The resulting catalyst precursor contained 1.05% chromium and 1.73% aluminum expressed as the respective elements. Surface area and pore volume measured for the catalyst precursor by the ASAP 2420 instrument were $301m^2/g$ and $2.21cm^3/g$, respectively.

[0116]   Embodiment 10 (According to the present invention)

[0117]   A methanolic solution of chromium acetate and aluminum acetate was prepared by adding 1.07g of chromium acetate and 2.85g of boric acid stabilized basic aluminum acetate to a beaker containing a magnetic stirrer. Approximately $74cm^3$ of methanol was added and said composition was stirred for 1 hour so that all chromium and aluminum salts were dissolved. This solution of chromium and aluminum was added to 30g of the silica xerogel support, same as that used in Embodiment 9, so that the chromium and aluminum species were impregnated into the support. Methanol was removed from the thus-formed catalyst precursor by drying in a vacuum oven at 140°C for 3 hours. The resulting blue/green catalyst precursor powder had chromium and aluminum contents of 0.96% and 1.76% by weight, expressed as the respective element. Boron content was determined to be 1,380 ppm by weight (0.138%). The surface area and the pore volume measured by Micromeritics ASAP 2420 were $306m^2/g$ and $2.13cm^3/g$, respectively.

[0118]   It should be noted that Embodiments 1 through 3 all related to equivalent homopolymerization at 700°C using catalysts having similar particle sizes, pore volumes, surface areas and similar loadings of Cr and Al. Embodiment 1 was a catalyst prepared according to the prior art. Embodiment 2 that used a catalyst prepared according to the present invention had the homopolymer density and the melt indexes which were similar to those obtained from use of the prior art catalyst. Embodiment 3, in which the catalyst was prepared by deposition of Cr from aqueous solution followed by deposition of Al by an organometallic route, yielded a homopolymer where the melt indices were considerably lower than those obtained in Embodiment 1 or Embodiment 2, which demonstrated the different nature of the catalyst prepared by said route. The activation of the catalyst in Embodiment 1 also led to the formation of noxious fumes.

[0119]   Embodiments 4 through 8 all related to copolymerization at 600°C. Once again, the particle sizes, surface areas and pore volumes for the catalysts were practically the same, along with the Cr and Al loadings, except for Embodiment 5 where only Cr was present (Al not included). Embodiment 7 (comparative example) corresponded to the method that uses a catalyst prepared using an organometallic route according to the prior art. Here, a copolymer of HLMI value 8.0 was obtained. Embodiments 4 and 6 used catalysts prepared by embodiments of the present invention, with Cr/Al being deposited from aqueous solution and methanol solution, respectively. These embodiments yielded HLMI values of 10.8 and 8.6, respectively, which shows that the catalysts prepared according to the present invention can match or exceed the HLMI values for the prior art catalysts. Embodiment 5 (comparative example) that does not use aluminum failed to yield the required HLMI value of 8.0 or more. Embodiment 8 (comparative example) in which the catalyst was prepared using deposition of chromium nitrate and aluminum nitrates from a methanolic solution failed to yield an adequate HLMI (the value was only 6.4), either. Furthermore, the activation of the catalysts in Embodiments 7 and 8 led to noxious fume formation.

[0120]   Embodiments 9 and 10 relate to embodying the second aspect method of the present invention to form catalyst precursors on high porosity inorganic carriers, which were prepared by a freeze-drying route. Although there is a small reduction in porosity arising from the application of said method, it is clear that said method is still applicable to such high porosity carriers without collapsing the carriers.

[0121]   Accordingly, it can be seen that the activated catalysts prepared using the precursors according to the present invention provide the same or higher melt indexes than the prior art catalysts prepared from precursors made by a conventional organometallic route. Also, said catalysts have similar activities, but do not result in noxious fume formation during catalyst activation from the catalyst precursors of the present invention. Furthermore, the method of the present invention does not lead to a substantial loss in porosity for the resulting catalyst precursor, compared to prior art methods of forming the precursors.

- 15 -

Registered patent 10-1095944

[0122]  It should be appreciated that modifications to said embodiments could be made without departing from the scope of the present invention as defined in the appended scope of claims. For example, the xerogel support could be prepared by milling a hydrogel to form an aqueous slurry, followed by spray-drying rather than by direct evaporative drying of a hydrogel.

lOd

- 16 -

 **Language on Demand, Inc.**

4207 Fox Lake Dr.
Fairfax, VA  22033
Tel:    703-691-2852
Fax:   703-691-4299
Email:  Info@visitlod.com

# **Certificate of Translation**

I, Seung H. Rowe declare under penalty of perjury that:

(1)    I understand the **KOREAN** language and the **ENGLISH** language; that

(2)    I'm a member of American Translator's Association in good standing

(2)    To the best of my knowledge and belief, the attached translation in the **ENGLISH**
is (are) true, accurate, and correct reflection of the statements in the **KOREAN**
language in the original document:

Date of Translation: January 14, 2013
No. of Pages: 16 pages
Subject: KR_095944

*January 14, 2013*

*Signature & Date*

======================================================================

Subscribed and sworn to or affirmed before me this ___14TH___ day of

January , 2013

Notary Public

JAMES EDWARD-MARSHALL HALE
Notary Public
Commonwealth of Virginia
7532722
My Commission Expires Aug 31, 2016

ATTACHMENT 2
EXHIBIT A



(19) 대한민국특허청(KR)
(12) 등록특허공보(B1)

(45) 공고일자    2011년12월19일
(11) 등록번호    10-1095944
(24) 등록일자    2011년12월13일

(51)    Int. Cl.

　　　 *C08F 4/22* (2006.01)  *C08F 4/12* (2006.01)
　　　 *C08F 10/00* (2006.01)  *C08F 210/16* (2006.01)
(21) 출원번호        10-2010-7011247
(22) 출원일자(국제출원일자)  2008년10월15일
　　 심사청구일자    2011년01월21일
(85) 번역문제출일자  2010년05월24일
(65) 공개번호        10-2010-0093529
(43) 공개일자        2010년08월25일
(86) 국제출원번호    PCT/GB2008/003488
(87) 국제공개번호    WO 2009/053672
　　 국제공개일자    2009년04월30일
(30) 우선권주장
　　 0720983.6  2007년10월26일  영국(GB)
(56) 선행기술조사문헌
　　 EP00055864 A2*
　　 KR1020020047149 A*
　　 *는 심사관에 의하여 인용된 문헌

(73) 특허권자
　　 피큐 실리카스 유케이 리미티드
　　 영국 쳴서 더블유에이5 1에이큐 워링턴 리버플 로
　　 드 4 뱅크 키
(72) 발명자
　　 마스텐 크리스틴 엘리자베스
　　 영국 씨에이치2 4에이치디 체스터 라임 우드 클로
　　 즈 4
　　 파커 로버트 조셉
　　 영국 더블유에이5 2알엑스 채셔 워링턴 펜케스 워
　　 링턴 로드 226
(74) 대리인
　　 유미특허법인

전체 청구항 수 : 총  4  항                                                       심사관 :    강희만

(54) 촉매 전구체 입자, 그의 제조 방법 및 용도

*(57) 요 약*

올레핀 중합 촉매용 촉매 전구체의 제조 방법으로서, 크롬염 및 붕산과 알루미늄 카르복실레이트의 수용액 또는
알코올 용액을 사용하여 실리카 크세로겔과 같은 무기 지지체 물질 상에 적층시키는 단계를 포함하는 제조 방법.
상기 크롬염, 알루미늄 카르복실레이트 및 붕산은 단일 용액으로부터 효과적으로 적층시키기에 충분히 용해성이
다.   상기 촉매 전구체는 하소에 의해 활성화되어, 종래 기술의 유기금속 경로에 의해 제조된 촉매를 사용하여
얻어지는 것과 대등한 폴리머 또는 코폴리머를 얻을 수 있는 생산성과 멜트 플로우 인덱스를 가진 α-올레핀을
동종중합 또는 공중합하기 위한 촉매를 형성할 수 있다.   상기 촉매 전구체의 활성화는 활성화시에, 크롬 또는
알루미늄의 유기금속 공급원을 사용하는 방법에 비해 감소된 레벨의 독성의, 또는 유해한 흄을 발생한다.

등록특허 10-1095944

## 특허청구의 범위

**청구항 1**

삭제

**청구항 2**

삭제

**청구항 3**

삭제

**청구항 4**

삭제

**청구항 5**

삭제

**청구항 6**

삭제

**청구항 7**

삭제

**청구항 8**

크롬염, 알루미늄 카르복실레이트 및 붕산을 운반하는 무기 지지체 물질(inorganic support material)을 포함하며, 상기 무기 지지체 물질이 90중량% 내지 100중량%의 $SiO_2$를 포함하는 실리카 크세로겔(xerogel)인, 올레핀 중합 촉매용 촉매 전구체의 제조 방법으로서,

i) 무기 지지체 물질을 제공하는 단계,

ii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염을 포함하는 제1 용액으로부터 상기 무기 지지체 물질 상에 크롬염을 적층하는 단계,

iii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 알루미늄 카르복실레이트 및 붕산을 포함하는 제2 용액으로부터 상기 무기 지지체 물질 상에 알루미늄 카르복실레이트 및 붕산을 적층하는 단계, 및

iv) 상기 용매를 제거하여 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 촉매 전구체를 형성하는 단계를 포함하며,

여기서 상기 크롬염을 상기 제1 용액으로부터 상기 무기 지지체 물질 상에 적층시키고, 상기 알루미늄 카르복실레이트 및 붕산이 상기 제2 용액으로부터 상기 무기 지지체 물질 상에 적층되기 전에 용매를 제거하는, 촉매 전구체의 제조 방법.

**청구항 9**

크롬염, 알루미늄 카르복실레이트 및 붕산을 운반하는 무기 지지체 물질(inorganic support material)을 포함하며, 상기 무기 지지체 물질이 90중량% 내지 100중량%의 $SiO_2$를 포함하는 실리카 크세로겔(xerogel)인, 올레핀 중합 촉매용 촉매 전구체의 제조 방법으로서,

i) 무기 지지체 물질을 제공하는 단계,

ii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염을 포함하는 제1 용액으로부터 상기 무기 지지체 물질 상에 크롬염을 적층하는 단계,

iii) 물, $C_1 \sim C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 알루미늄 카르복실레이트 및 붕산을 포함하는 제2 용액으로부터 상기 무기 지지체 물질 상에 알루미늄 카르복실레이트 및 붕산을 적층하는 단계, 및

iv) 상기 용매를 제거하여 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 촉매 전구체를 형성하는 단계를 포함하며,

여기서, 상기 단계 i) 이후, 먼저 상기 단계 iii)의 상기 알루미늄 카르복실레이트 및 붕산을 상기 제2 용액으로부터 상기 무기 지지체 물질 상에 적층하는 단계를 수행한 다음,

상기 제2 용액으로부터 용매를 제거하고,

그 후 상기 단계 ii)의 상기 크롬염을 상기 제1용액으로부터 상기 무기 지지체 물질 상에 적층하는 단계를 수행하는,

촉매 전구체의 제조 방법.

**청구항 10**

삭제

**청구항 11**

제8항 또는 제9항에 있어서,

상기 용매가 증발에 의해 제거되는, 촉매 전구체의 제조 방법.

**청구항 12**

제8항 또는 제9항에 있어서,

상기 무기 지지체 물질이 실리카 하이드로겔(hydrogel)로부터 물을 증발시킴으로써 제조되는 실리카 크세로겔인, 촉매 전구체의 제조 방법.

**청구항 13**

삭제

**청구항 14**

삭제

**청구항 15**

삭제

**청구항 16**

삭제

**청구항 17**

삭제

**청구항 18**

삭제

**청구항 19**

삭제

**청구항 20**

삭제

## 청구항 21

삭제

## 명 세 서

### 기 술 분 야

[0001]   본 발명은 크롬 및 알루미늄 화합물을 운반하는 다공질 무기 입자, 특히 실리카 입자, 및 그의 제조 방법에 관한 것이다.   상기 입자, 특히 실리카 입자는 올레핀(α-알켄)의 중합 공정에서 사용하기 위한 촉매를 형성하도록 활성화될 수 있다.

### 배 경 기 술

[0002]   올레핀의 중합 공정에서 사용하기 위한 전형적인 활성화 촉매는 다공질 무기 지지체 상에 담지된 산화크롬을 포함한다.   많은 용도에 있어서, 산화알루미늄이 무기 지지체 자체(예를 들면 지지체가 실리카-알루미나 코-겔(co-gel) 지지체인 경우)의 일부로서 존재하거나, 또는 다공질 무기 지지체의 기공 구조 내에 운반되는 것이 바람직하다.

[0003]   산화물의 혼합물이 무기 지지체의 분자 구조 내에 혼입되어 있으면, 상기 구조를 약화시키고, 무기 다공질 지지체 물질을 위한 높은 다공도(porosity)를 얻기 어렵게 하는 경향이 있다.   이러한 이유에서, 무기 다공질 지지체 물질의 기공 구조 내(즉, 기공 표면 상에 적층된 상태)에는 산화크롬과 함께 알루미나가 함유되어 있는 것이 바람직하다.

[0004]   미국 특허 제3,984,351호에는, 크롬 화합물과 알루미늄 화합물을 무기 지지체 물질 상에 적층(deposition)시키고, 상기 지지체 물질을 300℃보다 높은 온도에서 비환원성 분위기에서 가열함으로써 제조되는 올레핀 중합 촉매가 개시되어 있다.   얻어지는 물질은 이어서, 금속 또는 비금속 환원제, 바람직하게는 붕소-함유 화합물과 조합되어 올레핀의 중합에 사용하기 위한 촉매가 제공된다.   바람직한 지지체 물질로서 실리카 크세로겔(xerogel)이 제시되어 있다.   촉매는 무기 지지체 상에 크롬 화합물과 알루미늄 화합물을 적층시킴으로써 제조된다.   제시된 화합물들은 유기 화합물이며, 상기 적층은 불활성 유기 용매로부터 이루어진다.   개시된 촉매 시스템은 향상된 멜트 인덱스와 같은 향상된 올레핀 폴리머 특성을 제공한다.

[0005]   특허 문헌 GB 1 575 352에는, 하나 이상의 α-알켄의 중합에 사용하기 위한 담지된 크롬-함유 촉매의 제조 방법 및 용도가 개시되어 있다.   개시된 방법에서, 크롬 아세틸 아세토네이트와 같은 크롬 1,3-디케토 화합물을 원소 주기율표의 IIA족 또는 IIIA족 금속, 바람직하게는 알루미늄 또는 마그네슘의 유기금속(organometallic) 화합물과 반응시킨다.   예를 들면, 트리-이소부틸 알루미늄이 사용될 수 있다.   유기금속 화합물이 부가되면, 크롬 화합물은 헵탄과 같은 지방족 용매 또는 지환족 용매 중에 용해되어, 얻어지는 용액을 다공질 무기 지지체 물질의 함침용으로 사용할 수 있게 된다.   이어서, 용매의 증발에 의해 크롬 및 금속 화합물은 무기 지지체 물질의 기공 구조 내의 표면 상에 적층될 수 있다.   바람직한 다공질 무기 지지체 물질은 실리카이다.

[0006]   용매가 제거된 후, 함침된 입자(즉, 크롬 및 금속 화합물로 함침된 무기 다공질 지지체 입자)는 촉매 입자로서 유용한 것으로 만들어지도록 활성화될 필요가 있다.   일반적으로, 캐리어 입자는 비활성화 형태(본 명세서에서는 비활성화 촉매 입자로 지칭됨)로 판매 및 수송되므로 올레핀 중합용 촉매 입자로서 사용되기 이전에 활성화를 필요로 한다.   활성화는 비활성화 촉매 입자를 200~1,200℃와 같은 고온에서 수초 동안 가열함으로써 수행되지만, 질소, 불활성 가스 또는 이산화탄소와 같은 비환원성 분위기에서는 전형적으로 수시간 동안 가열되어, 크롬이 크롬 VI 상태로 변환된다.   활성화된 다음, 촉매는 한번에 사용되거나, 또는 사용될 때까지 건조한 불활성 분위기에서 저장된다.

[0007]   GB 1 575 352의 방법에 의하면, 다공질 무기 캐리어 물질을 크롬 화합물과 알루미늄 화합물 모두에 의해 동시에 함침할 수 있다.   그러나, 상기 방법에서는 크롬 및 알루미늄 화합물을 지방족 및/또는 지환족 용매 중에 용해시킬 필요가 있어서, 함침에 이어서 용매를 증발시킬 때 잠재적 인화성 및 용매 회수 문제가 초래된다.   또한, 비활성화 촉매 입자 상에 존재하는 크롬 및 알루미늄 화합물은 복합 유기금속 화합물이다.   비활성화 촉매 입자가 비환원성 또는 산화성 분위기에서 가열에 의해 활성화되면, 이들 화합물이 분해되어 악취성이고 잠재적으로 독성인 흄(fume)의 형성을 초래하여, 격납(containment), 스크러빙(scrubbing) 및 방출 제어가 필요하게 된다.   또한, 본 발명자들은 크롬 및 알루미늄 화합물의 용액 중 일부는 높은 점도를 가지므로, 무기 다공질 지지체 물

등록특허 10-1095944

질의 기공 구조 내로 용액을 함침시키기에 부적합하다는 것을 발견했다.

[0008]   특허 문헌 WO 99/12978에는, 다공질 무기 산화물 지지체를 크롬 화합물로 함침시키는 제1 단계, 및 제1 단계에서 얻어진 생성물을 티타늄 또는 알루미늄 화합물 중 어느 하나로 함침시키는 선택적인 제2 단계를 포함하는 방법에 의해 제조되는 촉매가 개시되어 있다.   상기 크롬 화합물은 하소(calcining)에 의해 산화크롬으로 변환될 수 있는 산화크롬 또는 크롬 화합물로서, 예를 들면 크롬의 질산염, 황산염, 탄산염, 아세트산염, 아세틸아세토네이트, 알루미늄 크로메이트 또는 tert-부틸 크로메이트이다.   제시된 알루미늄 화합물은 아세틸아세테이트, 아세틸아세토네이트, 알콕시 또는 알킬 타입이다.   사용되는 용매는 특정되지는 않지만, 제시된 알루미늄 화합물이 극성 용매 중에서 유의적으로 가용성이 되지는 않는다.   여기에는 WO 99/12978에 개시된 바와 같은 방법에 의해 별도의 단계로서 크롬 화합물의 함침 및 알루미늄 화합물의 함침을 실행함으로써 발생될 수 있는 잠재적 문제들이 있다.   용매 제거에 이어지는 제1 함침은 무기 다공질 캐리어 물질의 기공 구조의 부분적 또는 완전한 블록킹(blocking)을 초래하여 제2 함침을 실행하기가 더 어렵게 되거나 불가능해질 수 있다.   또한, 그러한 기공 블록킹이 일어나지 않더라도, 크롬 또는 알루미늄이 촉매 전구체 내에서 원자 레벨에서는 함께 혼합되지 않기 때문에, 크롬 또는 알루미늄의 혼합물의 촉매적 거동이 변형될 수 있다.   그보다는, 알루미늄 화합물의 개별 입자들이 이미 존재하는 크롬 화합물 표면에 적층될 수 있다.   이에 따라 활성화 촉매를 사용하여 제조되는 폴리머에 대한 촉매 활성의 변화 및 있을 수 있는 멜트 인덱스의 감소를 초래할 수 있다.

[0009]   미국 특허 제4,814,306호에는, 공촉매(co-catalyst)와 조합 상태로 사용되며 각각 산화물 형태인 크롬, 인 및 알루미늄을 함유한 담지된 촉매가 개시되어 있다.   담지된 촉매는 유기 용매 중의 크롬 및 알루미늄 유기금속 화합물을 사용하여 다공질 지지체 입자를 함침시킴으로써 형성된다.   상기 공촉매는 리튬 알킬 및 보론알킬이다.   다공질 실리케이트 캐리어 상에 크롬과 알루미늄을 적층시키기 위해 질산알루미늄, 인산 및 질산크롬을 사용하는 비교예에서는, 올레핀의 중합용으로 활성화되어 사용될 때, 유기금속 경로에 비해 낮은 생산성과 낮은 멜트 플로우 인덱스를 가진 촉매 전구체가 생성된다.

[0010]   따라서, 종래 기술의 문제점의 일부 또는 전부를 극복할 수 있는 촉매 전구체를 형성하기 위해, 크롬 및 알루미늄 화합물을 무기 다공질 지지체 물질 상에 함침시키는 방법이 요구된다.   또한, 활성화 촉매가 올레핀의 동종(homo)-중합 또는 공중합에 사용될 때, 비극성 용매로부터 적층된 유기금속 화합물을 사용하여 제조된, 종래 기술의 촉매와 유사한 멜트 플로우 인덱스와 생산성을 제공하기 위해 전구체로부터 형성된 활성화 촉매가 요구된다.   무기 지지체 물질의 함침을 위해 크롬 및 알루미늄 화합물의 수성, 또는 저급 지방족 알코올 용액을 사용하는 것이 바람직하다.   그보다 고급인 헵탄과 같은 지방족, 비극성 화합물 대신에 그러한 용매를 사용하면, 특히 용매로서 물을 사용한 경우에 증발 공정중에 유해 물질이 더 줄어드는 것과 같이, 용매 제거와 관련된 공정상 문제점을 줄이게 될 것이다.   질산염, 카르복실레이트(예를 들면, 아세테이트 및 옥살레이트) 및 황산염과 같은 크롬염이 물, 저급 지방족 알코올 또는 그것들의 혼합물에 가용성이기는 하지만, 혼합 용매를 형성하기 위해 크롬 화합물과 함께 알루미늄 화합물을 용해시키는 것은 무기 지지체 상에 적층시키는 데 필요한 농도에서는 일반적으로 불가능한 것으로 밝혀졌다.   또한, 무기 촉매 상에 알루미늄을 적층시키기 위해 몇몇 가용성 알루미늄염이 사용될 경우, 얻어지는 활성화 촉매는 올레핀 중합용으로 사용될 때, 유기금속성 크롬 및 알루미늄 화합물로부터 제조된 촉매에 비해 감소된 HLMI를 제공하는 것으로 밝혀졌다.

[0011]   따라서, 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물 중에 용해된 크롬염을 포함하는 용액 중에 알루미늄을 용해된 형태로 내포시켜, 불용성 크롬 또는 알루미늄염의 침전을 초래하지 않도록 하는 방법을 찾아내야 할 필요가 있다.   또한, 얻어지는 활성화 촉매가 비극성 용매로부터 적층된 유기금속 화합물을 사용하여 제조된 종래 기술의 촉매와 유사한 성질을 가지도록, 동일한 무기 캐리어 상에 함유된 크롬염과 함께, 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물로부터 알루미늄염을 무기 캐리어 상에 적층시키는 방법을 찾아내는 것도 필요하다.

[0012]   또한, 종래 기술에서 사용되는 여러 가지 크롬 및/또는 알루미늄 화합물, 특히 유기금속 화합물은, 활성화 촉매를 형성하기 위해 촉매 전구체를 활성화하거나 하소하는 동안 유해하거나 독성인 흄을 생성할 수 있다.   이에 따라 촉매 전구체를 활성화시키는 현장에서 복잡한 흄 처리 장치가 필요할 수 있다.

## 발명의 내용

### 해결하려는 과제

[0013]   본 발명의 목적은, 무엇보다도 수성 또는 알코올성 용매를 기초로 하는 용액으로부터 크롬 및 알루미늄을 적층시킴으로써 촉매 전구체를 제조하는 방법을 제공하는 것이다.   본 발명의 목적은 또한, 촉매 활성화시 유해하거

ATTACHMENT 2
EXHIBIT A

등록특허 10-1095944

나 독성인 흠의 형성을 피할 수 있는 촉매 전구체를 제조하는 방법을 제공하는 것이다.  본 발명의 또 다른 목적은, 유기금속을 사용한 방법에 의해 제조되는 종래 기술의 촉매와 유사한 활성을 가지며, 그러한 종래 기술의 촉매에 의해 얻어지는 값 이상의 멜트 인덱스를 가지는 폴리머를 형성하기 위해 사용할 수 있는,  α-올레핀(올레핀)의 동종-중합 또는 공중합용 촉매를 제공하는 것이다.

### *과제의 해결 수단*

[0014]  놀랍게도, 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물 중의 크롬 및/또는 알루미늄 화합물의 용액을, 무기 지지체 물질 상에 적층된 크롬 및 알루미늄 화합물을 포함하는 비활성화 촉매 입자(즉, 촉매 전구체 입자)를 형성하기 위해 무기 지지체 물질을 코팅하거나 함침하는 데 유용하도록 충분히 높은 크롬 및/또는 알루미늄의 농도로 제조할 수 있음을 발견했다.  상기 용액은 다공질 무기 지지체 물질의 기공 구조를 투과할 수 있을 정도로 충분히 낮은 점도를 가질 수 있다.  용매는 증발에 의해 용이하게 제거되어 촉매 전구체를 형성할 수 있으므로, 특히 용매가 묻어거나 또는 물을 포함하는 경우에, 휘발성 유기 화합물에 의한 대기 로딩(loading) 또는 인화성 (flammability)과 관련된 문제가 감소된다.  또한, 선택된 화합물들은, 촉매를 활성화하는 동안, 모든 잔류 용매의 분해와 병행하는 상기 화합물의 분해가, 종래 기술에서 사용된 몇몇 유기금속 화합물 및 용매에 의해 형성되는 것과 같은 독성이거나 유해한 흠을 발생하지 않는 것들이마.

[0015]  또한, 크롬 화합물에 이어서 알루미늄 화합물, 또는 그의 역순의 순차적 적층에 의해, 크롬 및 알루미늄 화합물이 함께 적층된 것과 대등한 성질을 가진 허용가능한 촉매 전구체가 수득된다.

[0016]  본 발명의 제1 측면은, 크롬염, 알루미늄 카르복실레이트 및 붕산을 운반하는 무기 지지체 물질을 포함하는, 올레핀 중합 촉매용 촉매 전구체를 제공한다.

[0017]  본 발명의 제2 측면은, 본 발명의 제1 측면에 따른, 올레핀 중합 촉매용 촉매 전구체의 제조 방법으로서,

[0018]  i) 무기 지지체 물질을 제공하는 단계,

[0019]  ii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염을 포함하는 제1 용액으로부터 상기 무기 지지체 물질 상에 크롬염을 적층하는 단계,

[0020]  iii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 알루미늄 카르복실레이트 및 붕산을 포함하는 제2 용액으로부터 상기 무기 지지체 물질 상에 알루미늄 카르복실레이트 및 붕산을 적층하는 단계, 및

[0021]  iv) 용매를 제거하여 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 촉매 전구체를 형성하는 단계

[0022]  를 포함하는, 촉매 전구체의 제조 방법을 제공한다.

[0023]  상기 크롬염은 제1 용액으로부터 무기 지지체 물질 상에 적층될 수 있고, 제1 용액의 용매는 알루미늄 카르복실레이트와 붕산이 제2 용액으로부터 적층되기 전에 제거될 수 있다.  상기 방법은 또한, 제2 용액으로부터 알루미늄 카르복실레이트와 붕산을 먼저 적층한 다음, 제1 용액으로부터 크롬염을 적층하기 전에 제2 용액의 용매를 제거함으로써 실행될 수 있다.

[0024]  바람직하게는, 공정을 간편하게 하기 위해, 본 발명의 제2 측면의 방법은 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 단일 용액을 사용하여 실행된다.

[0025]  따라서, 본 발명의 제2 측면의 바람직한 방법은,

[0026]  i) 무기 지지체 물질을 제공하는 단계,

[0027]  ii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액을 제공하는 단계,

[0028]  iii) 상기 무기 지지체 물질 상에 상기 용액을 적층하는 단계, 및

[0029]  iv) 상기 용매를 제거하여 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 촉매 전구체를 형성하는 단계

[0030]  를 포함한다.

[0031]  "용매의 제거"란, 당업자에게는 건조된, 자유 유동형(free-flowing)의 수송이 용이한 촉매 전구체를 형성하기 위해 충분한 용매가 제거되는 것으로 이해될 것이다.  이것은, 잔류 용매의 일부가 촉매 전구체의 일부로서 잔

ATTACHMENT 2
EXHIBIT A

등록특허 10-1095944

류할 수 있음을 의미할 수 있다.   예를 들면, 촉매 전구체는 15% 이하, 바람직하게는 10% 이하의 잔류 용매를 함유하면서도, 자유-유동형 분말로서 거동할 수 있다.   그러한 모든 잔류 용매는 활성화 촉매를 형성하기 위해 촉매 전구체가 활성화될 때 제거될 것이다.   대안적으로, 용매는 촉매 전구체로부터 실질적으로 완전히 제거됨으로써 용매 제거 후에는 미결합(unbound) 용매가 존재하지 않을 수 있다.

[0032]    이하에 상세히 설명하는 본 발명의 바람직한 측면과 구현예는, 적절한 경우에, 본 발명의 제1 및 제2 측면 모두에 적용된다.

[0033]    "촉매 전구체"란, 촉매로서, 특히 올레핀 중합 촉매로서 사용하기 위해 활성화될 수 있는 현장으로의 수송과 취급에 적합한 생성물을 의미한다.   일반적으로, 그러한 촉매는 사용 직전에, 이하에 기재한 바와 같은 비환원성 분위기에서 가열함으로써 활성화된다.   따라서, 촉매 전구체는, 간단히 활성화 또는 하소에 의해 촉매를 형성하는 데 사용될 수 있는 상업적으로 유용한 물질이다.

[0034]    크롬염으로는 카르복실레이트, 질산염, 황산염, 염화물 또는 이것들의 혼합물이 적합하지만, 임의의 적절한 크롬염이 사용될 수 있다.   크롬의 황산염, 염화물 또는 카르복실레이트는 특히 바람직한 염이고, 그중에서도 카르복실레이트는 촉매 전구체의 활성화시 독성이거나 유해한 흄을 생성하지 않기 때문에 특히 바람직하다.   이러한 이유 외에도 본 발명의 제2 측면의 방법에서 사용되는 용매 중의 높은 용해도 때문에 아세트산크롬이 특히 바람직하다.   적합하게는, 크롬염은 상기 용액이 원소로서 나타낸 크롬을 1중량% 이상, 바람직하게는 2중량% 이상, 보다 바람직하게는 4중량% 이상 포함할 수 있을 정도로 용매 중의 용해도를 가져야 한다.

[0035]    적합하게는, 무기 지지체 물질은 다공질 무기 산화물이다.

[0036]    전형적으로, 상기 무기 지지체 물질은 1~300$\mu$m의 중량 평균 입경(weight mean particle diameter, D$_{[4,3]}$)을 가진 입자 형태이다.   이 전형적 평균 직경은, 본질적으로 지지체 물질과 동일한 입경을 가지는 촉매 전구체 입자 및 활성화 촉매 입자에도 적용된다.   이것은 300 RF 렌즈(측정 범위: 0.05~900$\mu$m), Malvern Mastersizer$^{TM}$ 소프트웨어 v. 2.18 및 DIF 2012 분산 유닛을 구비한 Malvern Mastersizer$^{TM}$ 모델 S와 같은 장치를 사용하여 광산란에 의한 입자 크기 분석에 의해 측정된다.   호주 웨세스터서 멜버른 소재, Malvern Instruments사 제조의 이 측정기기는 Mie 이론을 이용하여 입도 분포를 계산한다.   Mie 이론은 구형 입자에 의해 광이 어떻게 산란되는가를 예측하고, 입자의 굴절율을 고려한다.   실라카 굴절율에 대해 사용되는 참값은 1.4564이고, 물 분산제(dispersant)의 굴절율이 1.33일 때 상기 입자의 가상 굴절율(광의 흡수)에 대한 참값은 0.1이다.

[0037]    적합하게는, 상기 입자는 500$\mu$m 이하, 바람직하게는 400$\mu$m 이하의 d$_{90}$을 가진다.   상기 입자는 300$\mu$m 이하의 d$_{50}$을 가질 수 있다.   상기 입자는 1$\mu$m 이상, 바람직하게는 10$\mu$m 이상의 d$_{10}$을 가진다.   (명확히 하기 위해, d$_{90}$은 입자의 90중량%가 d$_{90}$ 미만의 직경을 가질 때의 직경이고, d$_{50}$과 d$_{10}$에 대해서도 마찬가지로 정의된다).   바람직하게는, 상기 입자는 1~300$\mu$m, 보다 바람직하게는 5~250$\mu$m, 더욱 바람직하게는 25~150$\mu$m의 d$_{50}$을 가진다.

[0038]    상기 입자는 체질(sieving)과 같은 수단에 의한 크기 분급을 선택적으로 병행하는 분쇄(comminution)에 의해 제조될 수 있고, 또는 분무-건조와 같은 방법에 의해 제조될 수 있다.

[0039]    본 발명의 제2 측면의 방법이 가지는 또 다른 이점은, 무기 지지체 물질이 입자 형태로 되어 있을 때, 크롬과 알루미늄이 다양한 직경의 입자에 걸쳐 더욱 균일하게 분배되어 있는 점이다.   특허 문헌 GB 1 575 352의 방법과 같은 종래 기술의 방법은, 보다 높은 농도의 크롬과 알루미늄을 운반하는 무기 물질의 더 작은 입자를 형성함으로써, 중합시 촉매적으로 활성인 표면의 효과적 활용을 잠재적으로 감소시킬 수 있다.   또한, 중합에 대한 촉매 작용을 위해 활성화 촉매가 사용될 때, 촉매 내부의 활성 사이트(active site)에서의 중합은 지지체 물질의 붕괴(fragmentation)를 초래하기 쉽다.   이와 같은 중합시 촉매 붕괴는, 촉매 입자를 폴리머로부터 제거하지 않아도 된다는 것을 의미하기 때문에 중요하고 유리한 특징이다.   그러나, 붕괴되지 않은 커다란 촉매 입자가 폴리머에 잔류할 경우, 그러한 입자는 폴리머로부터 형성되는 물체에 결함(defect)을 형성시킬 수 있다.   커다란 촉매 입자가 상대적으로 더 적은 활성 사이트를 가질 경우, 이러한 입자의 불충분한 붕괴를 초래할 수 있고, 그 결과 하류 공정의 결함을 초래할 수 있다.   본 발명은 더 작은 입자의 활성 사이트와 동일한 농도의 활성 사이트를 가진 보다 큰 촉매 입자를 제공하므로, 이들 큰 입자의 붕괴가 용이하게 이루어지도록 하여, 그러한 공정 결함을 감소시키거나 배제시킨다.

[0040]    적합한 무기 지지체 물질로는, 실리카, 알루미나, 혼합 실리카-알루미나와 같은 산화물, 또는 지르코늄, 토륨 또는 마그네슘의 산화물이 포함된다.   다른 원소의 산화물도 무기 지지체 물질의 원자 격자 구조의 일부로서 존

- 7 -

재할 수 있다. 적합하게는, 지지체 물질은 무기 산화물 겔의 형태, 바람직하게는 실리카 겔로 되어 있다.

[0041]  무기 지지체 물질이 크세로겔일 때, 크세로겔은 분무 건조에 의해, 하이드로겔로부터 물을 증발시킴으로써 제조될 수 있고, 또는 예를 들면 증발에 의해 얻어지는 용매-교환된(solvent-exchanged) 겔로부터 교환 용매를 제거하면서, 메탄올, 에탄올, 에틸 아세테이트, 이소프로필 알코올, 또는 다른 적합한 용매와 같은 수-혼화성(water-miscible) 용매와의 용매 교환에 의해 하이드로겔로부터 물을 제거함으로써 제조될 수 있다. 용매를 제거하는 또 다른 방법은, 에틸 아세테이트와 같은 부분적으로 수-혼화성 용매와의 공비 증류에 의한 방법이다. 용매를 하이드로겔에 가하고, 혼합물을 증류한다. 용매가 농후한 응축물을 증류 혼합물에 반송하는 한편, 물이 농후한 증류물은 폐기하여, 하이드로겔 중의 물을 용매로 대체시킨다. 그런 다음, 얻어지는 겔로부터 증발 또는 다른 적합한 수단에 의해 용매를 제거함으로써 크세로겔이 형성될 수 있다.

[0042]  물의 증발을 이용하여 물을 제거함으로써 제조된 크세로겔에 있어서, 상기 방법은 일반적으로, 물을 제거하기 위한 용매 교환 공정에 비해 얻어지는 크세로겔에 대한 최종 기공 체적을 더 감소시키는 결과를 가져온다. 그러나, 용매 교환 방법에 의해 제조된 크세로겔은, 수성 또는 알코올성 용액(본 발명의 크롬염 및/또는 알루미늄염 용액(들))이 기공 구조에 유입될 때, 하이드로겔의 증발 방식의 건조에 의해 형성되는 크세로겔보다 부분적 구조 붕괴(즉, 기공의 상실)를 일으키기가 더 쉽다.

[0043]  분무-건조에 있어서, 전형적으로 하이드로겔은 분쇄되어, 증발에 의해 슬러리 액적으로부터 용매를 플래시시키기 위해 분무 건조기에 공급되는 용매, 통상적으로는 물 중의 분산액을 생성한다. 이것은 건조 조건에 따라서, 건조되거나 부분적으로 건조된 겔의 응집된, 전형적으로는 구형인 입자를 형성한다. 부분적으로 건조된 겔은, 예를 들면 증발 방식의 건조 또는 전술한 바와 같은 용매 교환에 의해 추가로 건조되어 크세로겔을 형성할 수 있다. 상기 공정의 다른 조합도 가능한데, 그러한 예로는 분무 건조 후 추가의 분쇄 단계가 포함된다. 동결-건조도 또 다른 적합한 공정인데, 이것은 건조된 겔의 제조에 이용될 수 있다(그 경우에, 얼음으로서의 물과 같은 고체 형태의 동결된 용매가 진공 하에서 승화에 의해 제거된다).

[0044]  본 발명의 제2 측면의 방법은 용매 교환, 공비 증류, 또는 동결-건조에 의해 건조된 것과 같은 고도로 다공질인 무기 캐리어에 적용될 수 있고, 또한 물의 증발에 의해 제조되는 크세로겔과 같은 상대적으로 낮은 다공도를 가진 다공질 무기 캐리어에도 적용된다.

[0045]  따라서, 본 발명의 제2 측면의 방법은 고도로 다공질인 실리카 크세로겔을 제조하기 위해 용매 교환과 같은 복잡한 용매 제거 방법을 이용할 필요가 없이, 효과적인 올레핀 중합 촉매를 형성하도록 활성화될 수 있는 촉매 전구체를 제조할 수 있다는 것을 발견했다. 또한, 간단한 물의 증발에 의해 제조되는 크세로겔은, 염의 증착을 위한 카르복실레이트 및/또는 알루미늄 카르복실레이트와 같은 크롬염의 수성 또는 알코올성 용액과 접촉하게 되면, 복잡한 건조 공정에 의해 제조된 보다 다공질인 크세로겔보다 기공이 붕괴되는 경향이 적은 것으로 밝혀졌다. 따라서, 본 발명은 또한 기공 구조의 붕괴를 초래하지 않는 크롬 및 알루미늄의 로딩(loading) 또는 적층을 위한 용매(들)과 함께 간단한 크세로겔 제조 공정을 이용할 수 있게 할 뿐 아니라, 상기 용액 중의 용매가 제거될 때, 또는 얻어지는 촉매 전구체가 하소에 의해 활성화될 때 발생되는 유해한 독성의 또는 인화성 흄의 과도한 위험성이 없이 용액으로부터 크롬 및 알루미늄을 높은 레벨로 로딩할 수 있게 한다.

[0046]  강조할 사항은, 본 발명의 제2 측면은 또한, 용매 교환, 공비 증류, 동결 건조 등과 같은 다른 방법에 의해 제조된 크세로겔 또는 다른 무기 캐리어 입자로부터 촉매 전구체를 형성하는 데 사용될 때에도 효과적이고, 하이드로겔로부터 증발 건조에 의해 형성된 크세로겔과 함께 사용하는 것에 한정되지 않다는 것이다.

[0047]  적합한 다공질 무기 지지체 물질은 실리카 크세로겔이다. 티타니아나 알루미늄과 같은 다른 산화물, 또는 그러한 산화물의 혼합물이 실리카 크세로겔의 원자 격자 구조에 포함될 수 있지만, 이것들은 또한 존재하지 않을 수도 있다. 적합하게는, 본 발명에서 사용되는 실리카 크세로겔은 크세로겔의 중량%로 표현했을 때 90중량% 이상의 SiO₂을 포함한다. 그 이유는, 다른 산화물이 존재하면, 실리카 골격 구조의 약화를 초래하여, 무기 지지체 물질의 기공 구조에 높은 다공도를 얻는 것을 잠재적으로 더 어렵게 만들 수 있기 때문이다. 보다 바람직하게는, 실리카 크세로겔은 95중량% 이상의 실리카, 보다 바람직하게는 98중량% 이상의 실리카를 포함한다. 크세로겔 중의 SiO₂ 레벨은 뒤에 설명하는 바와 같이 XRF를 이용한 원소 분석에 의해 적합하게 측정된다.

[0048]  본 명세서에서, 달리 설명되지 않는 한, 중량%는 XRF를 이용한 원소 분석에 의해 측정된 퍼센트를 의미한다. 즉, 퍼센트는 XRF에 의해 측정된 총 물질에 대해 표현된다. XRF용의 샘플 제조에 이용되는 높은 온도는, 물과 같은 모든 휘발성 물질이 측정 이전에 소실되어 포함하지 않을 것임을 의미한다. XRF에 의해 측정되지 않는 붕소의 경우에, 퍼센트는 500℃에서 4시간 동안 건조된 물질을 기준으로 계산된다.

- 8 -

[0049]  적합하게는, 무기 지지체 물질은 0.5~4.0㎤/g 또는 0.5~3.0㎤/g, 바람직하게는 1.0~3.0㎤/g 또는 0.8~2.5㎤/g, 보다 바람직하게는 1.0~2.0㎤/g의 다공도를 가진다.

[0050]  적합하게는, 무기 지지체 물질의 표면적은 100~1,000㎡/g, 예를 들면 200~800㎡/g, 바람직하게는 200~700㎡/g, 예를 들면 250~700㎡/g, 보다 바람직하게는 250~500㎡/g이다.  상기 표면적은 기공 체적과 함께, ASAP2420 분석기(영국 베드포드서 던스터블 소재 Micromeritics Ltd에 의해 공급됨)를 사용하여 질소 다공도 측정법(porosimetry)에 의해 측정된다.  측정을 실시하기 전에 먼저, 상기 기기의 배기 스테이션에서 샘플을 270℃에서 적어도 1시간 동안 탈기시킨다.  샘플 튜브(배기된 샘플을 수용)을 분석 스테이션으로 옮기고, 액체 질소에 침지시키고, 질소 등온선(isotherm)을 관정한다.  0.08~0.20 범위의 P/P₀에서의 데이터 포인트를 취하는 BET 이론을 이용하여, 멀티포인트 표면적을 계산한다.  기공 체적 측정은 적층 레그(leg) 상에 0.98의 P/P₀에 기록된다.

[0051]  촉매 전구체에 대해 다공도 및 표면적 측정이 수행될 때, 샘플은 측정되기 전에 500℃에서 4시간 동안 공기 중에 유지시킨다.

[0052]  본 발명의 제2 측면은 또한, 무기 지지체 물질의 하이드로겔로부터 물을 제거하는 용매 교환 공정에서 사용되는 용매로서, 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액을 이용하여 구현될 수 있다.  교환되고, 그에 따라 로딩된 겔은 이어서 가열되어 용매가 증발되고, 크롬염, 알루미늄 카르복실레이트 및 붕산이 로딩된 촉매 전구체가 형성된다.  이 방법은 실리카 하이드로겔과 같은 하이드로겔과 함께 이용하기에 적합하고, 함침용 유기 용매 중에 유기금속 화합물이 사용되는 경우에 필요한 부가적 건조 단계가 필요하지 않다는 이점을 제공한다.

[0053]  본 발명의 제2 측면을 구현하는 또 다른 방법에서, 무기 지지체 물질은 본 발명의 제2 측면의 방법을 수행하기 전에 미결합 용매를 실질적으로 포함하지 않을 수 있다.  미결합 용매란 진공 오븐에서 140℃에서 1시간 동안 무기 지지체 물질을 가열함으로써 제거될 수 있는 용매를 의미한다.

[0054]  크롬염, 알루미늄 카르복실레이트 및 붕산은 무기 지지체 물질의 기공 구조 내에 적합하게 운반된다.

[0055]  이것은, 예를 들면, 용매 중에 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액을 다공질 무기 지지체 물질 상에 분무한 다음, 용매를 제거함으로써 달성될 수 있다.  예를 들면, 다공질 무기 지지체 물질이 입자상 형태로 되어 있는 경우, 입자를 더블콘 블렌더(double cone blender)와 같은 믹서 내에서 굴리면서 그 위로 용액을 분무할 수 있다.  계속해서, 입자를 오븐에서 또는 유동층 장치를 이용하여 건조시키거나, 플래시 건조기에 통과시켜 용매를 제거할 수 있다.  또 다른 방법은, 가열된 유동층에서 유동화된 입자 상에 상기 용액을 분무함으로써, 용매의 제거와 동시에 기공 구조에 대한 상기 물질의 로딩이 일어나도록 하는 방법이다.  다른 방법으로서, 예를 들면 과량의 용액 중에 입자상 물질을 분산시키고, 여과하여 과량의 용액을 제거한 다음, 용매를 제거하기 위해, 오븐 또는 유동층 장치와 같은 적합한 수단에 의해 입자를 가열하는 방법도 적합하다.  바람직하게는, 다공질 캐리어 입자를 초기에 습윤시키는 공정이 함침 방법으로서 사용되고, 용액은 모세관 힘에 의해 캐리어 입자의 기공 구조 내로 유입된다.  두 가지 용액(제1의 크롬염 용액 및 제2의 알루미늄 카르복실레이트와 붕산을 포함하는 용액)을 사용하여 본 발명의 방법을 수행할 경우, 전술한 것과 동일한 공정을 제1 용액에 대해 사용한 다음, 제2 용액으로 함침시키는 공정(또는 그 역순)을 반복할 수 있다.

[0056]  카르복실레이트란 알킬 카르복실레이트의 염을 의미한다.  적합한 알킬 카르복실레이트로는, 분자 1개당 6개 이하의 탄소 원자, 바람직하게는 4개 이하, 보다 바람직하게는 2개 이하의 탄소 원자를 가진 모노-, 디-, 및 트리-카르복시산이 포함된다.  그러한 카르복실레이트는 촉매 전구체를 활성화시킬 때, 유해하거나 독성인 홈을 과도하게 형성하지 않으면서 분해되는 것으로 밝혀진다.

[0057]  바람직한 모노카르복실레이트로는, 포르메이트, 아세테이트, 락테이트 및 프로피오네이트가 포함된다.  바람직한 디카르복실레이트로는, 옥살레이트, 말레이트, 알레에이트, 말로네이트, 글루타레이트, 숙시네이트가 포함되고, 바람직한 트리카르복실레이트는 시트레이트이다.  카르복실레이트의 혼합물을 이용할 수도 있다.

[0058]  바람직하게는, 크롬염이 카르복실레이트일 때, 크롬염은 크롬 아세테이트이다.  바람직하게는, 알루미늄 카르복실레이트는 알루미늄 아세테이트이다.

[0059]  알루미늄 카르복실레이트와 함께 붕산이 존재하면, 수성 및/또는 알코올성 용액 중의 알루미늄 카르복실레이트의 용해도가 증가되고, 용액으로부터 무기 지지체 물질 상에 적층시키는 데 필요한 농도에서 알루미늄 카르복실레이트의 침전을 초래하지 않는 것으로 밝혀졌다.  크롬염과 알루미늄 카르복실레이트의 용액 중에 붕산이 존재

하면, 수성 및/또는 알코올성 용액 중의 알루미늄 카르복실레이트의 용해도가 증가되고, 크롬염 또는 알루미늄 염의 침전을 초래하지 않으므로, 용액으로부터 무기 지지체 물질의 로딩을 촉진시키는 것으로 밝혀졌다.  이에 따라, 용매가 제거된 후 무기 지지체 물질이 붕산도 함유하게 된다.

[0060]  용액 중에 존재하는 염의 레벨은, 촉매 전구체 및 궁극적인 활성화 촉매에 대한 원하는 로딩 레벨을 얻기 위해, 무기 지지체 물질의 기공 체적을 고려하여 선택될 것이다.  요구되는 레벨은 사용되는 함침 방법 및 무기 지지 체 물질의 다공도에 의존할 것이다.  크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액은 적합하게는, 원소로 환원된 크롬을 0.05~2중량%, 예를 들면 0.1~1중량% 포함한다.  상기 용액은 적합하게는, 원소로 환원 된 알루미늄을 0.1~4중량%, 예를 들면 0.2~2중량% 포함한다.  상기 용액은 적합하게는, 원소로 환원된 붕소를 0.01~0.4중량%, 예를 들면 0.02~0.2중량% 포함한다.  용액 중의 크롬, 알루미늄 또는 붕소의 상한은 특별히 중요하지는 않다.  적합하게는, 용액 중의 알루미늄 대 붕소의 비는, 중량 기준으로 알루미늄/붕소로 표현했을 때, 50/1 내지 3/1, 바람직하게는 40/1 내지 4/1, 보다 바람직하게는 30/1 내지 5/1이다.  적합하게는, 용액 중 의 알루미늄 대 크롬의 비는, 중량 기준으로 알루미늄/크롬으로 표현했을 때, 25/1 내지 1/2, 바람직하게는 8/1 내지 2/3, 보다 바람직하게는 4/1 내지 1/1이다.  크롬염용 용액과, 알루미늄 카르복실레이트 및 붕산용 용액을 별도로 사용하는 경우, 전술한 것과 동일한, 전형적으로 바람직한 레벨이 사용된다.

[0061]  붕산을 용액에 혼입시키기 위한 적합한 수단은, 본 발명의 알루미늄 카르복실레이트의 공급원으로서, 붕산에 의 해 안정화된 상업적으로 입수가능한 염기성 알루미늄 아세테이트를 이용하는 방법을 포함한다.  바람직하게는, 붕산으로 안정화시킨 염기성 알루미늄 아세테이트는 본 발명의 알루미늄 카르복실레이트와 붕산의 공급원으로서 사용된다.  이 물질은, 예를 들면, 원소로 환원했을 때 전형적으로 16~20중량%의 알루미늄과 2.5중량%의 붕소 를 포함하는 백색 분말의 형태로, Sigma Aldrich사로부터 상업적으로 입수가능하다.

[0062]  본 발명의 제1 측면의 촉매 전구체 또는 본 발명의 제2 측면에 의해 제조된 촉매 전구체는 적합하게는, 상기 촉 매 전구체의 표면에 적층되어 있는 담지된 물질(carried material)로서 크롬을, 원소로 환원했을 때 0.01~3중 량%, 바람직하게는 0.1~2중량%를 포함한다.  상기 촉매 전구체는 적합하게는, 상기 촉매 전구체의 표면에 적층되어 있는 담지된 물질로서 알루미늄을, 원소로 환원했을 때 0.1~ 8중량%, 바람직하게는 0.2~4중량%, 보다 바람직하게는 0.5~2.5중량% 포함한다.  상기 촉매 전구체는 적합하게 는, 상기 촉매 전구체의 표면에 적층되어 있는 담지된 물질로서 붕소를, 원소로 환원했을 때 0.005~2중량%, 바 람직하게는 0.01~0.5중량%, 보다 바람직하게는 0.1~0.3중량% 포함한다.  "표면 상에"라는 용어는 임의의 외측 표면 이외에도, 촉매 전구체의 모든 기공 구조의 표면을 포함하는 것을 의미한다.  크롬과 알루미늄의 레벨 은 Phillips PW2400 기기를 이용한 XRF(X-선 형광법)에 의해 적합하게 측정된다.  분석용 샘플은 붕산리튬 플럭 스(flux)를 이용하여 융해된 비즈(beads)로서 제조된다.  융해 온도는 전형적으로 1,000℃ 내지 1,250℃이다.

[0063]  XRF에 의해 측정될 수 없는 붕소는 ICP(유도 결합 플라즈마) 분광법을 이용하여 용액 중에서 적합하게 측정된다.  전형적으로는, 촉매 샘플 1g에 질산 10㎖를 첨가하고, 비등시킨 다음 250㎖가 되도록 희석함으로써 추출물이 생성된다.  ICP에 의해 용해 용액을 분석하기 전에, 이 추출물을 0.45㎛의 필터를 사용하여 여과한다.  붕 소 값은, Varian ICP-OES(Inductively Coupled Plasma-Optical Emission Spectrometer)를 사용하여 매칭된 산 매트릭스(matched acid matrix) 중의 붕소 표준과 비교하여 판정된다.  얻어진 값은 동일한 출처의 촉매 전구체 샘플에 대해 500℃에서의 중량 평형 중량 손실을 측정함으로써, 건조 기준으로 보정된다.  붕소 레벨은 500℃- 건조 물질의 중량에 대한 붕소의 중량으로 표현된다.

[0064]  담지된 물질로서 존재하는 크롬, 알루미늄 및 붕소의 양(즉, 전형적으로는 촉매 전구체의 표면에 적층된 것)은, 함침로서 촉매 전구체를 형성하기 전에 무기 지지체 물질에서의 측정된 레벨과 비교함으로써 판정된다.  담지된 물질로서 존재하는 레벨은, 무기 지지체 물질의 구조 내에 이미 존재하는 Cr, Al 또는 B로부터 임의의 기여분 (contribution)을 뺌으로써 얻어진다.  "담지된 물질로서 존재하다" 및 "표면 상에 적층되다"라는 용어는 무기 지지체 물질의 모든 기공 구조 내에 함유되어 있는 표면 상의 물질을 포함한다.

[0065]  크롬염, 알루미늄 카르복실레이트 및 붕산의 용액을 제공하기 위해 사용되는 용매는, 바람직하게는 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물이다.  이는 용매가 제거될 때 유해한, 인화성 또는 독성인 흄을 피하기 위해서이다.  물, 메탄올, 에탄올, 이소프로판올 및 이것들의 혼합물이 바람직한 용매이고, 물, 메탄올, 에탄올 및 그 혼합물이 특히 바람직하고, 물, 메탄올 및 그의 혼합물이 더욱 바람직하다.  물은 독성과 인화성이 없기 때문에 특히 유용하다.  다른 용매도 본 발명의 성능에 방해가 되지 않는 수준에서 사용되거나, 또는 상기 바람 직한 용매 내에 혼입될 수 있다.

[0066]  바람직하게는, 용매는 적층된 크롬염, 알루미늄 카르복실레이트 및 붕산을 무기 지지체 물질 중에 잔류시키도록

증발에 의해 제거된다.  앞에서 설명한 바와 같이, "제거"라 함은 자유 유동형이고 수송이 용이한 촉매 전구체가 얻어지도록 충분히 용매가 제거되는 것을 의미하고, 용매의 제거 후에 촉매 전구체의 중량%로 표현했을 때, 15중량%에 달하거나 또는 10중량% 미만의 용매가 여전히 존재할 수 있다.  대안적으로, 용매는 미결합 용매가 존재하지 않도록 실질적으로 제거될 수 있다.  미결합 용매란 진공 오븐에서 140℃에서 1시간 동안 무기 지지체 물질을 가열함으로써 제거될 수 있는 용매를 의미한다.

[0067]   본 발명의 제3 측면은, 비환원성 분위기에서 200~1,200℃의 온도, 바람직하게는 300~1,100℃, 보다 바람직하게는 400~900℃의 온도에서 30분 내지 15시간, 바람직하게는 8시간 이하, 보다 바람직하게는 6시간 이하의 시간 동안, 본 발명의 제1 측면에 따른 촉매 전구체의 가열에 의해 얻어지거나 얻을 수 있는 올레핀 중합 촉매, 또는 본 발명의 제2 측면의 방법에 의해 제조되는 올레핀 중합 촉매를 제공한다.

[0068]   바람직하게는, 상기 비환원성 분위기는 공기 또는 산소 또는 이것들의 혼합물과 같은 산소-함유 분위기이다.  이 공정은 활성 올레핀 중합 촉매를 형성하기 위해, 촉매 전구체의 활성화를 하소 공정으로서 알려져 있다.

[0069]   종래 기술의 촉매, 특히 촉매 전구체가 지방족 용매로부터 전달된 유기금속 크롬 및 알루미늄 화합물에 의해 로딩된 촉매에 있어서, 이 활성화 공정은 활성화 공정중에 크롬 및 알루미늄 화합물이 분해될 때 유해한 및/또는 독성인 휘발성 성분의 형성을 초래할 수 있었다.  본 발명은 그러한 바람직하지 않은 활성화 부산물의 형성을 회피한다.

[0070]   전형적으로, 활성화된 올레핀 중합 촉매는, 촉매 전구체에 대해 전술한 바람직한 레벨과 유사한 레벨의 크롬, 알루미늄 및 붕소를 포함한다.  Cr, Al 및 B에 대한 측정 기술은, 촉매 전구체 및 활성화 촉매에 대해 측정된 레벨이 실질적으로 동일하도록, 분석 이전 또는 분석시에 전처리를 실행하는 단계를 포함한다.  촉매에 대한 활성화/하소 공정중에 열에 의해 확산이 활성화되어, 담지된 Al, Cr이 무기 지지체 물질의 표면 상에 존재하지 않고 무기 지지체 물질의 구조 내로 확산될 수 있다.  크롬과 알루미늄의 레벨은 전술한 바와 같이 XRF에 의해 적합하게 측정된다.  붕소도 전술한 바와 같이 측정된다.  촉매 상에 담지된 물질로서 존재하는 양은, 촉매 전구체를 형성하기 위한 함침 공정 이전에 무기 지지체 물질에 이미 존재하는 Cr, Al 및 B의 양으로부터 측정된 양을 뺌으로써 얻어진다.

[0071]   본 발명의 제4 측면은, 본 발명의 제3 측면에 따른 올레핀 중합 촉매의 존재 하에서 중합이 수행되는 것을 특징으로 하는, 하나 이상의 $C_2$~$C_8$ α-알켄의 중합 방법에 관한 것이다.  알켄 또는 다른 모노머와 조합을 이룬 알켄의 혼합물을 사용할 수 있다.  본 발명의 방법을 이용하여, 본 발명의 촉매 전구체로부터 제조된 촉매의 용도는 특별히 알켄 중합에 한정되는 것은 아니지만, 그 목적에 특히 적합하다.  본 발명의 전구체로부터 제조되거나 본 발명의 방법에 의해 제조된 촉매와 조합을 이룬 공촉매를 사용할 수 있다.  전형적으로는, 촉매의 활성화 후에, 주변 온도로 냉각되어 중합 공정에 바로 사용할 수 있도록 저장된다.  본 발명을 이용하여 제조된 촉매는, 용액, 슬러리-루프(slurry-loop), 용액 CSTR(continuous flow stirred tank) 또는 기상 중합과 같은 공정 경로에 의해, 예를 들면 폴리에틸렌의 제조용의 다양한 동종-중합 또는 공중합 경로에서 사용될 수 있다.

### 발명의 효과

[0072]   본 발명에 의하면, 수성 또는 알코올성 용매를 기재로 하는 용액으로부터 크롬 및 알루미늄을 적층시킴으로써 올레핀 중합용 촉매 전구체를 제조할 수 있다.  본 발명의 촉매 전구체를 사용하면 촉매 활성화시 유해하거나 독성인 흄의 형성을 초래하지 않는다.  또한, 본 발명에 의하면, 유기금속을 사용하는 방법에 의해 제조되는 종래 기술의 촉매와 유사한 활성을 가지며, 종래 기술의 촉매에 의해 얻어지는 값 이상의 멜트 인덱스를 가지는 폴리머를 형성할 수 있는 촉매를 제조할 수 있다.

### 발명을 실시하기 위한 구체적인 내용

[0073]   오직 예시로서 본 발명의 특정한 실시예를 설명하기로 한다.

[0074]   **실시예**

[0075]   이하에 상세히 설명하는 실시예에서, ASTM D-1238에 따라, 190℃에서 각각 21.6kg 및 2.16kg의 하중을 사용하여 고부하 멜트 인덱스(HLMI) 및 멜트 인덱스(MI)를 판정했다.

[0076]   사용된 실리카 크세로겔 지지체 물질은 이하에 설명하는 적층 실험을 행하기 이전에, 전술한 방법에 의해 측정했을 때, 검출 가능한 양의 크롬, 알루미늄 또는 붕소를 함유하지 않는 것으로 밝혀졌다.

[0077]   **실시예 1 (비교예 – 헵탄으로부터의 유기금속 – 동종 중합 – 700℃)**

[0078]   하이드로겔의 증발 건조에 의해 실리카 크세로겔 지지체(순수 실리카) 100g을 제조했다.  상기 지지체는 Micromeritics ASAP 2420 분석기를 사용하여 전술한 바와 같이 측정했을 때, 각각 381㎡/g 및 1.76㎤/g의 표면적 및 질소 다공도 분석법에 의한 기공 체적을 가졌다.

[0079]   상기 지지체 입자는 Malvern Mastersizer™을 사용하여 측정했을 때 다음과 같은 입도 분포를 가졌다: $d_{90}$ 169.3 ㎛, $d_{50}$ 114.6㎛ 및 $d_{10}$ 63.4㎛($d_{90}$은 입자의 90중량%가 $d_{90}$ 미만의 직경을 가질 때의 직경이고, $d_{50}$과 $d_{10}$에 대해서도 마찬가지로 정의된다).

[0080]   교반기가 장착된 건조 반응 플라스크에 실리카 크세로겔 지지체(140℃에서 예비 건조된 것) 100g을 투입했다.  상기 플라스크에 헵탄 600㎖를 가하여 실리카/헵탄 슬러리를 형성했다.  자석 교반기가 들어 있는 또 다른 세정된 건조 플라스크에 크롬 아세틸아세토네이트 6.78g을 투입했다.  상기 크롬 아세틸아세토네이트에 헵탄 500㎖를 가하고, 크롬 아세틸아세토네이트 슬러리를 교반하면서 트리이소부틸 알루미늄 용액(헵탄 중의 1.0몰 용액) 64.3㎖를 가했다.  이 반응 혼합물을 방치하여 냉각시켰다.  그 후, Cr/Al 복합 용액을, 실리카와 헵탄이 들어 있는 플라스크에 옮겨 넣었다.  얻어진 슬러리를 추가로 1시간 동안 교반한 다음, 메탄을 6.4㎖를 슬러리에 가했다.  교반을 중단하고, 촉매 전구체 입자를 방치하여 침강시켰다.  과량의 헵탄을 제거하기 위해 슬러리를 여과하고, 용매로 습윤되어 있는 잔류 필터-케이크를 140℃의 건조 오븐에서 건조하여 자유 유동형 녹색 분말을 얻었다.  얻어진 촉매 전구체는 각각의 원소로 나타낸 값으로서 1.06%의 크롬과 1.76%의 알루미늄을 함유했다.  ASAP 2420 기기를 사용하여 촉매 전구체에 대해 측정한 표면적 및 기공 체적은 각각 358㎡/g 및 1.66㎤/g이었다.

[0081]   이 촉매 전구체 10g을, 유동층 반응기에서 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 700℃로 5시간 동안 유지했다.  활성화 촉매 0.148g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 에틸렌을 사용하는 동종중합 조건 하에서 테스트했다.  전체 반응기 압력은 40.3기압이었고, 에틸렌 분압은 16.0기압이었다.  반응기는 104℃로 유지되었다.  폴리에틸렌 370g을 제조했고, 촉매 활성은 2640g/g/hr로 계산되었다.  상기 폴리머는 0.22g/10분의 멜트 인덱스(MI), 19.7g/10분의 고부하 멜트 인덱스(HLMI) 및 0.9611g/㎤의 밀도를 가졌다.

[0082]   **실시예 2 (본 발명에 따름 – 동종중합 – 700℃)**

[0083]   자석 교반기가 들어 있는 비커에 크롬 아세테이트 1.15g과 붕산 안정화 염기성 알루미늄 아세테이트 2.84g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 메탄올 용액을 제조했다.  약 50㎖의 메탄올을 첨가하고, 크롬 염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬과 알루미늄 용액을 실시예 1에서 사용한 것과 같은 건조 실리카 크세로겔 지지체 30g에 가하여, 크롬과 알루미늄 종(species)을 지지체 내로 함침시켰다.  이렇게 형성된 촉매 전구체를 140℃의 진공 오븐에서 3시간 동안 건조함으로써 메탄올을 제거했다.  얻어진 청색/녹색 촉매 전구체 분말은, 원소로 환산했을 때 크롬과 알루미늄을 각각 0.93중량% 및 1.87중량% 함유했다.  붕소 함량은 1,720 중량ppm으로 판정되었다.  Micromeritics ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 364㎡/g 및 1.67㎤/g이었다.

[0084]   이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 700℃로 5시간 동안 유지했다.

[0085]   활성화 촉매 0.172g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 실시예 1에서와 같이 동종중합 조건(즉, 모노머로서 에틸렌을 사용함) 하에서 테스트했다.  전체 반응기 압력은 40.3기압이었고, 에틸렌 분압은 16.0기압이었다.  반응기는 104℃로 유지되었다.  폴리에틸렌 431g이 제조되었고, 촉매 활성은 2839g/g/hr로 계산되었다.  상기 폴리머는 0.22g/10분의 MI, 19.4g/10분의 HLMI 및 0.9606g/㎤의 밀도를 가졌다.

[0086]   **실시예 3 (비교예 – 순차적으로 Cr 다음에 Al 합침 – 동종중합 – 700℃)**

[0087]   7.68중량%의 크롬을 함유하는 크롬 아세테이트 용액을 추가의 물 2,201㎤로 희석하여 크롬 아세테이트 수용액을 제조했다.  이 용액을 실시예 1에 기재되어 있는 실리카 크세로겔 1,500g에 첨가했다.  물을 제거하여 크롬 함량이 0.97%인 자유 유동형 촉매를 수득했다.  표면적과 기공 체적은 각각 380㎡/g 및 1.62㎤/g이었다(ASAP 2420).

[0088]   상기 Cr 함유 실리카 70g을 140℃에서 4시간 동안 예비 건조하고, 밀봉된 플라스크에 넣었다.  헵탄 250㎤을 가

했다.  질소로 퍼지하면서, 헵탄 중의 1.0M 트리이소부틸 알루미늄 용액 43㎤을 가했다.  30분간 교반한 후, 상기 조성물을 여과하고, 얻어진 필터케이크를 진공 오븐에서 140℃에서 건조했다.  생성된 옅은 청색/녹색 촉매 전구체 분말은 크롬 및 알루미늄을, 원소로 환산했을 때 각각 0.95% 및 1.71% 함유했다.  ASAP 2420 분석기를 사용하여 측정한 상기 촉매 전구체의 표면적 및 기공 체적은 각각 375㎡/g 및 1.61㎤/g이었다.

[0089]  이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  온도는 냉각하여 질소로 스위칭하기 전에 700℃로 5시간 동안 유지했다.

[0090]  활성화 촉매 0.172g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 실시예 1에서 사용한 동종중합 조건 하에서 테스트했다.  전체 반응기 압력은 39.9기압이었고, 에틸렌 분압은 15.9기압이었다.  반응기는 104℃로 유지되었다.  폴리에틸렌 447g이 제조되었고, 촉매 활성은 2997g/g/hr로 계산되었다.  상기 폴리머는 0.14g/10분의 MI, 14.4g/10분의 HLMI 및 0.9602g/㎤의 밀도를 가졌다.

[0091]  **실시예 4 (본 발명에 따름 - 공중합 - 600℃ 활성화)**

[0092]  비커에 크롬 아세테이트 33.5g과 붕산 안정화 염기성 알루미늄 아세테이트 96.4g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 수용액을 제조했다.  약 1.44리터의 물을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬 알루미늄 용액을, ASAP 2420 기기를 사용하여 측정한 파라미터로서 377㎡/g의 표면적과 1.75㎤/g의 기공 체적을 가진 실리카 지지체 1kg에 첨가했다.

[0093]  얻어진 촉매 전구체로부터 물을 제거하여, 크롬과 알루미늄의 함량이 원소로 환산하여 각각 1.00중량% 및 1.98중량%인 청색/회색 촉매 분말을 수득했다.  붕소 함량은 2,130ppm으로 판정되었다.  ASAP 2420을 사용하여 측정한 표면적과 기공 체적은 각각 354㎡/g 및 1.63㎤/g이었다.  Malvern Mastersizer™을 사용하여 측정한 이 촉매의 입도 분포는 다음과 같이 판정되었다: d₁₀ 75.1㎛, d₅₀ 126㎛ 및 d₉₀ 180.6㎛.  이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0094]  활성화 촉매 0.180g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 헥센 15㎤을 사용하여 공중합 조건 하에서 테스트했다.  전체 반응기 압력은 40.1기압이었고, 에틸렌 분압은 15.8기압이었다.  반응기는 100℃로 유지되었다.  코폴리머 468g이 제조되었고, 촉매 활성은 2643g/g/hr로 계산되었다.  상기 코폴리머는 10.8g/10분의 HLMI 및 0.9487g/㎤의 밀도를 가졌다.

[0095]  **실시예 5 (비교예 - Al 사용않음 - 공중합 - 600℃ 활성화)**

[0096]  비커에 크롬 아세테이트 33.5g을 가하여 크롬 아세테이트의 수용액을 제조했다.  약 1.44리터의 물을 가하고, 크롬 아세테이트가 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬 용액을 실시예 4에 기재된 바와 같이 실리카 지지체 1kg에 첨가했다.

[0097]  얻어진 촉매 전구체로부터 물을 제거하여, 크롬 함량이 1.03%인 청색/회색 촉매 분말을 수득했다.  ASAP 2420을 사용하여 측정한 표면적과 기공 체적은 각각 376㎡/g 및 1.69㎤/g이었다.  Malvern Mastersizer™에 의한 이 촉매의 입도 분포는 다음과 같이 판정되었다: d₁₀ 75.4㎛, d₅₀ 126.2㎛ 및 d₉₀ 181.3㎛.  이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0098]  활성화 촉매 0.178g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 헥센 15㎤을 사용하여 공중합 조건 하에서 테스트했다.  전체 반응기 압력은 40.0기압이었고, 에틸렌 분압은 15.8기압이었다.  반응기는 100℃로 유지되었다.  코폴리머 459g이 제조되었고, 촉매 활성은 2630g/g/hr로 계산되었다.  상기 코폴리머는 5.7g/10분의 HLMI 및 0.9466g/㎤의 밀도를 가졌다.

[0099]  **실시예 6 (본 발명에 따름 - 공중합 - 600℃ 활성화)**

[0100]  자석 교반기가 들어 있는 비커에 크롬 아세테이트 5.14g과 붕산 안정화 염기성 알루미늄 아세테이트 13.67g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 메탄올 용액을 제조했다.  약 240㎤의 메탄올을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬과 알루미늄 용액을, ASAP 2420 기기를 사용하여 측정한 파라미터로서 383㎡/g의 표면적과 1.75㎤/g의 기공 체적을 가진 실리카 지지체 150g에 첨가하여, 크롬과 알루미늄 종을 실리카 내로 함침시켰다.  상기 촉매를 140℃의 진공 오븐에서 3시간

등록특허 10-1095944

동안 건조함으로써 촉매로부터 과량의 메탄올을 제거했다.   얻어진 청색/회색 촉매 분말은, 원소로서 환산했을 때 크롬과 알루미늄을 각각 1.03중량% 및 1.92중량% 함유했다.   붕소 함량은 1,600ppm으로 판정되었다.   ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 361㎡/g 및 1.63㎤/g이었다.   Malvern Mastersizer$^{TM}$에 의해 측정한 입도 분포는, $d_{10}$ 65.5㎛, $d_{50}$ 118.4㎛ 및 $d_{90}$ 176.4㎛로 나타났다.

[0101]   이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.   냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0102]   활성화 촉매 0.193g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 헥센 15㎤을 사용하여 공중합 조건 하에서 테스트했다.   전체 반응기 압력은 40.0기압이었고, 에틸렌 분압은 15.8기압이었다.   반응기는 100℃로 유지되었다.   코폴리머 490g이 제조되었고, 촉매 활성은 2340g/g/hr로 계산되었다.   상기 코폴리머는 8.6g/10분의 HLMI 및 0.9503g/㎤의 밀도를 가졌다.

[0103]   **실시예 7 (비교예 – 헵탄으로부터의 유기금속 – 공중합 – 600℃ 활성화)**

[0104]   교반기가 장착된 건조 반응 플라스크에, ASAP 2420에 의한 표면적 및 기공 체적이 각각 393㎡/g 및 1.73㎤/g인 실리카 지지체(140℃에서 예비건조됨) 150g을 가했다.   상기 플라스크에 헵탄 900㎤을 가하여 실리카/헵탄 슬러리를 형성했다.   자석 교반기가 들어 있는 또 다른 세정된 건조 플라스크에 크롬 아세틸아세토네이트 9.51g을 가했다.   상기 크롬 아세틸아세토네이트에 헵탄 80㎤를 가하고, 크롬 아세틸아세토네이트 슬러리를 교반하면서 트리이소부틸 알루미늄 용액(헵탄 중의 1.0몰 용액) 100.1㎤를 가했다.   이 반응 혼합물을 방치하여 냉각시켰다.   그 후, Cr/Al 복합 용액을, 실리카와 헵탄이 들어 있는 플라스크에 옮겨 넣었다.   얻어진 슬러리를 추가로 1시간 동안 교반한 다음, 메탄올 9.6㎤를 슬러리에 가했다.   교반을 중단하고, 촉매 전구체 입자를 방치하여 침강시켰다.   과량의 헵탄을 제거하기 위해 슬러리를 여과하고, 용매로 습윤되어 있는 잔류 필터-케익을 140℃의 건조 오븐에서 건조하여 자유 유동형 녹색 분말을 얻었다.   얻어진 촉매 전구체는 각각의 원소로 나타낸 값으로서 0.99중량%의 크롬과 1.86중량%의 알루미늄을 함유했다.   ASAP 2420 기기를 사용하여 측정한 표면적 및 기공 체적은 각각 375㎡/g 및 1.63㎤/g이었다.

[0105]   이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.   냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0106]   활성화 촉매 0.190g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 공중합 조건(헥센 15㎤을 사용) 하에서 테스트했다.   전체 반응기 압력은 40.1기압이었고, 에틸렌 분압은 15.9기압이었다.   반응기는 100℃로 유지되었다.   코폴리머 484g이 제조되었고, 촉매 활성은 2215g/g/hr로 계산되었다.   상기 코폴리머는 8.0g/10분의 HLMI 및 0.9508g/㎤의 밀도를 가졌다.

[0107]   **실시예 8 (비교예 – 크롬 및 알루미늄의 질산염 사용 – 공중합 – 600℃ 활성화)**

[0108]   자석 교반기가 들어 있는 비커에 Cr(NO₃)₃·9H₂O 7.54g 및 Al(NO₃)₃·9H₂O 25.72g을 가하여 질산크롬과 질산알루미늄의 메탄올 용액을 제조했다.   약 143㎤의 메탄올을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.   상기 크롬/알루미늄 용액을, ASAP 2420 기기를 사용하여 측정한 파라미터로서 377㎡/g의 표면적과 1.75㎤/g의 기공 체적을 가진 실리카 100g에 첨가했다.

[0109]   상기 촉매를 140℃의 진공 오븐에서 3시간 동안 건조함으로써 촉매로부터 과량의 메탄올을 제거했다.   얻어진 청색/녹색 촉매 전구체는, 원소로서 환산했을 때 크롬과 알루미늄을 각각 1.06중량% 및 1.96중량% 함유했다.   ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 362㎡/g 및 1.64㎤/g이었다.

[0110]   Malvern Mastersizer$^{TM}$에 의해 측정한 입도 분포는, $d_{10}$ 73.8㎛, $d_{50}$ 125.2㎛ 및 $d_{90}$ 180.4㎛로 나타났다.

[0111]   이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.   냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0112]   활성화 촉매 0.185g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 공중합 조건(헥센 15㎤을 사용) 하에서 테스트했다.   전체 반응기 압력은 40.1기압이었고, 에틸렌 분압은 16.0기압이었다.   반응기는 100℃로 유지되었다.   코폴리머 485g이 제조되었고, 촉매 활성은 2666g/g/hr로 계산되었다.   상기 코폴리머는 6.4g/10분의 HLMI 및 0.9508g/㎤의 밀도를 가졌다.

[0113]   **실시예 9 (비교예 – 헵탄으로부터의 유기금속)**

[0114]   하이드로겔의 동결 건조에 의해 실리카 크세로겔 지지체(순수 실리카) 100g을 제조했다.   상기 지지체는 Micromeritics ASAP 2420 분석기를 사용하여 전술한 바와 같이 측정했을 때, 각각 321㎡/g 및 2.32㎤/g의 표면적 및 질소 다공도 분석법에 의한 기공 체적을 가졌다.

[0115]   상기 지지체 입자는 Malvern Mastersizer$^{TM}$을 사용하여 측정했을 때 다음과 같은 입도 분포를 가졌다: $d_{90}$ 182.8 ㎛, $d_{50}$ 76.5㎛ 및 $d_{10}$ 12.9㎛.   교반기가 장착된 건조 반응 플라스크에 실리카 크세로겔 지지체(140℃에서 예비 건조된 것) 25g을 투입했다.   상기 플라스크에 헵탄 150㎤를 가하여 실리카/헵탄 슬러리를 형성했다.   자석 교반기가 들어 있는 또 다른 세정된 건조 플라스크에 크롬 아세틸아세토네이트 1.82g을 투입했다.   상기 크롬 아세틸아세토네이트에 헵탄 20㎤를 가하고, 크롬 아세틸아세토네이트 슬러리를 교반하면서 트리이소부틸 알루미늄 용액(헵탄 중의 1.0몰 용액) 17.3㎤를 가했다.   이 반응 혼합물을 방치하여 냉각시켰다.   그 후, Cr/Al 복합 용액을, 실리카와 헵탄이 들어 있는 플라스크에 옮겨 넣었다.   얻어진 슬러리를 추가로 1시간 동안 교반한 다음, 메탄올 1.7㎤를 슬러리에 가했다.   교반을 중단하고, 촉매 전구체 입자를 방치하여 침강시켰다.   과량의 헵탄을 제거하기 위해 슬러리를 여과하고, 용매로 습윤되어 있는 잔류 필터-케이크를 140℃의 건조 오븐에서 건조하여 자유 유동성 녹색 분말을 얻었다.   얻어진 촉매 전구체는 각각의 원소로 나타낸 값으로서 1.05%의 크롬과 1.73%의 알루미늄을 함유했다.   ASAP 2420 기기를 사용하여 촉매 전구체에 대해 측정한 표면적 및 기공 체적은 각각 301 ㎡/g 및 2.21㎤/g이었다.

[0116]   **실시예 10 (본 발명에 따름)**

[0117]   자석 교반기가 들어 있는 비커에 크롬 아세테이트 1.07g과 붕산 안정화 염기성 알루미늄 아세테이트 2.85g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 메탄올 용액을 제조했다.   약 74㎤의 메탄올을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.   이 크롬과 알루미늄 용액을 실시예 9에서 사용한 것과 같은 실리카 크세로겔 지지체 30g에 가하여, 크롬과 알루미늄 종을 지지체 내로 함침시켰다.   이렇게 형성된 촉매 전구체를 140℃의 진공 오븐에서 3시간 동안 건조함으로써 메탄올을 제거했다.   얻어진 청색/녹색 촉매 전구체 분말은, 원소로 환산했을 때 크롬과 알루미늄을 각각 0.96중량% 및 1.76중량% 함유했다.   붕소 함량은 1,380 중량ppm(0.138%)으로 판정되었다.   Micromeritics ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 306㎡/g 및 2.13㎤/g이었다.

[0118]   실시예 1 내지 3은 모두 유사한 입자 크기, 기공 체적, 표면적 및 Cr과 Al의 유사한 로딩을 가지는 촉매를 사용한 700℃에서의 동등한 동종중합에 관한 것이었음을 알아야 한다.   실시예 1은 종래 기술에 따라 제조된 촉매였다.   본 발명에 따라 제조된 촉매를 사용한 실시예 2는 종래 기술의 촉매를 사용하여 얻어진 것과 유사한 호모폴리머 밀도 및 멜트 인덱스를 가졌다.   수용액으로부터 Cr을 적층시킨 다음, 유기금속 경로에 따라 Al을 적층시킴으로써 촉매를 제조한 실시예 3에서는 실시예 1 또는 2에서 얻어진 것보다 멜트 인덱스가 상당히 낮은 호모폴리머가 수득되었는데, 이는 상기 경로를 이용하여 제조된 촉매의 성질이 상이하다는 것을 나타내는 것이다.   실시예 1에서의 촉매의 활성화도 유해한 흄의 형성을 초래했다.

[0119]   실시예 4 내지 8은 모두 600℃에서의 공중합에 관한 것이었다.   여기서도 마찬가지로, Cr만이 존재한 실시예 5(Al 불포함)를 제외하고는, 촉매에 대한 입자 크기, 기공 체적 및 기공 체적이 Cr 및 Al 로딩과 아울러 실질적으로 동일했다.   실시예 7(비교예)은 종래 기술에 따라 유기금속 경로를 이용하여 제조된 촉매를 사용하는 방법에 해당했다.   여기서는 HLMI 값이 8.0인 코폴리머가 수득되었다.   실시예 4와 6은 본 발명의 방법의 구현예에 의해 제조된 촉매를 사용한 것으로서, Cr/Al이 각각 수용액과 메탄올 용액으로부터 적층되었다.   이들 예에서는 각각 10.8 및 8.6의 HLMI 값이 얻어졌으며, 이는 본 발명에 따라 제조된 촉매가 종래 기술의 촉매의 HLMI 값과 대등하거나 능가할 수 있음을 나타내는 것이다.   알루미늄을 사용하지 않은 실시예 5(비교예)는 요구되는 HLMI 값인 8.0 이상을 제공하지 못했다.   메탄올 용매로부터 질산크롬 및 질산알루미늄을 적층시키는 방법을 이용하여 촉매가 제조된 실시예 8(비교예)도 적합한 HLMI 값을 제공하지 못했다(HLMI 값이 6.4에 불과했음).   또한, 실시예 7과 8에서의 촉매의 활성화는 유해한 흄의 형성을 초래했다.

[0120]   실시예 9와 10은 동결 건조 경로에 의해 제조된, 다공도가 높은 무기 캐리어 상에 촉매 전구체를 형성하기 위한, 본 발명의 제2 측면에 따른 방법의 구현예에 관한 것이다.   상기 방법을 적용함으로써 다공도의 약간의 감소가 일어나지만, 상기 방법은 캐리어의 붕괴를 일으키지 않고 높은 다공도의 캐리어에 적용가능하다는 것이 명백하다.

[0121]   따라서, 본 발명에 따른 전구체를 사용하여 제조된 활성화 촉매는, 종래의 유기금속 경로에 의해 제조된 전구체로부터 제조된 종래 기술의 촉매와 동일하거나 그보다 높은 멜트 인덱스를 제공한다는 것을 알 수 있다.   또한,

상기 촉매는 유사한 활성을 가지면서도, 본 발명의 촉매 전구체로부터 촉매를 활성화하는 동안 유해한 홉의 형성을 초래하지 않는다.   또한, 본 발명의 방법은 전구체를 형성하는 종래 기술의 방법에 비해서, 얻어지는 촉매 전구체에 대한 다공도의 실질적인 손실을 초래하지 않는다.

[0122]   첨부된 청구의 범위에 정의된 본 발명의 범위를 벗어나지 않고 상기 실시예에 대한 변형을 이룰 수 있음을 이해해야 할 것이다.   예를 들면, 크세로겔 지지체는, 하이드로겔을 미분하여 수성 슬러리를 형성한 다음, 하이드로겔의 직접적인 증발 건조하지 않고 분무-건조함으로써 제조될 수 있다.

# EXHIBIT  B

Registered patent 10-1211924



**(19) Korea Intellectual Property Office (KR)**
**(12) Registered Patent Publication (B1)**

(45) Publication Date:   December 13, 2012
(11) Registration No.:   10-1211924
(24) Registration Date:   December 7, 2012

(51) International Patent Classification (Int. Cl.)
*C08F 4/22*   (01. 2006)   *C08F 4/12*   (01. 2006)
*C08F 10/00* (01. 2006)   *C08F 210/16* (01. 2006)
(21) Application No.      10-2011-7022339 (Divisional)
(22) Application date (Int'l)          October 15, 2008
      Date requested for examination      October 10, 2012
(85) Translation submission date      September 23, 2011
(65) Laid-open publication No.      10-2011-0115176
(43) Laid-open publication date      October 20, 2011
(62) Original application          Patent 10-2010-7011247
      Original application date (Int'l)    October 15, 2008
      Date requested for examination      January 21, 2011
(86) International application No.      PCT/GB2008/003488
(87) International Laid-open No.      WO 2009/053672
      International Laid-open date      April 30, 2009
(30) Priority claim
      0720983.6   October 26, 2007   Great Britain (GB)
(56) Prior art research references
      KR100664894 B1
      JP20030508599 A
      EP0055863 A2
      EP0055864 A2
Total number of claims: 15

(73) Patentee
      PQ Silicas UK Limited
      4 Liverpool Road, Bank Quay, Warrington
      WA5 1AB, Chelshire, England
(72) Inventor
      Christine Elizabeth Marsden
      4 Lime Wood Close, Chester, 4HD CH2,
      England
      Robert Joseph Parker
      226 Warrington Road, Penketh, Warrington,
      Cheshire, WA5 2RX, England
(74) Agent
      YOU ME Patent & Law Firm

                                    Examiner: Hee Mahn Kang

(54) Title of the Invention: **Catalyst precursor particles, their preparation and use**

**(57) ABSTRACT**
A method for preparing a catalyst precursor for an olefin polymerization catalyst involves the use of aqueous solutions or alcoholic solutions of a chromium salt and of boric acid and aluminum carboxylate for deposition onto an inorganic support material, such as a silica xerogel. Said chromium salt, aluminum carboxylate and boric acid are sufficiently soluble for deposition from a single solution to be effective. Said catalyst precursor can be activated by calcination to form a catalyst for homo- or co-polymerization of α-olefins having productivity and melt flow index for the resulting polymer or copolymer which is comparable to the results obtained with catalysts prepared by the organometallic routes of the prior art. The activation of said catalyst precursor generates reduced levels of toxic or noxious fumes during activation compared to the use of organometallic sources of chromium or aluminum.

Registered patent 10-1211924

*WHAT IS CLAIMED IS:*

Claim 1
A method for preparing a catalyst precursor for an olefin polymerization catalyst, the catalyst precursor comprising an silica xerogel inorganic support material that includes $SiO_2$ having 90% ~ 100% by weight, said silica xerogel carrying a chromium salt, aluminum carboxylate and boric acid within the pore structure of the inorganic support material, said method comprising:

i) a step of providing a silica xerogel inorganic support material containing 90% ~ 100% by weight with porosity of 0.5 ~ 4.0 $cm^3/g$;

ii) a step of providing a solution containing chromium salt, aluminum carboxylate and boric acid in the solvent which is water, $C_1$~ $C_4$ aliphatic alcohol, or a mixture thereof

iii) a step of depositing said solution onto said inorganic support material; and

iv) a step of removing said solvent to form the catalyst precursor containing chromium salt, aluminum carboxylate and boric acid within said silica xerogel pore structure


Claim 2
A method for preparing a catalyst precursor according to claim 1, wherein said solvent is removed by evaporation


Claim 3
A method for preparing a catalyst precursor according to claim 1, wherein said silica xerogel is prepared by evaporating water from silica hidrogel


Claim 4
A method for preparing a catalyst precursor according to claim 1, wherein Said silica xerogel is prepared by evaporating water from silica hydrogel by solvent exchange with a water-miscible solvent and removal of said water-miscible solvent


Claim 5
A method for preparing a catalyst precursor according to claim 1, wherein said aluminum carboxylate is aluminum acetate


Claim 6
A method for preparing a catalyst precursor according to claim 5, wherein said chromium salt is carboxylate, sulphate, chloride or a mixture thereof


Claim 7
A method for preparing a catalyst precursor according to claim 6, wherein said chromium salt is chromium carboxylate


Claim 8
A method for preparing a catalyst precursor according to any of claims 1 through 7, wherein said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element

- 2 -

Claim 9
An olefin polymerization catalyst precursor including silica xerogel having 90% ~ 100% by weight of $SiO_2$ and comprising within said silica xerogel pore structure chromium salt, selected from chromium carboxylate, chromium sulphate, chromium chloride, or mixtures thereof; aluminum carboxylate; and boric acid.

Claim 10
An olefin polymerization catalyst precursor according to claim 9, wherein
said aluminum carboxylate is aluminum acetate

Claim 11
An olefin polymerization catalyst precursor according to claim 10, wherein
said chromium carboxylate is chromium carboxylate

Claim 12
An olefin polymerization catalyst precursor according to claim 11, wherein
said chromium salt is chromium acetate

Claim 13
An olefin polymerization catalyst precursor according to any of claims 9 through 12, wherein
said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element

Claim 14
A method of preparing an olefin polymerization catalyst that includes heating of the catalyst precursor according to claim 13 for 30 minutes ~ 15 hours at 200 ~ 1,200°C in a non-reducing atmosphere

Claim 15
Method of polymerizing one or more $C_2 \sim C_8$ α-alken, wherein
said polymerization process is carried out in the presence of the olefin polymerization catalyst prepared with a method according to claim 14

Claim 16

Deleted

Claim 17

Deleted

Claim 18

Deleted

Claim 19

Deleted

### SPECIFICATION

### FIELD OF ART

[0001]   The present invention relates to porous inorganic particles, particularly silica particles, carrying chromium and aluminum compounds, and the preparation methods thereof. Said particles, particularly silica particles, may be activated so as to form catalyst particles for use in the polymerization of olefins (α-alkenes).

### BACKGROUND ART

[0002]   Typical activated catalysts for use in the polymerization process of olefins comprise chromium oxide carried on a porous inorganic support. For many uses, it is desirable if aluminum oxide is also present, either as part of the inorganic support itself (for instance in cases where the support is a silica-alumina co-gel support), or carried in the pore structure of the porous inorganic support.

[0003]   The incorporation of mixtures of oxides into the molecular structure of the inorganic support tends to weaken said structure and make it more difficult to achieve high porosities for the inorganic porous support material. For this reason, it is desirable to have alumina included along with the chromium oxide within the pore structure (i.e. deposited on the pore surfaces) of the inorganic porous support material.

[0004]   U.S. Patent 3,984,351 discloses olefin polymerization catalysts prepared by depositing a chromium compound and an aluminum compound on an inorganic support material and heating said support material in a non-reducing atmosphere at a temperature above 300°C. The resulting material is then combined with a metal or non-metal reducing agent, preferably a boron-containing compound, to provide a catalyst to be used in the polymerization of olefins. Silica xerogels are presented as preferred support materials. Said catalysts are prepared by depositing chromium and aluminum compounds on the inorganic support. The compounds presented are organic compounds and said deposition is made from an inert, organic solvent. The disclosed catalyst system provides improved olefin polymer characteristics, such as improved melt indexes.

[0005]   GB 1 575 352 discloses the preparation method and use of supported, chromium-containing catalysts to be used for polymerization of one or more α-alkenes. In the process disclosed, a chromium 1, 3-diketo compound such as chromium acetyl acetonate is reacted with an organometallic compound of a Group IIA or Group IIIA metal, preferably with aluminum or magnesium, from the periodic table of elements. For instance, tri-isobutyl aluminum may be used. If the organometallic compound is added to the chromium compound, the chromium compound is melted in aliphatic or cycloaliphatic solvents such as heptane, making it possible to use the resultant solution for impregnation of a porous inorganic support material. The chromium and metal compounds can then be deposited on surfaces within the pore structure of the inorganic support material by evaporation of the solvent. Preferred porous inorganic support materials are silicas.

[0006]   After removal of the solvent, the impregnated particles (i.e., inorganic porous support particles impregnated with chromium and metal compounds) need to be activated in order to make them useful as catalyst particles. In general, since the carrier particles are sold and transported in unactivated form (referred to in this specification as unactivated catalyst particles), they require activation prior to being used as catalyst particles for olefin polymerization. Activation is carried out by heating the unactivated catalyst particles at a high temperature such as 200°C ~ 1200°C for a few seconds, but typically for several hours in a non-reducing atmosphere such as nitrogen, inert gas or carbon dioxide such that the chromium is converted to a chromium VI state. Once activated, the catalyst is used at once, or stored in a dry, inert atmosphere until it is used.

[0007]   According to the process of GB 1 575 352, a porous inorganic carrier material can be simultaneously impregnated with both chromium compound and aluminum compound.  However, said method requires that the chromium and aluminum compounds be dissolved in an aliphatic and/or cycloaliphatic solvent, leading to potential flammability and solvent recovery problems when evaporating the solvent following impregnation. Furthermore, the chromium and aluminum compounds present on the unactivated catalyst particles are complex organometallic compounds. When the unactivated catalyst particles are subjected to activation by heating in a non-reducing or an oxidizing atmosphere, the degradation of these compounds leads to the formation of odorous and potentially toxic fumes, leading to a requirement for containment, scrubbing and emission control. Furthermore, we the inventors have found that some solutions of chromium and aluminum compounds have high viscosities, and so are unsuitable for impregnation of the solution into the pore structure of an inorganic porous support material.

[0008]   WO 99/12978 discloses catalysts prepared by a process comprising a first stage in which a porous inorganic oxide support is impregnated with a chromium compound and am optional second stage in which the product obtained from the first stage is impregnated with either a titanium or an aluminum compound.

- 4 -

Said chromium compound is a chromium oxide or a chromium compound, which can be converted to chromium oxide by calcining such as chromium nitrate, sulphate, carbonate, acetate, acetyl acetonate, aluminum chromate or tert-butyl chromate. The aluminum compounds presented are acetyl acetate, acetyl acetonate, alkoxy or alkyl types. The solvents to be used are not specified, but the aluminum compounds presented would not be significantly soluble in polar solvents. There are potential problems, which may arise from carrying out chromium compound impregnation and aluminum compound impregnation as separate steps by a method such as that disclosed in WO 99/12978. The first impregnation, which follows solvent removal, may lead to partial or complete blocking of the pore structure of the inorganic porous carrier material, possibly making it more difficult, or impossible, for a second impregnation to be carried out effectively. Furthermore, even though such pore blocking does not take place, the catalytic behavior of the mixture of chromium and aluminum may be modified because the chromium and aluminum are not co-mingled at the atomic level in the catalyst precursor. Instead, separate particles of aluminum compound may be deposited onto the chromium compound already present. This may lead to a change in the catalyst activity and a possible reduction in the melt index for the polymer produced using the activated catalyst.

[0009]   U.S. Patent 4,814,308 discloses a supported catalyst containing chromium, phosphorus and aluminum, each being in an oxide form, used in combination with a co-catalyst. The supported catalyst is formed by means of impregnating the porous support particles using chromium and aluminum organometallic compounds in an organic solvent. Said co-catalyst is lithium alkyl and boron alkyl. In the comparative example, which uses aluminum nitrate, phosphoric acid and chromium nitrate to deposit chromium and aluminum onto a porous silicate carrier, a catalyst precursor is produced having low productivity and low melt flow index compared to the organometallic route, when activated and used for polymerization of olefins.

[0010]   Hence, in order to form catalyst precursors that overcomes some or all of the problems of the prior art, there is a need for a method for impregnation of chromium and aluminum compounds onto inorganic porous support materials. There is also a need for the activated catalyst formed from the precursors in order to provide the melt flow index and productivity similar to that of the prior art catalysts that are prepared using organometallic compounds or co-polymerization of olefins. It is desirable to use an aqueous, or lower aliphatic alcohol, solution of chromium and aluminum compounds for impregnation of the inorganic support material. If such solvents are used instead of higher-grade aliphatic, non-polar compounds such as heptane, the process-related problems associated with solvent removal would be reduced just as the harmful substances are reduced during the evaporation process, particularly, in cases where water is used as a solvent. Although chromium salts such as nitrate, carboxylates (e.g., acetates and oxalates) and sulphate are soluble in water, lower aliphatic alcohols or their mixtures, it has been identified that dissolution of aluminum compounds along with the chromium compounds in order to form a mixed solution is generally not possible at the concentrations needed for deposition onto an inorganic support. It has also been identified that, in cases where a few soluble aluminum salts are used for deposition of aluminum onto an inorganic catalyst, the resulting activated catalyst, when used for olefin polymerization, provides reduced HLMI compared to a catalyst prepared from organometallic chromium and aluminum compounds.

[0011]   Hence there is a need to identify a method for including aluminum in a dissolved form in the solutions that contains chromium salts dissolved in water, $C_1 \sim C_4$ aliphatic alcohol, or mixtures thereof, which does not lead to the precipitation of insoluble chromium or aluminum salts. There is also a need to identify a method of depositing aluminum salts from water, $C_1 \sim C_4$ aliphatic alcohol, or mixtures thereof onto an inorganic carrier, along with chromium salts contained on the same inorganic carrier, so that the resulting activated catalyst has similar properties to prior art catalysts prepared using organometallic compounds deposited from non-polar solvents.

[0012]   Furthermore, many of the chromium and/or aluminum compounds used in the prior art, particularly organometallic compounds, can generate noxious or toxic fumes during the activation or calcination of catalyst precursor in order to form activated catalyst. This may require complex fume treatment equipment at the site where the catalyst precursor is activated.

### *DESCRIPTION OF THE INVENTION*

### *TECHNICAL PROBLEMS TO BE SOLVED BY THE PRESENT INVENTION*

[0013]   Above all, it is an object of the present invention to provide a method for preparing catalyst precursors by deposition of chromium and aluminum from aqueous or alcoholic solvent-based solutions. It is another object of the present invention to provide a method for preparing catalyst precursors which can avoid the formation of noxious or toxic fumes during catalyst activation. It is yet another object of the present invention to provide catalyst precursors which, when activated, can provide catalysts for homo-polymerization or co-polymerization of α-alkenes (olefins) having activities similar to prior art catalysts prepared by organometallic method, and which can be used to form polymers with melt indexes equal to or greater than the values achieved with such prior art catalysts.

- 5 -

### MEANS FOR SOLVING THE PROBLEMS

[0014]   Surprisingly, it has been found that solutions of chromium and/or aluminum compounds in water, $C_1 \sim C_4$ aliphatic alcohol, or mixtures thereof can be prepared with sufficiently high concentrations of chromium and/or aluminum to be useful for coating or impregnating inorganic support material in order to form unactivated catalyst particles (i.e., catalyst precursor particles) comprising chromium and aluminum compounds deposited on the inorganic support material. Said solutions can have sufficiently low viscosity for penetrating the pore structure of porous inorganic support materials. Since the solvent can be easily removed by evaporation to form the catalyst precursor, the problems relating to loading the atmosphere with volatile organic compounds or flammability are reduced, particularly in cases where the solvent is water or includes water. Moreover, the selected compounds are such that their decomposition, along with the decomposition of any and all residual solvent, during the activation of the catalyst, does not generate toxic or noxious fumes like those formed by some organometallic compounds and solvents used in the prior art.

[0015]   Moreover, sequential deposition of chromium compounds and then aluminum compounds, or sequential deposition in the reverse order, yields acceptable catalyst precursors having properties equivalent to those in which the chromium and aluminum compounds are deposited together.

[0016]   A first aspect of the present invention provides a catalyst precursor for an olefin polymerization catalyst comprising an inorganic support material that carries chromium salt, aluminum carboxylate and boric acid.

[0017]   A second aspect of the invention provides a method for preparing a catalyst precursor according to the first aspect of the present invention for an olefin polymerization catalyst comprising:

[0018]   i) a step of providing the inorganic support material;

[0019]   ii) a step of depositing a chromium salt onto said inorganic support material from a first solution comprising a chromium salt in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof;

[0020]   iii) a step of depositing an aluminum carboxylate and boric acid onto said inorganic support material from a second solution comprising an aluminum carboxylate and boric acid in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof; and

[0021]   iv) a step of removing solvent to form the catalyst precursor comprising chromium salt, aluminum carboxylate, and boric acid,

[0022]   *[Note: The source text at 0022 is included in 0017 due to the nature of the Korean sentence structure.]*

[0023]   Said chromium salt may be deposited onto the inorganic support material from the first solution. And solvent of the first solution may be removed before the aluminum carboxylate and boric acid are deposited from the second solution. Also, said process may be carried out by depositing the aluminum carboxylate and boric acid from the second solution to begin with, and by removing the solvent of the second solution before chromium salt is deposited from the first solution.

[0024]   Preferably, for process simplicity, the method of the second aspect of the present invention is executed using a single solution comprising chromium salt, aluminum carboxylate and boric acid.

[0025]   Hence, a preferred method of the second aspect of the present invention comprises:

[0026]   i) a step of providing the inorganic support material;

[0027]   ii) a step of providing a solution comprising chromium salt, aluminum carboxylate and boric acid in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof;

[0028]   iii) a step of depositing said solution onto said inorganic support material; and

[0029]   iv) a step of removing said solvent to form the catalyst precursor comprising chromium salt, aluminum carboxylate and boric acid.

[0030]   *[Note: The source text at 0030 is included in 0025 due to the nature of the Korean sentence structure.]*

[0031]   By "removing the solvent", those skilled in the art would understand that sufficient amount of solvent is removed in order to form a dry and free-flowing easy-to-transport catalyst precursor. This may mean that a portion of the residual solvent may remain as part of the catalyst precursor. For instance, the catalyst precursor may contain 15% or less residual solvent, preferably 10% or less, and still behave as a free-flowing powder. Any such residual solvent will be removed when the catalyst precursor is activated to form an activated catalyst. Alternatively, the solvent may be substantially fully removed from the catalyst precursor such that no unbound solvent may remain after solvent removal.

[0032]   The preferred aspects and embodiments of the present invention detailed below apply to both the first and second aspects of the present invention, where appropriate.

[0033]   A "catalyst precursor" means a product, which is suitable for handling and transporting to a site where it can be activated in order to be used as a catalyst, particularly as an olefin polymerization catalyst. Generally, such catalysts are activated by means of heating in a non-reducing atmosphere shortly before use as described below. Hence the catalyst precursor is a commercially useful material that can be used to form catalysts simply by activation or calcination.

[0034]   Carboxylate, nitrate, sulphate, chloride or a mixture thereof are suitable as chromium salt, but any appropriate chromium salt may be used. Chromium sulphates, chlorides or carboxylates are particularly preferred salts. Among those, carboxylates are particularly preferred as they do not generate toxic or noxious fumes during activation of the catalyst precursor. In addition to such a reason, chromium acetate is particularly preferred because of its high solubility in the solvents used in the method of the second aspect of the present invention. Suitably, the chromium salt should have solubility in the solvent such that said solution may comprise at least 1% by weight of chromium expressed as the element, preferably 2% or higher, and yet more preferably 4% or more.

[0035]   Suitably, the inorganic support material is a porous inorganic oxide.

[0036]   Typically, said inorganic support material is in the form of particles having a weight mean particle diameter ($D_{[4, 3]}$) of 1 ~ 300µm. This typical mean diameter also applies to the catalyst precursor particles and to the activated catalyst particles, which have essentially the same particle diameter as the support material. This is measured by analyzing the particle size by means of light scattering Malvern Mastersizer™ model S having 300RF lens (measurement range 0.05 ~ 900µm), Malvern Mastersizer™ software v. 2.18, and a DIF 2012 dispersion unit. This instrument made by Malvern Instruments, located in Worcestershire, Melbourne in Australia uses a Mie theory to calculate the particle size distribution. The Mie theory predicts how light is scattered by spherical particles and takes into account the refractive index of the particles. The real value used for silica refractive index is 1.4564. And  the real value is 0.1 for the imaginary refractive index of the particle (the absorption of light) when the refractive index of water dispersant is 1.33.

[0037]   Suitably, said particles have a $d_{90}$ of 500µm or less, preferably 400µm or less. Said particles may have a $d_{50}$ of 300µm or less. Said particles may have a $d_{10}$ of 1µm or more, preferably 10µm or more. (For the sake of clarity, $d_{90}$ is the diameter at which 90% by weight of the particles have a diameter less than $d_{90}$ and this definition applies to $d_{50}$ and $d_{10}$ as well). Preferably, said particles have a $d_{50}$ of 1 ~ 300µm, more preferably 5 ~ 250µm, and even more preferably 25 ~ 150µm.

[0038]   Said particles may be prepared by comminution, which is optionally combined with size classification by a means such as sieving. Or said particles may be prepared by a method such as spraying-drying.

[0039]   Another advantage of the second aspect method of the present invention is that the chromium and aluminum are found to be more evenly distributed over particles of varying diameters when the inorganic support material is of a particulate form. Prior art methods such as the method described in GB 1 575 352 may lead to smaller particles of inorganic material that carries higher concentrations of the chromium and aluminum, thereby leading to potentially less effective utilization of the catalytically active surfaces during polymerization. Also, when the activated catalysts are used to catalyze polymerization, polymerization at active sites within the catalysts tends to lead to fragmentation of the support material. This fragmentation of the catalyst particles during polymerization is an important and advantageous characteristic as it means that the catalyst particles do not have to be removed from the polymer. However, if large un-fragmented catalyst particles remain in the polymer, they can form defects in the articles formed from the polymer. If large catalyst particles have fewer active sites, this can lead to poor fragmentation of these particles and consequent downstream process defects. The present invention provides larger catalyst particles having active sites with the same concentration as the active site of smaller particles, facilitating fragmentation of these larger particles and reducing or eliminating such process defects.

[0040]   Suitable inorganic support materials include oxides such as silica, alumina, mixed silica-alumina or oxides of zirconium, thorium or magnesium. Oxides of other elements may also be present as part of the atomic lattice structure of the inorganic support material. Suitably, the support material is in the form of an inorganic oxide gel, preferably a silica gel.

[0041]   When xerogel is the inorganic support material, xerogel may be prepared by means of spray drying by evaporating water from a hydrogel. Or, for example, it may be prepared by removing water from a hydrogel by solvent exchange with a water-miscible solvent such as, methanol, ethanol, ethyl acetate, isopropyl alcohol or some other suitable solvent, along with removal of the exchanging solvent from the resulting solvent-exchanged gel obtained by evaporation.

- 7 -

Another method for removing solvent is by azeotropic distillation with a partially water-miscible solvent such as ethyl acetate. The solvent is added to the hydrogel and the mixture is distilled. A solvent-rich condensate is returned to the distilling mixture while the water-rich distillate is discarded, leading to replacement of the water in the hydrogel with the solvent. The resulting gel may then have the solvent removed by evaporation or other suitable means to form xerogel.

[0042] For xerogels, which is prepared by water removal by means of water evaporation, said process generally leads to lower final pore volumes for the resulting xerogels than would a solvent exchange process to remove water. However, a xerogel prepared by a solvent exchange method is more prone to partial structural collapse (i.e., loss of porosity) than is a xerogel formed by evaporative drying of a hydrogel, when an aqueous or alcoholic solution (such as the chromium salt and/or aluminum salt solution or solutions of the present invention) enters the pore structure.

[0043] In case of spray-drying, typically a hydrogel is communited to produce a dispersion in a solvent -- usually water -- which is fed to a spray dryer to flash off the solvent from slurry droplets by evaporation. This forms agglomerated -- typically spheroidal -- particles of dried or partially dried gel, depending on the drying conditions. Partially dried gel may be further dried to form xerogel by, for instance, evaporative drying or by solvent exchange as described above. Other combinations of said processes are possible. An example includes a further comminution step after spray drying. Freeze-drying is another suitable process, which may be used for the preparation of dried gel (where frozen solvent in a solid form, e.g., water as ice is removed by sublimation under vacuum).

[0044] The second aspect method of the present invention is applicable to highly porous inorganic carriers such as those dried by solvent exchange, azeotropic distillation, or freeze-drying as well as to less porous inorganic carriers with lower porosities such as xerogels prepared by water evaporation.

[0045] Hence, it was found that the second aspect method of the present invention can produce catalyst precursors, which can be activated to form effective olefin polymerization catalysts, without the need to use complex solvent removal methods such as solvent exchange in order to produce highly porous silica xerogels. Moreover, it was found that xerogels produced by simple water evaporation are less susceptible to pore collapse than more porous xerogels produced by complex drying processes when contacted with an aqueous or alcoholic solution of chromium salt such as carboxylate and/or aluminum carboxylate for deposition of the salts. Hence the present invention not only makes it possible to use a simple xerogel preparation process along with a solvent or solvents for loading or depositing chromium and aluminum that do not cause pore structure to collapse, but allows to load chromium and aluminum at a high level from the solution without an excessive risk of noxious, toxic or flammable fumes generated when the solvent in said solution is removed, or when the resulting catalyst precursor is activated by calcination.

[0046] It should be emphasized that the second aspect of the present invention is also effective when used to form catalyst precursors from xerogels or other inorganic carrier particles made by other methods such as solvent exchange, azeotropic distillation, freeze drying, etc., and that it is not limited to use with xerogels formed by evaporative drying from a hydrogel.

[0047] Silica xerogel is a suitable porous inorganic support material. Other oxides such as titanium or aluminum or mixtures of such oxides may be included in the atomic lattice structure of the silica xerogel, but these may not be present, either. Suitably, silica xerogels used in the present invention comprise 90% or more by weight of $SiO_2$, expressed as percentage by weight of the xerogel. This is because the presence of other oxides may lead to weakening of the silica skeletal structure, making it potentially more difficult to achieve high porosity in the pore structure of the inorganic support material. More preferably, the silica xerogels comprises 95% or more by weight of silica, more preferably 98% or more by weight of silica. The $SiO_2$ level in the xerogel is appropriately measured by an elemental analysis using XRF as described below.

[0048] In this specification, unless otherwise explained, percentages by weight refer to percentages as measured by an elemental analysis using XRF. In other words, percentages are expressed in relation to the total material measured by XRF. The high temperatures used in sample preparation for XRF mean that all the volatile materials such as water will have been lost prior to measurement and will not be included. In case of boron, which is not measurable by XRF, percentages are calculated on the basis of a material dried at 500°C for 4 hours.

[0049] Suitably, the inorganic support material has porosity of 0.5 ~ 4.0 cm$^3$/g or 0.5 ~ 3.0 cm$^3$/g, preferably of 1.0 ~ 3.0 cm$^3$/g or 0.8 ~ 2.5 cm$^3$/g, and more preferably of 1.0 ~ 2.0 cm$^3$/g.

- 8 -

[0050]   Suitably the surface area of the inorganic support material is $100 \sim 1000$ m$^2$/g, for instance $200 \sim 800$ m$^2$/g, preferably $200 \sim 700$ m$^2$/g, for instance from 250 to 700 m$^2$/g, and more preferably $250 \sim 500$ m$^2$/g. Said surface area, along with the pore volume, is measured by nitrogen porosimetry using an ASAP2420 analyzer (supplied by Micromeritics Ltd. located in Dunstable, Bedfordshire in UK). Samples are first outgassed at 270°C for at least 1 hour on said instrument's outgassing station prior to measurement. The sample tube (containing the outgassed sample) is transferred to the analysis station, submerged in liquid nitrogen and a nitrogen isotherm is determined. A multipoint surface area is calculated using a BET theory that takes data points in the $P/P_0$ range of $0.08 \sim 0.20$. The measurements of the pore volumes are recorded at $P/P_0$ of 0.98 on the desorption leg.

[0051]   When porosity and surface area measurements are carried out on the catalyst precursors, the samples are held in air at 500°C for 4 hours prior to measurement.

[0052]   The second aspect of the present invention may also be implemented by using a solution comprising chromium salt, aluminum carboxylate and boric acid in a solvent which is water, $C_1 \sim C_4$ aliphatic alcohol, or a mixture thereof as the solvent used in a solvent exchange process to remove water from a hydrogel of the inorganic support material. The exchanged and hence loaded gel is then heated to have the solvent evaporated and the catalyst precursor is formed, loaded with chromium salt, aluminum carboxylate and boric acid. This process is suitable for use with hydrogels such as silica hydrogels and it provides the advantage that no additional drying step is needed such as is required when organometallic compounds are used in organic solvents for impregnation.

[0053]   In another method for implementing the second aspect of the present invention, the inorganic support material may be substantially free of unbound solvent prior to carrying out the method of the second aspect of the present invention. An unbound solvent means a solvent that can be removed by heating the inorganic support material in a vacuum oven at 140°C for 1 hour.

[0054]   Chromium salt, aluminum carboxylate and boric acid are suitably carried within a pore structure of the inorganic support material.

[0055]   For example, this may be achieved by spraying a solution comprising chromium salt, aluminum carboxylate and boric acid in a solvent, onto the porous inorganic support material, followed by the removal of the solvent. For example, if the porous inorganic support material is in a particulate form, the particles may be tumbled in a mixer such as a double cone blender while the solution is sprayed onto them. Subsequently, the particles may be dried in an oven or using a fluidized bed apparatus, or passed through a flash drier to remove solvent. Another method is to spray said solution onto the fluidized particles in a heated fluidized bed, whereby loading of said materials to the pore structure takes place concurrently with the solvent removal. As another method, for example, it is appropriate to disperse the particulate material in an excess solution, which is filtered to remove the excess solution, and then heat the particles by a suitable means such as an oven or in a fluidized bed apparatus in order to remove the solvent. Preferably, incipient wetting of porous carrier particles is used as the impregnation method, with the solution being drawn into the pore structure of the carrier particles by capillary forces. When the method of the present invention is carried out using two solutions (a first chromium salt solution and a second solution comprising aluminum carboxylate and boric acid), the same process described above may be used for the first solution, followed by repetition of the process for impregnation with the second solution (or vice versa).

[0056]   Carboxylate means a salt of an alky carboxylate. Suitable alkyl carboxylates include mono-, di-, and tri-carboxylic acids with 6 or fewer carbon atoms per molecule, preferably 4 or fewer, and more preferably 2 or fewer. It was found that such carboxylates decompose upon activation of the catalyst precursor without excessively generating noxious or toxic fumes.

[0057]   Preferred monocarboxylates include formate, acetate, lactate and propionate. Preferred dicarboxylates include oxalate, malate, aleate [*sic. maleate*], malonate, glutarate, and succinate. And a preferred tricarboxylates is citrate. Mixtures of carboxylates may also be employed.

[0058]   Preferably, when the chromium salt is a carboxylate, it is chromium acetate. Preferably, the aluminum carboxylate is aluminum acetate.

[0059]   It was found that, if boric acid exists along with aluminum carboxylate, solubility of aluminum carboxylate in the aqueous and/or alcoholic solution is increased, which does not lead to precipitation of aluminum carboxylate at the concentrations needed for deposition onto the inorganic support material from the solution. It was found that, if boric acid exists in a solution of the chromium salt and aluminum carboxylate, solubility of the aluminum carboxylate in the aqueous and/or alcoholic solution is increased, which does not lead to precipitation of the chromium salt or of the aluminum salt. Hence it facilitates loading of the inorganic support material from the solution. As a result, the inorganic support material contains boric acid as well after removal of the solvent.

- 9 -

[0060]   The levels of salts present in a solution will be selected by taking into account the pore volume of the inorganic support material in order to obtain desired loading levels for the catalyst precursor and the eventual activated catalyst. The levels needed depend upon the impregnation method used and porosity of the inorganic support material. The solution comprising chromium salt, aluminum carboxylate and boric acid suitably comprises 0.05% ~ 2% by weight of chromium expressed as the element, for instance, 0.1% ~ 1%. Said solution suitably comprises 0.1% ~ 4% by weight of aluminum expressed as the element, for instance, 0.2% ~ 2%. Said solution suitably comprises 0.01% ~ 0.4% by weight of boron expressed as the element, for instance, 0.02% ~ 0.2%. The upper limit of the chromium, aluminum or boron in the solution is not particularly important. Suitably, the ratio of aluminum to boron in the solution, expressed as aluminum/boron by weight, is 50/1 ~ 3/1, preferably 40/1 ~ 4/1, and more preferably 30/1 ~ 5/1. Suitably, the ratio of aluminum to chromium in the solution, expressed as aluminum/chromium by weight, is 25/1 ~ 1/2, preferably 8/1 ~ 2/3, and more preferably 4/1 ~ 1/1. When the solution for chromium salt, solution for aluminum carboxylate and solution for boric acid are separately used, typical and preferred levels are used, which are the same as those described above.

[0061]   A suitable means for incorporating boric acid into the solution involves the use of commercially available basic aluminum acetate stabilized with boric acid as the source of the aluminum carboxylate of the present invention. Preferably, basic aluminum acetate stabilized by boric acid is used as a source of aluminum carboxylate and of boric acid for the present invention. For example, this material is commercially available from Sigma Aldrich in the form of a white powder typically comprising 16 ~ 20% by weight of aluminum and 2.5% by weight of boron expressed as the elements.

[0062]   * The catalyst precursor of the first aspect of the present invention or the catalyst precursor prepared by the second aspect of the present invention suitably comprises, as carried material, deposited on the surfaces of said catalyst precursor, of 0.01 ~ 3% by weight of chromium expressed as the element, preferably 0.1 ~ 2%, and more preferably 0.25 ~ 1.5%. Said catalyst precursor suitably comprises, as carried material, deposited on the surfaces of the catalyst precursor, of 0.1 ~ 8% of aluminum expressed as the element, preferably 0.2 ~ 4%, and more preferably 0.5 ~ 2.5%. Said catalyst precursor suitably comprises, as carried material, deposited on the surfaces of the catalyst precursor, of 0.005 ~ 2% of boron expressed as the element, preferably 0.05 ~ 0.5%, and more preferably 0.1 ~ 0.3% by weight. The term "on the surfaces" is meant to include the surfaces within any pore structure of the catalyst precursor in addition to any external surfaces. The levels of chromium and aluminum are suitably measured by means of XRF (X-ray fluorescence method) using a Phillips PW2400 instrument. Samples for analysis are prepared as fused beads using a lithium borate flux. Fusion is typically between 1000°C and 1250°C.

[0063]   Boron, which cannot be measured by XRF, is suitably measured in solution using ICP (Inductively Coupled Plasma) spectrometry. Typically an extract is generated by adding 10cm$^3$ of nitric acid to 1g of catalyst sample, boiling and subsequently diluting to 250 cm$^3$. Prior to analysis of the extract by ICP, this extract is filtered using a 0.45μm filter. Boron values are determined by comparison with boron standards in a matched acid matrix using a Varian ICP-OES (Inductively Coupled Plasma--Optical Emission Spectrometer). The value obtained is corrected to a dry basis value by measuring the weight equilibrium weight loss at 500°C for a catalyst precursor sample of the same provenance. The boron level is expressed as the weight of boron relative to the weight of 500°C-dried material.

[0064]   The amounts of chromium, aluminum and boron present as carried materials (i.e., typically, deposited on the surfaces of the catalyst precursor) are determined by comparison with the measured levels in the inorganic support material prior to impregnation to form the catalyst precursor. The levels present as carried material are obtained by subtracting any contribution from Cr, Al or B already existing in the structure of the inorganic support material. The terms "present as carried material" and "deposited on the surfaces" include the material on surfaces contained within all the pore structures of the inorganic support material.

[0065]   The solvent used to provide the solution of chromium salt, aluminum carboxylate and boric acid is preferably water, $C_1 ~ C_4$ aliphatic alcohol, or a mixture thereof. This is to avoid noxious, flammable or toxic fumes when the solvent is removed. Water, methanol, ethanol, isopropanol and mixtures thereof are preferred solvents. And water, methanol and ethanol and their mixtures are particularly preferred. And water, methanol and mixtures thereof are especially preferred. Water is particularly useful because of its lack of toxicity and flammability. Other solvents may also be used or incorporated into said preferred solvents at the levels such that they do not interfere with the performance of the present invention.

[0066]   Preferably, the solvent is removed by evaporation in order to leave the chromium salt, aluminum carboxylate and boric acid deposited in the inorganic support material. As described above, "removal" means that sufficient amount of solvent is removed such that a free-flowing and easily-transportable catalyst precursor is obtained. And as much as 15% or 10% or less by weight of solvent may still be present, expressed as percent by weight of the catalyst precursor, after solvent removal. Alternatively, solvent may be substantially removed such that there is no unbound solvent. An unbound solvent means a solvent, which can be removed by heating the inorganic support material in a vacuum oven at 140°C for 1 hour.

[0067]   A third aspect of the present invention provides an olefin polymerization catalyst obtained or obtainable by heating a catalyst precursor according to the first aspect of the present invention or prepared according to the method of the second aspect of the present invention in a non-reducing atmosphere at a temperature of 200 ~ 1200°C, preferably 300 ~ 1100°C, and more preferably 400 ~ 900°C for a time period of 30 minutes to 15 hours, preferably up to 8 hours, and more preferably up to 6 hours.

[0068]   Preferably, said non-reducing atmosphere is an oxygen-containing atmosphere such as air, oxygen or mixtures thereof. This process is known as activation or calcination of the catalyst precursor in order to form the active olefin polymerization catalyst.

[0069]   For catalysts of the prior art, particularly those where the catalyst precursor was loaded with organometallic chromium and aluminum compounds delivered from aliphatic solvents, this activation process could lead to generation of noxious and/or toxic volatile components as the chromium and aluminum compounds decomposed during the activation process. The present invention avoids generation of such undesirable by-products of activation.

[0070]   Typically, the activated olefin polymerization catalyst comprises chromium, aluminum and boron at the levels similar to the preferred levels described above for the catalyst precursor. The measurement techniques for Cr, Al and B include pre-treatment before or during analysis such that the measured levels for catalyst precursor and activated catalyst are practically the same. Thermally activated diffusion during the activation / calcination process for the catalyst may lead to the carried Al and Cr diffusing into the structure of the inorganic support material, rather than being present on its surfaces. The levels of chromium and aluminum are suitably measured by means of XRF as described above. Boron is also measured as described above. The amounts present as carried material on the catalyst are obtained by subtracting the measured amounts of Cr, Al and B already existing in the inorganic support material prior to impregnation to form a catalyst precursor.

[0071]   A fourth aspect of the present invention relates to a method for polymerization of one or more $C_2 \sim C_8$ α-alkenes characterized in that polymerization is carried out in the presence of an olefin polymerization catalyst according to the third aspect of the present invention. Mixtures of alkenes or alkenes in combination with other monomers may be employed. The use of the catalysts prepared from the catalyst precursors of the present invention according to the method of the present invention is not particularly restricted to alkene polymerization, but it is particularly suitable for that purpose. Co-catalyst prepared from the precursors of the present invention or co-catalyst in combination with the catalyst prepared in accordance with the method of the present invention may be used. Typically, after activation of the catalyst, it is cooled to the ambient temperature and stored ready for use in polymerization. The catalyst prepared according to the present invention may be used in a variety of homo- or co-polymerization routes, for instance, for production of polyethylenes, by the process routes such as solution, slurry-loop, solution CSTR (continuous flow stirred tank) or gas phase polymerization.

### *EFFECT OF THE INVENTION*

[0072]   According to the present invention, it is possible to prepare catalyst precursors for olefin polymerization by depositing chromium and aluminum from a solution based on aqueous or alcoholic solvent. Use of the catalyst precursors according to the present invention does not lead to generation of toxic or noxious fumes during activation of catalyst. Also, according to the present invention, it is possible to prepare a catalyst that can form polymers having activation similar to the catalyst of the prior art prepared in a method that employs organometals and having melt indexes higher than the values obtained by the catalyst of the prior art.

### *DETAILED DESCRIPTION FOR REDUCING THE INVENTION TO PRACTICE*

[0073]   Specific embodiments of the present invention will now be described only as the examples.

[0074]   Embodiment

[0075]   In the embodiments described below, high load melt index (HLMI) and melt index (MI) were determined in accordance with ASTM D-1238 using loads of 21.6 kg and 2.16 kg respectively at 190°C.

[0076]   It was found that the silica xerogel support materials used contain no measurable amounts of chromium, aluminum or boron when measured by the methods described above, prior to carrying out the deposition experiments described below.

- 11 -

[0077] Embodiment 1 (Comparative example - Organometals from Heptane – Homopolymerization - 700°C)

[0078] 100g of a silica xerogel support (pure silica) was prepared by evaporative drying of a hydrogel. When measured as described above using a Micromeritics ASAP 2420 analyzer, said support had a surface area of 381m$^2$/g and the pore volume of 1.76cm$^3$/g by nitrogen porosimetry.

[0079] When measured with Malvern Mastersizer™, said support particles had the following particle diameter distribution: d$_{90}$ of 169.3μm, d$_{50}$ of 114.6μm and d$_{10}$ of 63.4μm. (d$_{90}$ is the diameter at which 90% by weight of the particles have a diameter less than d$_{90}$ and the definitions apply to d$_{50}$ and d$_{10}$ as well.)

[0080] 100 g of the silica xerogel support (pre-dried at 140°C) was added to a dry reaction flask fitted with a stirrer. 600 cm$^3$ of heptane were added to said flask to form a silica/heptane slurry. 6.78 g chromium acetylacetonate was added to another cleansed dry flask containing a magnetic stirrer. 500cm$^3$ of heptane was added to said chromium acetylacetonate and 64.3cm$^3$ of triisobutyl aluminum solution (1.0 molar solution in heptane) was added while stirring the chromium acetylacetonate slurry. This reaction mixture was allowed to cool. Then the Cr/Al complex solution was transferred to the flask containing silica and heptane. The resulting slurry was stirred for one additional hour and then 6.4cm$^3$ methanol was added to the slurry. Stirring was stopped and the catalyst precursor particles were left to settle. The slurry was filtered to remove excess heptane and the residual filter-cake, which was wet with solvent, was dried in a drying oven at 140°C to obtain a free flowing green powder. The resulting catalyst precursor contained 1.06% chromium and 1.76% aluminum expressed as the respective elements. The surface area and the pore volume were determined for the catalyst precursor using the ASAP 2420instrument, and the results were 358m$^2$/g and 1.66 cm$^3$/g respectively.

[0081] 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 700°C for 5 hours before cooling and switching to nitrogen. 0.148g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor, which was tested under the homopolymerization conditions of using ethylene. Total reactor pressure was 40.3 atm and the ethylene partial pressure was 16.0 atm. The reactor was maintained at 104°C. 370 g of polyethylene was prepared and the catalyst activity was calculated to be 2,640 g/hr. Said polymer had a melt index (MI) of 0.22 g/10 min, a high load melt index (HLMI) of 19.7g/10 min and a density of 0.9611 g/cm$^3$.

[0082] Embodiment 2 (According to the present invention - Homopolymerization -700°C)

[0083] A methanolic solution of chromium acetate and aluminum acetate was prepared by adding 1.15g of chromium acetate and 2.84g of boric acid stabilization basic aluminum acetate to a beaker containing a magnetic stirrer. Approximately 50cm$^3$ of methanol was added and said composition was stirred for 1 hour for all chromium and aluminum salts to be dissolved. This chromium and aluminum solution was added to 30g of the dried silica xerogel support, same as the one used in Embodiment 1, such that the chromium and aluminum species were impregnated into the support. The catalyst precursor thus formed was dried in a vacuum oven at 140°C for 3 hours to remove methanol. The resulting blue/green catalyst precursor powder had chromium and aluminum contents of 0.93% and 1.87% by weight expressed as the respective element. Boron content was determined at 1,720 ppm by weight. The surface area and the pore volume determined with the Micromeritics ASAP 2420 were 364 m$^2$/g and 1.67cm$^3$/g, respectively.

[0084] 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 700°C for 5 hours before cooling and switching to nitrogen.

[0085] 0.172g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the homopolymerization conditions (i.e., using ethylene as monomer) as was the case in Embodiment 1. Total reactor pressure was 40.3atm and the ethylene partial pressure was 16.0 atm. The reactor was maintained at 104°C. 431g of polyethylene was prepared and the catalyst activity was calculated to be 2,839 g/hr. Said polymer had MI of 0.22 g/10 min, HLMI of 19.4g/10 min and a density of 0.9606 g/cm$^3$.

[0086] Embodiment 3 (Comparative example - Sequential Cr - Al impregnation - Homopolymerization - 700°C)

[0087] An aqueous solution of chromium acetate was prepared by diluting a chromium acetate solution that contains 7.68% by weight of chromium with additional 2,201 cm$^3$ of water. This solution was added to 1,500g of silica xerogel described in Embodiment 1. Water was removed to yield a free flowing catalyst having a chromium content of 0.97%. The surface area and the pore volume were 380m$^2$/g and 1.62cm$^3$/g (ASAP 2420), respectively.

- 12 -

[0088]   70g of said Cr-containing silica was pre-dried at 140°C for 4 hours and placed in a sealed flask. 250cm$^3$ of heptane was added. 1.0 molar triisobutyl aluminum solution in heptane was added while purging with nitrogen. After stirring for 30 minutes, said composition was filtered and the resulting filter cake was dried in a vacuum oven at 140°C. The pale blue/green catalyst precursor powder generated contained chromium and aluminum contents of 0.95% and 1.71% expressed as the respective elements. The surface area and the pore volume of said catalyst precursor measured with ASAP 2420 were 375 m$^2$/g and 1.61 cm$^3$/g, respectively.

[0089]   10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 700°C for 5 hours before cooling and switching to nitrogen.

[0090]   0.172g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the homopolymerization conditions used in Embodiment 1. Total reactor pressure was 39.9 atm and the ethylene partial pressure was 15.9 atm. The reactor was maintained at 104°C. 447 g of polyethylene was prepared and the catalyst activity was calculated to be 2,997g/g/hr. Said polymer had MI of 0.14 g/10 min, HLMI of 14.4 g/10 min and a density of 0.9602 g/cm$^3$.

[0091]   Embodiment 4 (According to the present invention - Copolymerization - 600°C activation)

[0092]   An aqueous solution of chromium acetate and aluminum acetate was prepared by adding 33.5g of chromium acetate and 96.4g of boric acid stabilized basic aluminum acetate to a beaker. Approximately 1.44 liters of water was added and said composition was stirred for 1 hour for both chromium and aluminum salts were dissolved. This chromium aluminum solution was added to 1kg of silica support having a surface area of 377 m$^2$/g and a pore volume of 1.75 cm$^3$/g, both parameters being determined using the ASAP 2420 instrument.

[0093]   Water was removed from the resulting catalyst precursor, yielding blue/grey catalyst powder which had chromium and aluminum contents of 1.00% and 1.98% by weight of the respective elements. Boron content was determined to be 2,130 ppm. The surface area and the pore volume determined with ASAP 2420 were 354m$^2$/g and 1.63cm$^3$/g, respectively. Particle diameter distribution was determined for this catalyst by Malvern Mastersizer™ which indicated: d$_{10}$ of 75.1μm, d$_{50}$ of126μm and d$_{90}$ of 180.6μm. 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0094]   0.180g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions using 15cm$^3$ hexene. Total reactor pressure was 40.1 atm and the ethylene partial pressure was 15.8 atm. The reactor was maintained at 100°C. 468 g of copolymer was prepared and the catalyst activity was calculated to be 2,643g/g/hr. Said copolymer had HLMI of 10.8g/10 min and a density of 0.9487g/cm$^3$.

[0095]   Embodiment 4 (Comparative example - no Al used - copolymerization - 600° C activation)

[0096]   An aqueous solution of chromium acetate was prepared by adding 33.5g of chromium acetate to a beaker. Approximately 1.44 liters of water was added and said composition stirred for 1 hour so that all chromium acetate was dissolved. This chromium solution was added to 1kg of silica support as described in Embodiment 4.

[0097]   Water was removed from the resulting catalyst precursor, yielding blue/grey catalyst powder which had a chromium content of 1.03%. The surface area and the pore volume determined with ASAP 2420 were 376m$^2$/g and 1.69cm$^3$/g, respectively. Particle diameter distribution was determined for this catalyst by Malvern Mastersizer™ which indicated: d$_{10}$ of 75.4μm, d$_{50}$ of 126.2μm and d$_{90}$ of 181.3μm. 10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0098]   0.178g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions using 15cm$^3$ hexene. Total reactor pressure was 40.0 atm and the ethylene the partial pressure was 15.8 atm. The reactor was maintained at 100°C. 459g of copolymer was prepared and the catalyst activity was calculated to be 2,630g/g/hr. Said copolymer had HLMI of 5.7g/10 min and a density of 0.9466 g/cm$^3$.

[0099]   Embodiment 6 (According to the present invention - Copolymerization - 600°C activation)

[0100]   A methanolic solution of chromium acetate and aluminum acetate was prepared by adding 5.14g of chromium acetate and 13.67g of boric acid stabilized basic aluminum acetate to a beaker containing a magnetic stirrer. Approximately 240cm$^3$ of methanol was added and said composition stirred for 1 hour so that all chromium and aluminum salts were dissolved. This chromium aluminum solution was added to 150g of silica support having a surface area of 383m$^2$/g and the pore volume of 1.75Cm$^3$/g, both parameters being determined by ASAP2420 instrument, so that the chromium and aluminum species were impregnated into the silica. Excess methanol was removed from said catalyst by drying in a vacuum oven at 140°C for 3 hours.

- 13 -

The resulting blue/grey catalyst powder had chromium and aluminum contents of 1.03% and 1.92% by weight of the respective elements. Boron content was determined to be 1,600 ppm. The surface area and the pore volume determined using ASAP 2420 were 361m$^2$/g and 1.63cm$^3$/g, respectively. Particle diameter distribution was determined by Malvern Mastersizer™ and indicated: $d_{10}$ of 65.5μm, $d_{50}$ of 118.4μm and $d_{90}$ of 176.4μm.

[0101]   10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0102]   0.193g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions using 15cm$^3$ hexene. Total reactor pressure was 40.0 atm and the ethylene partial pressure was 15.8 atm. The reactor was maintained at 100°C. 490g of copolymer was prepared and the catalyst activity was calculated to be 2,340g/g/hr. Said copolymer had HLMI of 8.6g/10 min and a density of 0.9503g/cm$^3$.

[0103]   Embodiment 7 (Comparative example - Organometals from Heptane - Copolymerization - 600°C activation)

[0104]   150g of silica support (pre-dried at 140°C) with a surface area and a pore volume of 393m$^2$/g and 1.73cm$^3$/g, respectively, measured by ASAP 2420 were added to a dry reaction flask fitted with a stirrer. 900cm$^3$ of heptane was added to said flask to form a silica/heptane slurry. 9.51g of chromium acetylacetonate was added to another cleansed dry flask containing a magnetic stirrer. 80cm$^3$ of heptane was added to said chromium acetylacetonate and 100.1cm$^3$ of triisobutyl aluminum solution (1.0 molar in heptane) was added while stirring the chromium acetylacetonate slurry. This reaction mixture was left to cool. Then, the Cr/Al complex solution was transferred to the flask containing silica and heptane. The resulting slurry was stirred for one additional hour and then 9.6cm$^3$ of methanol was added to the slurry. Stirring was stopped and catalyst particles were left to settle. The slurry was filtered to remove excess heptane and the residual solvent wet filter-cake was dried in a drying oven at 140°C to obtain free flowing green powder. The resulting catalyst precursor contained 0.99% chromium by weight and 1.86% aluminum by weight as the respective elements. Surface area and pore volume measured with an ASAP 2420 instrument were 375 m$^2$/g and 1.63cm$^3$/g, respectively.

[0105]   10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0106]   0.190g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions (using 15cm$^3$ hexene). Total reactor pressure was 40.1 atm and the ethylene partial pressure was 15.9 atm. The reactor was maintained at 100°C. 484g of copolymer was prepared and the catalyst activity was calculated to be 2,215 g/g/hr. Said copolymer had HLMI of 8.0g/10 min and a density of 0.9508g/cm$^3$.

[0107]   Embodiment 8 (Comparative example - chromium and aluminum nitrates used - copolymerization - 600°C activation)

[0108]   A methanolic solution of chromium nitrate and aluminum nitrate was prepared by adding 7.54g of Cr(NO$_3$)$_3$·9H$_2$O and 25.71g of Al(NO$_3$)$_3$·9H$_2$O to a beaker containing a magnetic stirrer. Approximately 143cm$^3$ of methanol was added and said composition was stirred for 1 hour so that all chromium and aluminum salts were dissolved. Said chromium/aluminum solution was added to 100g of silica having a surface area of 377m$^2$/g and a pore volume of 1.75cm$^3$/g, both parameters being determined using an ASAP2420 instrument.

[0109]   Excess methanol was removed from the catalyst by drying said catalyst in a vacuum oven at 140°C for 3 hours. The resulting blue/green catalyst precursor had chromium and aluminum contents of 1.06% and 1.96% by weight of the respective elements. The surface area and the pore volume measured with ASAP2420 were 362m$^2$/g and 1.64cm$^3$/g, respectively.

[0110]   Particle size distribution measured by Malvern Mastersizer™ indicated: $d_{10}$ of 73.8μm, $d_{50}$ of 125.2μm and $d_{90}$ of 180.4μm.

[0111]   10g of this catalyst precursor was activated in a fluidized bed reactor using dry air as the fluidization gas. The temperature was maintained at 600°C for 5 hours before cooling and switching to nitrogen.

[0112]   0.185g of activated catalyst was transferred to a 5-liter isobutane slurry polymerization reactor and tested under the copolymerization conditions (using 15cm$^3$ hexene). Total reactor pressure was 40.1 atm and the ethylene partial pressure was16.0 atm. The reactor was maintained at 100°C. 485 g of copolymer was prepared and the catalyst activity was calculated as 2,666 g/g/hr. Said copolymer had HLMI of 6.4g/10 min and a density of 0.9508g/cm$^3$.

[0113]   Embodiment 9 (Comparative example - Organometals from heptane)

- 14 -

[0114]  100g of a silica xerogel support (pure silica) was prepared by freeze drying of hydrogel. When measured by a Micromeritics ASAP 2420 analyzer as described above, said support had a surface area of $321 m^2/g$ and a pore volume of $2.32 cm^3/g$ by nitrogen porosimetry.

[0115]  Said support particles had the following particle diameter distribution measured by a Malvern Mastersizer™: $d_{90}$ of 182.8µm, $d_{50}$ of 76.5µm and $d_{10}$ of 12.9µm. 25 g of silica xerogel support (pre-dried at140°C) was added to a dry reaction flask fitted with a stirrer. $150 cm^3$ of heptane was added to said flask to form a silica/heptane slurry. 1.82g of chromium acetylacetonate was added to another cleansed dry flask containing a magnetic stirrer. $20 cm^3$ of heptane was added to said chromium acetylacetonate and $17.3 cm^3$ of triisobutyl aluminum (1.0 molar solution in heptane) was added while stirring the chromium acetylacetonate slurry. This reaction mixture was left to cool. Then, the Cr/Al complex solution was transferred to the flask containing silica and heptane. The resulting slurry was stirred for a one additional hour and then $1.7 cm^3$ of methanol was added to the slurry. Stirring was stopped and catalyst precursor particles were left to settle. The slurry was filtered to remove excess heptane and the residual filter-cake, which was wet with solvent, was dried in a vacuum oven at140°C to obtain a free flowing green powder. The resulting catalyst precursor contained 1.05% chromium and 1.73% aluminum expressed as the respective elements. Surface area and pore volume measured for the catalyst precursor by the ASAP 2420 instrument were $301 m^2/g$ and $2.21 cm^3/g$, respectively.

[0116]  Embodiment 10 (According to the present invention)

[0117]  A methanolic solution of chromium acetate and aluminum acetate was prepared by adding 1.07g of chromium acetate and 2.85g of boric acid stabilized basic aluminum acetate to a beaker containing a magnetic stirrer. Approximately $74 cm^3$ of methanol was added and said composition was stirred for 1 hour so that all chromium and aluminum salts were dissolved. This solution of chromium and aluminum was added to 30g of the silica xerogel support, same as that used in Embodiment 9, so that the chromium and aluminum species were impregnated into the support. Methanol was removed from the thus-formed catalyst precursor by drying in a vacuum oven at 140°C for 3 hours. The resulting blue/green catalyst precursor powder had chromium and aluminum contents of 0.96% and 1.76% by weight, expressed as the respective element. Boron content was determined to be 1,380 ppm by weight (0.138%). The surface area and the pore volume measured by Micromeritics ASAP 2420 were $306 m^2/g$ and $2.13 m^3/g$, respectively.

[0118]  It should be noted that Embodiments 1 through 3 all related to equivalent homopolymerization at 700°C using catalysts having similar particle sizes, pore volumes, surface areas and similar loadings of Cr and Al. Embodiment 1 was a catalyst prepared according to the prior art. Embodiment 2 that used a catalyst prepared according to the present invention had the homopolymer density and the melt indexes which were similar to those obtained from use of the prior art catalyst. Embodiment 3, in which the catalyst was prepared by deposition of Cr from aqueous solution followed by deposition of Al by an organometallic route, yielded a homopolymer where the melt indices were considerably lower than those obtained in Embodiment 1 or Embodiment 2, which demonstrated the different nature of the catalyst prepared by said route. The activation of the catalyst in Embodiment 1 also led to the formation of noxious fumes.

[0119]  Embodiments 4 through 8 all related to copolymerization at 600°C. Once again, the particle sizes, surface areas and pore volumes for the catalysts were practically the same, along with the Cr and Al loadings, except for Embodiment 5 where only Cr was present (Al not included). Embodiment 7 (comparative example) corresponded to the method that uses a catalyst prepared using an organometallic route according to the prior art. Here, a copolymer of HLMI value 8.0 was obtained. Embodiments 4 and 6 used catalysts prepared by embodiments of the present invention, with Cr/Al being deposited from aqueous solution and methanol solution, respectively. These embodiments yielded HLMI values of 10.8 and 8.6, respectively, which shows that the catalysts prepared according to the present invention can match or exceed the HLMI values for the prior art catalysts. Embodiment 5 (comparative example) that does not use aluminum failed to yield the required HLMI value of 8.0 or more. Embodiment 8 (comparative example) in which the catalyst was prepared using deposition of chromium nitrate and aluminum nitrates from a methanolic solution failed to yield an adequate HLMI (the value was only 6.4), either. Furthermore, the activation of the catalysts in Embodiments 7 and 8 led to noxious fume formation.

[0120]  Embodiments 9 and 10 relate to embodying the second aspect method of the present invention to form catalyst precursors on high porosity inorganic carriers, which were prepared by a freeze-drying route. Although there is a small reduction in porosity arising from the application of said method, it is clear that said method is still applicable to such high porosity carriers without collapsing the carriers.

[0121]  Accordingly, it can be seen that the activated catalysts prepared using the precursors according to the present invention provide the same or higher melt indexes than the prior art catalysts prepared from precursors made by a conventional organometallic route. Also, said catalysts have similar activities, but do not result in noxious fume formation during catalyst activation from the catalyst precursors of the present invention. Furthermore, the method of the present invention does not lead to a substantial loss in porosity for the resulting catalyst precursor, compared to prior art methods of forming the precursors.

- 15 -

[0122]   It should be appreciated that modifications to said embodiments could be made without departing from the scope of the present invention as defined in the appended scope of claims. For example, the xerogel support could be prepared by milling a hydrogel to form an aqueous slurry, followed by spray-drying rather than by direct evaporative drying of a hydrogel.



## Language on Demand, Inc.

4207 Fox Lake Dr.
Fairfax, VA 22033
Tel:   703-691-2852
Fax:   703-691-4299
Email: Info@visitlod.com

# __Certificate of Translation__

I, Seung H. Rowe declare under penalty of perjury that:

(1)   I understand the __KOREAN__ language and the __ENGLISH__ language; that

(2)   I'm a member of American Translator's Association in good standing

(2)   To the best of my knowledge and belief, the attached translation in the __ENGLISH__
      is (are) true, accurate, and correct reflection of the statements in the __KOREAN__
      language in the original document:

      Date of Translation: January 14, 2013
      No. of Pages: 16 pages
      Subject: KR_211924

*Signature & Date*   January 14, 2013

===========================================================================

Subscribed and sworn to or affirmed before me this _14TH_ day of

_JANUARY_, 2013

Notary Public

JAMES EDWARD-MARSHALL HALE
Notary Public
Commonwealth of Virginia
7532722
My Commission Expires Aug 31, 2016

ATTACHMENT 2
EXHIBIT B

등록특허 10-1211924



(19) **대한민국특허청(KR)**
(12) **등록특허공보(B1)**

(45) 공고일자     2012년12월13일
(11) 등록번호     10-1211924
(24) 등록일자     2012년12월07일

(51) 국제특허분류(Int. Cl.)
　　 *C08F 4/22* (2006.01)  *C08F 4/12* (2006.01)
　　 *C08F 10/00* (2006.01)  *C08F 210/16* (2006.01)
(21) 출원번호     10-2011-7022339(분할)
(22) 출원일자(국제)     2008년10월15일
　　 심사청구일자     2012년10월10일
(85) 번역문제출일자 2011년09월23일
(65) 공개번호     10-2011-0115176
(43) 공개일자     2011년10월20일
(62) 원출원     특허   10-2010-7011247
　　 원출원일자(국제)     2008년10월15일
　　 심사청구일자     2011년01월21일
(86) 국제출원번호     PCT/GB2008/003488
(87) 국제공개번호     WO 2009/053672
　　 국제공개일자     2009년04월30일
(30) 우선권주장
　　 0720983.6   2007년10월26일   영국(GB)
(56) 선행기술조사문헌
　　 KR100664894 B1
　　 JP20030508599 A
　　 EP0055863 A2
　　 EP0055864 A2

(73) 특허권자
　　 **피큐 실리카스 유케이 리미티드**
　　 영국 첼서 더블유에이5 1에이큐 위링턴 리버플 로
　　 드 4 뱅크 키
(72) 발명자
　　 **마스텐 크리스틴 엘리자베스**
　　 영국 씨에이치2 4에이치디 체스터 라임 우드 클로
　　 즈 4
　　 **파커 로버트 조셉**
　　 영국 더블유에이5 2알엑스 체셔 위링턴 펜케스 위
　　 링턴 로드 226
(74) 대리인
　　 **유미특허법인**

전체 청구항 수 : 총  15 항
심사관 :     강희만

(54) 발명의 명칭 **촉매 전구체 입자, 그의 제조 방법 및 용도**

(57) *요 약*

올레핀 중합 촉매용 촉매 전구체의 제조 방법으로서, 크롬염 및 붕산과 알루미늄 카르복실레이트의 수용액 또는
알코올 용액을 사용하여 실리카 크세로겔과 같은 무기 지지체 물질 상에 적층시키는 단계를 포함하는 제조 방법.
상기 크롬염, 알루미늄 카르복실레이트 및 붕산은 단일 용액으로부터 효과적으로 적층시키기에 충분히 용해성이
다.   상기 촉매 전구체는 하소에 의해 활성화되어, 종래 기술의 유기금속 경로에 의해 제조된 촉매를 사용하여
얻어지는 것과 대등한 폴리머 또는 코폴리머를 얻을 수 있는 생산성과 멜트 플로우 인덱스를 가진 α-올레핀을
동종중합 또는 공중합하기 위한 촉매를 형성할 수 있다.   상기 촉매 전구체의 활성화는 활성화시에, 크롬 또는
알루미늄의 유기금속 공급원을 사용하는 방법에 비해 감소된 레벨의 독성의, 또는 유해한 흄을 발생한다.

## 특허청구의 범위

**청구항 1**

무기 지지체 물질의 기공 구조 내에, 크롬염, 알루미늄 카르복실레이트 및 붕산을 담지하는(carrying), 90중량%
내지 100중량%의 SiO₂를 포함하는 실리카 크세로겔(xerogel)인 무기 지지체 물질을 포함하는 올레핀 중합 촉매
용 촉매 전구체의 제조 방법으로서,

i) 0.5~4.0㎤/g의 다공도(porosity)를 가지는 90중량% 내지 100중량%의 SiO₂를 포함하는 실리카 크세로겔
(xerogel)의 무기 지지체 물질을 제공하는 단계,

ii) 물, C₁~C₄ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염, 알루미늄 카르복실레이트 및 붕산을
포함하는 용액을 제공하는 단계,

iii) 상기 용액을 상기 무기 지지체 물질 상에 적층하는(depositing) 단계, 및

iv) 상기 용매를 제거하여 상기 실리카 크세로겔의 기공 구조 내에 크롬염, 알루미늄 카르복실레이트 및 붕산을
담지하는 촉매 전구체를 형성하는 단계를 포함하는 촉매 전구체의 제조 방법.

**청구항 2**

제1항에 있어서,

상기 용매가 증발에 의해 제거되는, 촉매 전구체의 제조 방법.

**청구항 3**

제1항에 있어서,

상기 실리카 크세로겔이 실리카 하이드로겔(hydrogel)로부터 물을 증발시킴으로써 제조되는, 촉매 전구체의 제
조 방법.

**청구항 4**

제1항에 있어서,

상기 실리카 크세로겔이, 수-혼화성(water-miscible) 용매와의 용매 교환 및 상기 수-혼화성 용매의 제거에 의
하여 실리카 하이드로겔(hydrogel)로부터 물을 증발시킴으로써 제조되는, 촉매 전구체의 제조 방법.

**청구항 5**

제1항에 있어서,

상기 알루미늄 카르복실레이트가 알루미늄 아세테이트인, 촉매 전구체의 제조 방법.

**청구항 6**

제5항에 있어서,

상기 크롬염이 카르복실레이트, 황산염, 염화물 또는 이것들의 혼합물인, 촉매 전구체의 제조 방법.

**청구항 7**

제6항에 있어서,

상기 크롬염이 크롬 카르복실레이트인, 촉매 전구체의 제조 방법.

**청구항 8**

제1항 내지 제7항 중 어느 한 항에 있어서,

상기 촉매 전구체가, 담지된 물질(carried material)로서, 원소로 환산했을 때 0.01~3중량%의 크롬, 원소로 환
산했을 때 0.1~8중량%의 알루미늄, 및 원소로 환산했을 때 0.005~2중량%의 붕소를 포함하는, 촉매 전구체의

제조 방법.

**청구항 9**

90중량% 내지 100중량%의 $SiO_2$를 포함하는 실리카 크세로겔(xerogel)을 포함하며, 상기 실리카 크세로겔의 기공 구조 내에, 크롬 카르복실레이트, 황산크롬, 염화 크롬 또는 이들의 혼합물에서 선택되는 크롬염, 알루미늄 카르복실레이트 및 붕산을 담지(carrying)하는, 올레핀 중합 촉매용 촉매 전구체.

**청구항 10**

제9항에 있어서,

상기 알루미늄 카르복실레이트가 알루미늄 아세테이트인, 올레핀 중합 촉매용 촉매 전구체.

**청구항 11**

제10항에 있어서,

상기 크롬염이 크롬 카르복실레이트인, 올레핀 중합 촉매용 촉매 전구체.

**청구항 12**

제11항에 있어서,

상기 크롬염이 크롬 아세테이트인, 올레핀 중합 촉매용 촉매 전구체.

**청구항 13**

제9항 내지 제12항 중 어느 한 항에 있어서,

상기 촉매 전구체가, 담지된 물질(carried material)로서, 원소로 환산했을 때 0.01~3중량%의 크롬, 원소로 환산했을 때 0.1~8중량%의 알루미늄, 및 원소로 환산했을 때 0.005~2중량%의 붕소를 포함하는 올레핀 중합 촉매용 촉매 전구체.

**청구항 14**

비환원성 분위기에서 200~1,200℃의 온도에서 30분 내지 15시간 동안, 제13항에 따른 촉매 전구체를 가열하는 것을 포함하는 올레핀 중합 촉매의 제조 방법.

**청구항 15**

하나 이상의 $C_2$~$C_8$ α-알켄의 중합 방법으로서,

상기 중합 공정은 제14항의 방법에 따라 제조된 올레핀 중합 촉매의 존재 하에서 수행되는 것을 특징으로 하는, 하나 이상의 $C_2$~$C_8$ α-알켄의 중합 방법.

**청구항 16**

삭제

**청구항 17**

삭제

**청구항 18**

삭제

**청구항 19**

삭제

명 세 서

## 기 술 분 야

[0001]    본 발명은 크롬 및 알루미늄 화합물을 운반하는 다공질 무기 입자, 특히 실리카 입자, 및 그의 제조 방법에 관한 것이다.    상기 입자, 특히 실리카 입자는 올레핀(α-알켄)의 중합 공정에서 사용하기 위한 촉매를 형성하도록 활성화될 수 있다.

## 배 경 기 술

[0002]    올레핀의 중합 공정에서 사용하기 위한 전형적인 활성화 촉매는 다공질 무기 지지체 상에 담지된 산화크롬을 포함한다.    많은 용도에 있어서, 산화알루미늄이 무기 지지체 자체(예를 들면 지지체가 실리카-알루미나 코-겔(co-gel) 지지체인 경우)의 일부로서 존재하거나, 또는 다공질 무기 지지체의 기공 구조 내에 운반되는 것이 바람직하다.

[0003]    산화물의 혼합물이 무기 지지체의 분자 구조 내에 혼입되어 있으면, 상기 구조를 약화시키고, 무기 다공질 지지체 물질을 위한 높은 다공도(porosity)를 얻기 어렵게 하는 경향이 있다.    이러한 이유에서, 무기 다공질 지지체 물질의 기공 구조 내(즉, 기공 표면 상에 적층된 상태)에는 산화크롬과 함께 알루미나가 함유되어 있는 것이 바람직하다.

[0004]    미국 특허 제3,984,351호에는, 크롬 화합물과 알루미늄 화합물을 무기 지지체 물질 상에 적층(deposition)시키고, 상기 지지체 물질을 300℃보다 높은 온도에서 비환원성 분위기에서 가열함으로써 제조되는 올레핀 중합 촉매가 개시되어 있다.    얻어지는 물질은 이어서, 금속 또는 비금속 환원제, 바람직하게는 붕소-함유 화합물과 조합되어 올레핀의 중합에 사용하기 위한 촉매가 제공된다.    바람직한 지지체 물질로서 실리카 크세로겔(xerogel)이 제시되어 있다.    상기 촉매는 무기 지지체 상에 크롬 화합물과 알루미늄 화합물을 적층시킴으로써 제조된다.    제시된 화합물들은 유기 화합물이며, 상기 적층은 불활성 유기 용매로부터 이루어진다.    개시된 촉매 시스템은 향상된 멜트 인덱스와 같은 향상된 올레핀 폴리머 특성을 제공한다.

[0005]    특허 문헌 GB 1 575 352에는, 하나 이상의 α-알켄의 중합에 사용하기 위한 담지된 크롬-함유 촉매의 제조 방법 및 용도가 개시되어 있다.    개시된 방법에서, 크롬 아세틸 아세토네이트와 같은 크롬 1,3-디케토 화합물을 원소 주기율표의 IIA족 또는 IIIA족 금속, 바람직하게는 알루미늄 또는 마그네슘의 유기금속(organometallic) 화합물과 반응시킨다.    예를 들면, 트리-이소부틸 알루미늄이 사용될 수 있다.    유기금속 화합물이 크롬 화합물에 부가되면, 크롬 화합물은 헵탄과 같은 지방족 용매 또는 지환족 용매 중에 용해되어, 얻어지는 용액을 다공질 무기 지지체 물질의 함침용으로 사용할 수 있게 된다.    이어서, 용매의 증발에 의해 크롬 및 금속 화합물은 무기 지지체 물질의 기공 구조 내의 표면 상에 적층될 수 있다.    바람직한 지지체 물질은 실리카이다.

[0006]    용매가 제거된 후, 함침된 입자(즉, 크롬 및 금속 화합물로 함침된 무기 다공질 지지체 입자)는 촉매 입자로서 유용한 것으로 만들어지도록 활성화될 필요가 있다.    일반적으로, 캐리어 입자는 비활성화 형태(본 명세서에서는 비활성화 촉매 입자로 지칭됨)로 판매 및 수송되므로, 올레핀 중합용 촉매 입자로서 사용되기 이전에 활성화를 필요로 한다.    활성화는 비활성화 촉매 입자를 200~1,200℃와 같은 고온에서 수초 동안 가열함으로써 수행되지만, 질소, 불활성 가스 또는 이산화탄소와 같은 비환원성 분위기에서는 전형적으로 수시간 동안 가열되어, 크롬이 크롬 VI 상태로 변환된다.    활성화된 다음, 촉매는 한번에 사용되거나, 또는 사용될 때까지 건조한 불활성 분위기에서 저장된다.

[0007]    GB 1 575 352의 방법에 의하면, 다공질 무기 캐리어 물질을 크롬 화합물과 알루미늄 화합물 모두에 의해 동시에 함침할 수 있다.    그러나, 상기 방법에서는 크롬 및 알루미늄 화합물을 지방족 및/또는 지환족 용매 중에 용해시킬 필요가 있어서, 함침에 이어서 용매를 증발시킬 때 잠재적 인화성 및 용매 회수 문제가 초래된다.    또한, 비활성화 촉매 입자 상에 존재하는 크롬 및 알루미늄 화합물은 복합 유기금속 화합물이다.    비활성화 촉매 입자가 비환원성 또는 산화성 분위기에서 가열에 의해 활성화되면, 이들 화합물이 분해되어 악취성이고 잠재적으로 독성인 흄(fume)의 형성을 초래하여, 격납(containment), 스크러빙(scrubbing) 및 방출 제어가 필요하게 된다.    또한, 본 발명자들은 크롬 및 알루미늄 화합물의 용액 중 일부는 높은 점도를 가지므로, 무기 다공질 지지체 물질의 기공 구조 내로 용액을 함침시키기에 부적합하다는 것을 발견했다.

[0008]    특허 문헌 WO 99/12978에는, 다공질 무기 산화물 지지체를 크롬 화합물로 함침시키는 제1 단계, 및 제1 단계에서 얻어진 생성물을 티타늄 또는 알루미늄 화합물 중 어느 하나로 함침시키는 선택적인 제2 단계를 포함하는 방

법에 의해 제조되는 촉매가 개시되어 있다.   상기 크롬 화합물은 하소(calcining)에 의해 산화크롬으로 변환될 수 있는 산화크롬 또는 크롬 화합물로서, 예를 들면 크롬의 질산염, 황산염, 탄산염, 아세트산염, 아세틸아세토네이트, 알루미늄 크로메이트 또는 tert-부틸 크로메이트이다.   제시된 알루미늄 화합물은 아세틸아세테이트, 아세틸아세토네이트, 알록시 또는 알킬 타입이다.   사용되는 용매는 특정되지는 않지만, 제시된 알루미늄 화합물이 극성 용매 중에서 유의적으로 가용성이 되지는 않는다.   여기에는 WO 99/12978에 개시된 바와 같은 방법에 의해 별도의 단계로서 크롬 화합물의 함침 및 알루미늄 화합물의 함침을 실행함으로써 발생될 수 있는 잠재적 문제점이 있다.   용매 제거에 이어지는 제1 함침은 무기 다공질 캐리어 물질의 기공 구조의 부분적 또는 완전한 블록킹(blocking)을 초래하여 제2 함침을 실행하기가 더 어려게 되거나 불가능해질 수 있다.   또한, 이런 기공 블록킹이 일어나지 않더라도, 크롬 또는 알루미늄이 촉매 전구체 내에서 원자 레벨에서는 함께 혼합되지 않기 때문에, 크롬 또는 알루미늄의 혼합물의 촉매적 거동이 변형될 수 있다.   그보다는, 알루미늄 화합물의 개별 입자들이 이미 존재하는 크롬 화합물 표면에 적층될 수 있다.   이에 따라 활성화 촉매를 사용하여 제조되는 폴리머에 대한 촉매 활성의 변화 및 있을 수 있는 멜트 인덱스의 감소를 초래할 수 있다.

[0009]   미국 특허 제4,814,306호에는, 공촉매(co-catalyst)와 조합 상태로 사용되며 각각 산화물 형태인 크롬, 인 및 알루미늄을 함유한 담지된 촉매가 개시되어 있다.   담지된 촉매는 유기 용매 중의 크롬 및 알루미늄 유기금속 화합물을 사용하여 다공질 지지체 입자를 함침시킴으로써 형성된다.   상기 공촉매는 리튬 알킬 및 보론알킬이다.   다공질 실리케이트 캐리어 상에 크롬과 알루미늄을 적층시키기 위해 질산알루미늄, 인산 및 질산크롬을 사용하는 비교예에서는, 올레핀의 중합으로 활성화되어 사용될 때, 유기금속 경로에 비해 낮은 생산성과 낮은 멜트 플로우 인덱스를 가진 촉매 전구체가 생성된다.

[0010]   따라서, 종래 기술의 문제점의 일부 또는 전부를 극복할 수 있는 촉매 전구체를 형성하기 위해, 크롬 및 알루미늄 화합물을 무기 지지체 물질 상에 함침시키는 방법이 요구된다.   또한, 활성화 촉매가 올레핀의 동종(homo)-중합 또는 공중합에 사용될 때, 비극성 용매로부터 적층된 유기금속 화합물을 사용하여 제조된, 종래 기술의 촉매와 유사한 멜트 플로우 인덱스와 생산성을 제공하기 위해 전구체로부터 형성된 활성화 촉매가 요구된다.   무기 지지체 물질의 함침을 위해 크롬 및 알루미늄 화합물의 수성, 또는 저급 지방족 알코올 용액을 사용하는 것이 바람직하다.   그보다 고급인 헵탄과 같은 지방족, 비극성 화합물 대신에 그러한 용매를 사용하면, 특히 용매로서 물을 사용한 경우에 정확한 공정중에 유해 물질이 더 줄어드는 것과 같이, 용매 제거와 관련된 공정상 문제점을 줄이게 될 것이다.   질산염, 카르복실레이트(예를 들면, 아세테이트 및 옥살레이트) 및 황산염과 같은 크롬염이 물, 저급 지방족 알코올 또는 그것들의 혼합물에 가용성이기는 하지만, 혼합 용매를 형성하기 위해 크롬 화합물과 함께 알루미늄 화합물을 용해시키는 것은 무기 지지체 상에 적층시키는 데 필요한 농도에서는 일반적으로 불가능한 것으로 밝혀졌다.   또한, 무기 촉매 상에 알루미늄을 적층시키기 위해 몇몇 가용성 알루미늄염이 사용될 경우, 얻어지는 활성화 촉매는 올레핀 중합용으로 사용될 때, 유기금속성 크롬 및 알루미늄 화합물로부터 제조된 촉매에 비해 감소된 HLMI를 제공하는 것으로 밝혀졌다.

[0011]   따라서, 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물 중에 용해된 크롬염을 포함하는 용액 중에 알루미늄을 용해된 형태로 내포시켜, 불용성 크롬 또는 알루미늄염의 침전을 초래하지 않도록 하는 방법을 찾아내야 할 필요가 있다.   또한, 얻어지는 활성화 촉매가 비극성 용매로부터 적층된 유기금속 화합물을 사용하여 제조된 종래 기술의 촉매와 유사한 성질을 가지도록, 동일한 무기 캐리어 상에 함유된 크롬염과 함께, 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물로부터 알루미늄염을 무기 캐리어 상에 적층시키는 방법을 찾아내는 것도 필요하다.

[0012]   또한, 종래 기술에서 사용되는 여러 가지 크롬 및/또는 알루미늄 화합물, 특히 유기금속 화합물은, 활성화 촉매를 형성하기 위해 촉매 전구체를 활성화하거나 하소하는 동안 유해하거나 독성인 흄을 생성할 수 있다.   이에 따라 촉매 전구체를 활성화시키는 현장에서 복잡한 흄 처리 장치가 필요할 수 있다.

## 발명의 내용

### 해결하려는 과제

[0013]   본 발명의 목적은, 무엇보다도 수성 또는 알코올성 용매를 기재로 하는 용액으로부터 크롬 및 알루미늄을 적층시킴으로써 촉매 전구체를 제조하는 방법을 제공하는 것이다.   본 발명의 목적은 또한, 촉매 활성화시 유해하거나 독성인 흄의 형성을 피할 수 있는 촉매 전구체를 제조하는 방법을 제공하는 것이다.   본 발명의 또 다른 목적은, 유기금속을 사용한 방법에 의해 제조되는 종래 기술의 촉매와 유사한 활성을 가지며, 그러한 종래 기술의 촉매에 의해 얻어지는 값 이상의 멜트 인덱스를 가지는 폴리머를 형성하기 위해 사용할 수 있는, α-알켄(올레

핀)의 동종-중합 또는 공중합용 촉매를 제공하는 것이다.

### *과제의 해결 수단*

[0014]  놀랍게도, 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물 중의 크롬 및/또는 알루미늄 화합물의 용액을, 무기 지지체 물질 상에 적층된 크롬 및 알루미늄 화합물을 포함하는 비활성화 촉매 입자(즉, 촉매 전구체 입자)를 형성하기 위해 무기 지지체 물질을 코팅하거나 함침하는 데 유용하도록 충분히 높은 크롬 및/또는 알루미늄의 농도로 제조할 수 있음을 발견했다.   상기 용액은 다공질 무기 지지체 물질의 기공 구조를 투과할 수 있을 정도로 충분히 낮은 점도를 가질 수 있다.   용매는 증발에 의해 용이하게 제거되어 촉매 전구체를 형성할 수 있으므로로, 특히 용매가 묻어거나 또는 물을 포함하는 경우에, 휘발성 유기 화합물에 의한 대기 로딩(loading) 또는 인화성 (flammability)과 관련된 문제가 감소된다.   또한, 선택된 화합물들은, 촉매를 활성화하는 동안, 모든 잔류 용매의 분해와 병행한 상기 화합물의 분해가, 종래 기술에서 사용된 몇몇 유기금속 화합물 및 용매에 의해 형성되는 것과 같은 독성이거나 유해한 흄을 발생하지 않는 것들이다.

[0015]  또한, 크롬 화합물에 이어서 알루미늄 화합물, 또는 그의 역순의 순차적 적층에 의해, 크롬 및 알루미늄 화합물이 함께 적층된 것과 대등한 성질을 가진 허용가능한 촉매 전구체가 수득된다.

[0016]  본 발명의 제1 측면은, 크롬염, 알루미늄 카르복실레이트 및 붕산을 운반하는 무기 지지체 물질을 포함하는, 올레핀 중합 촉매용 촉매 전구체를 제공한다.

[0017]  본 발명의 제2 측면은, 본 발명의 제1 측면에 따른, 올레핀 중합 촉매용 촉매 전구체의 제조 방법으로서,

[0018]  i) 무기 지지체 물질을 제공하는 단계,

[0019]  ii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염을 포함하는 제1 용액으로부터 상기 무기 지지체 물질 상에 크롬염을 적층하는 단계,

[0020]  iii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 알루미늄 카르복실레이트 및 붕산을 포함하는 제2 용액으로부터 상기 무기 지지체 물질 상에 알루미늄 카르복실레이트 및 붕산을 적층하는 단계, 및

[0021]  iv) 용매를 제거하여 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 촉매 전구체를 형성하는 단계

[0022]  를 포함하는, 촉매 전구체의 제조 방법을 제공한다.

[0023]  상기 크롬염은 제1 용액으로부터 무기 지지체 물질 상에 적층될 수 있고, 제1 용액의 용매는 알루미늄 카르복실레이트와 붕산이 제2 용액으로부터 적층되기 전에 제거될 수 있다.   상기 방법은 또한, 제2 용액으로부터 알루미늄 카르복실레이트와 붕산을 먼저 적층한 다음, 제1 용액으로부터 크롬염을 적층하기 전에 제2 용액의 용매를 제거함으로써 실행될 수 있다.

[0024]  바람직하게는, 공정을 간편하게 하기 위해, 본 발명의 제2 측면의 방법은 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 단일 용액을 사용하여 실행된다.

[0025]  따라서, 본 발명의 제2 측면의 바람직한 방법은,

[0026]  i) 무기 지지체 물질을 제공하는 단계,

[0027]  ii) 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액을 제공하는 단계,

[0028]  iii) 상기 무기 지지체 물질 상에 상기 용액을 적층하는 단계, 및

[0029]  iv) 상기 용매를 제거하여 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 촉매 전구체를 형성하는 단계

[0030]  를 포함한다.

[0031]  "용매의 제거"란, 당업자에게는 건조된, 자유 유동형(free-flowing)의 수송이 용이한 촉매 전구체를 형성하기 위해 충분한 용매가 제거되는 것으로 이해될 것이다.   이것은, 잔류 용매의 일부가 촉매 전구체의 일부로서 잔류할 수 있음을 의미할 수 있다.   예를 들면, 촉매 전구체는 15% 이하, 바람직하게는 10% 이하의 잔류 용매를 함유하면서도, 자유-유동형 분말로서 거동할 수 있다.   그러한 모든 잔류 용매는 활성화 촉매를 형성하기 위해 촉매 전구체가 활성화될 때 제거될 것이다.   대안적으로, 용매는 촉매 전구체로부터 실질적으로 완전히 제거됨

으로써 용매 제거 후에는 미결합(unbound) 용매가 존재하지 않을 수 있다.

[0032] 이하에 상세히 설명하는 본 발명의 바람직한 측면과 구현예는, 적절한 경우에, 본 발명의 제1 및 제2 측면 모두에 적용된다.

[0033] "촉매 전구체"란, 촉매로서, 특히 올레핀 중합 촉매로서 사용하기 위해 활성화될 수 있는 현장으로의 수송과 취급에 적합한 생성물을 의미한다.    일반적으로, 그러한 촉매는 사용 직전에, 이하에 기재한 바와 같은 비환원성 분위기에서 가열함으로써 활성화된다.    따라서, 촉매 전구체는, 간단히 활성화 또는 하소에 의해 촉매를 형성하는 데 사용될 수 있는 상업적으로 유용한 물질이다.

[0034] 크롬염으로는 카르복실레이트, 질산염, 황산염, 염화물 또는 이것들의 혼합물이 적합하지만, 임의의 적절한 크롬염이 사용될 수 있다.    크롬의 황산염, 염화물 또는 카르복실레이트는 특히 바람직한 염이고, 그중에서도 카르복실레이트는 촉매 전구체의 활성화시 독성이거나 유해한 흄을 생성하지 않기 때문에 특히 바람직하다.    이러한 이유 외에도 본 발명의 제2 측면의 방법에서 사용되는 용매 중의 높은 용해도 때문에 아세트산크롬이 특히 바람직하게는.    적합한게는, 크롬염은 상기 용액이 원소로서 나타낸 크롬을 1중량% 이상, 바람직하게는 2중량% 이상, 보다 바람직하게는 4중량% 이상 포함할 수 있을 정도로 용매 중의 용해도를 가져야 한다.

[0035] 적합하게는, 무기 지지체 물질은 다공질 무기 산화물이다.

[0036] 전형적으로, 상기 무기 지지체 물질은 1~300㎛의 중량 평균 입경(weight mean particle diameter, D $_{[4,3]}$)을 가진 입자 형태이다.    이 전형적 평균 직경은, 본질적으로 지지체 물질과 동일한 입경을 가지는 촉매 전구체 입자 및 활성화 촉매 입자에도 적용된다.    이것은 300 RF 렌즈(측정 범위: 0.05~900㎛), Malvern Mastersizer™ 소프트웨어 v. 2.18 및 DIF 2012 분산 유닛을 구비한 Malvern Mastersizer™ 모델 S와 같은 장치를 사용하여 광 산란에 의한 입자 크기 분석에 의해 측정된다.    호주 웨세스터셔 멜버른 소재, Malvern Instruments사 제조의 이 측정기기는 Mie 이론을 이용하여 입도 분포를 계산한다.    Mie 이론은 구형 입자에 의해 광이 어떻게 산란되는가를 예측하며, 입자의 굴절률을 고려한다.    실리카 굴절률에 대해 사용되는 참값은 1.4564이고, 물 분산제(dispersant)의 굴절률이 1.33일 때 상기 입자의 가상 굴절률(광의 흡수)에 대한 참값은 0.1이다.

[0037] 적합하게는, 상기 입자는 500㎛ 이하, 바람직하게는 400㎛ 이하의 d90을 가진다.    상기 입자는 300㎛ 이하의 d50을 가질 수 있다.    상기 입자는 1㎛ 이상, 바람직하게는 10㎛ 이상의 d10을 가진다.    (명확히 하기 위해, d90은 입자의 90중량%가 d90 미만의 직경을 가질 때의 직경이고, d50과 d10에 대해서도 마찬가지로 정의된다).    바람직하게는, 상기 입자는 1~300㎛, 보다 바람직하게는 5~250㎛, 더욱 바람직하게는 25~150㎛의 d50을 가진다.

[0038] 상기 입자는 체질(sieving)과 같은 수단에 의한 크기 분급을 선택적으로 병행하는 분쇄(comminution)에 의해 제조될 수 있고, 또는 분무-건조와 같은 방법에 의해 제조될 수 있다.

[0039] 본 발명의 제2 측면의 방법이 가지는 또 다른 이점은, 무기 지지체 물질이 입자 형태로 되어 있을 때, 크롬과 알루미늄이 다양한 직경의 입자에 걸쳐 더욱 균일하게 분배되어 있는 점이다.    특허 문헌 GB 1 575 352의 방법과 같은 종래 기술의 방법은, 보다 높은 농도의 크롬과 알루미늄을 운반하는 무기 물질의 더 작은 입자를 형성함으로써, 중합시 촉매로의 효과적 활성을 잠재적으로 감소시킬 수 있다.    또한, 중합에 의한 더 큰 촉매 작용을 위해 활성화 촉매가 사용될 때, 촉매 내부의 활성 사이트(active site)에서의 중합은 지지체 물질의 붕괴(fragmentation)를 초래하기 쉽다.    이와 같은 중합시 촉매 입자의 붕괴는, 촉매 입자를 폴리머로부터 제거하지 않아도 된다는 것을 의미하기 때문에 중요하고 유리한 특징이다.    그러나, 붕괴되지 않은 커다란 촉매 입자가 폴리머에 잔류할 경우, 그러한 입자는 폴리머로부터 형성되는 물체에 결함(defect)을 형성시킬 수 있다.    커다란 촉매 입자가 상대적으로 더 적은 활성 사이트를 가질 경우, 이러한 입자의 불충분한 붕괴를 초래할 수 있고, 그 결과 하류 공정의 결함을 초래할 수 있다.    본 발명은 더 작은 입자의 활성 사이트와 동일한 농도의 활성 사이트를 가진 보다 큰 촉매 입자를 제공하므로, 이들 큰 입자의 붕괴가 용이하게 이루어지도록 하여, 그러한 공정 결함을 감소시키거나 배제시킨다.

[0040] 적합한 무기 지지체 물질로는, 실리카, 알루미나, 혼합 실리카-알루미나와 같은 산화물, 또는 지르코늄, 토륨 또는 마그네슘의 산화물이 포함된다.    다른 원소의 산화물도 무기 지지체 물질의 원자 격자 구조의 일부로서 존재할 수 있다.    적합하게는, 지지체 물질은 무기 산화물 겔의 형태, 바람직하게는 실리카 겔로 되어 있다.

[0041] 무기 지지체 물질이 크세로겔일 때, 크세로겔은 분무 건조에 의해, 하이드로젤로부터 물을 증발시킴으로써 제조될 수 있고, 또는 예를 들면 증발에 의해 얻어지는 용매-교환된(solvent-exchanged) 겔로부터 교환 용매를 제거

하면서, 메탄올, 에탄올, 에틸 아세테이트, 이소프로필 알코올, 또는 다른 적합한 용매와 같은 수-혼화성 (water-miscible) 용매와의 용매 교환에 의해 하이드로젤로부터 물을 제거함으로써 제조될 수 있다. 용매를 제거하는 또 다른 방법은, 에틸 아세테이트와 같은 부분적으로 수-혼화성 용매와의 공비 증류에 의한 방법이다. 용매를 하이드로젤에 가하고, 혼합물을 증류한다. 용매가 농후한 응축물을 증류 혼합물에 반송하는 한편, 물이 농후한 증류물은 폐기하여, 하이드로젤 중의 물을 용매로 대체시킨다. 그런 다음, 얻어지는 젤로부터 증발 또는 다른 적합한 수단에 의해 용매를 제거함으로써 크세로젤이 형성될 수 있다.

[0042]  물의 증발을 이용하여 물을 제거함으로써 제조된 크세로젤에 있어서, 상기 방법은 일반적으로, 물을 제거하기 위한 용매 교환 공정에 비해 얻어지는 크세로젤에 대한 최종 기공 체적을 더 감소시키는 결과를 가져온다. 그러나, 용매 교환 방법에 의해 제조된 크세로젤은, 수성 또는 알코올성 용액(본 발명의 크롬염 및/또는 알루미늄 염 용액(들))이 기공 구조에 유입될 때, 하이드로젤의 증발 방식의 건조에 의해 형성되는 크세로젤보다 부분적 구조 붕괴(즉, 기공의 상실)를 일으키기가 더 쉽다.

[0043]  분무-건조에 있어서, 전형적으로 하이드로젤은 분쇄되어, 증발에 의해 슬러리 액적으로부터 용매를 플래시시키기 위해 분무 건조기에 공급되는 용매, 통상적으로는 물 중의 분산액을 생성한다. 이것은 건조 조건에 따라서, 건조되거나 부분적으로 건조된 젤의 응집된, 전형적으로는 구형인 입자를 형성한다. 부분적으로 건조된 젤은, 예를 들면 증발 방식의 건조 또는 용매 교환에 의해 추가로 건조되어 크세로젤을 형성할 수 있다. 상기 공정의 다른 조합도 가능한데, 그러한 예로는 분무 건조 후 추가의 분쇄 단계가 포함된다. 동결-건조도 또 다른 적합한 공정인데, 이것은 건조된 젤의 제조에 이용될 수 있다(그 경우에, 얼음으로서의 물과 같은 고체 형태의 동결된 용매가 진공 하에서 승화에 의해 제거된다).

[0044]  본 발명의 제2 측면의 방법은 용매 교환, 공비 증류, 또는 동결-건조에 의해 건조된 것과 같은 고도로 다공질인 무기 캐리어에 적용될 수 있고, 또한 물의 증발에 의해 제조되는 크세로젤과 같은 상대적으로 낮은 다공도를 가진 다공질 무기 캐리어에도 적용된다.

[0045]  따라서, 본 발명의 제2 측면의 방법은 고도로 다공질인 실리카 크세로젤을 제조하기 위해 용매 교환과 같은 복잡한 용매 제거 방법을 이용할 필요가 없이, 효과적인 올레핀 중합 촉매를 형성하도록 활성화될 수 있는 촉매 전구체를 제조할 수 있다는 것을 발견했다. 또한, 간단한 물의 증발에 의해 제조되는 크세로젤은, 염의 증착을 위한 카르복실레이트 및/또는 알루미늄 카르복실레이트와 같은 크롬염의 수성 또는 알코올성 용액과 접촉하게 되면, 복잡한 건조 공정에 의해 제조된 보다 다공질인 크세로젤보다 기공이 붕괴되는 경향이 적은 것으로 밝혀졌다. 따라서, 본 발명은 또한 기공 구조의 붕괴를 초래하지 않는 크롬 및 알루미늄의 로딩(loading) 또는 적층을 위한 용매(들)과 함께 간단한 크세로젤 건조 공정을 이용할 수 있게 할 뿐 아니라, 상기 용액 중의 용매가 제거될 때, 또는 얻어지는 촉매 전구체가 하소에 의해 활성화될 때 발생되는 유해한 독성의 또는 인화성 흄의 과도한 위험성이 없이 용액으로부터 크롬 및 알루미늄을 높은 레벨로 로딩할 수 있게 한다.

[0046]  강조할 사항은, 본 발명의 제2 측면은 또한, 용매 교환, 공비 증류, 동결 건조 등과 같은 다른 방법에 의해 제조된 크세로젤 또는 다른 무기 캐리어 입자로부터 촉매 전구체를 형성하는 데 사용될 때에도 효과적이고, 하이드로젤로부터 증발 건조에 의해 형성된 크세로젤과 함께 사용하는 것에 한정되지 않는다는 것이다.

[0047]  적합한 다공질 무기 지지체 물질은 실리카 크세로젤이다. 티타늄이나 알루미늄과 같은 다른 산화물, 또는 그러한 산화물의 혼합물이 실리카 크세로젤의 원자 격자 구조에 포함될 수 있지만, 이것들은 또한 존재하지 않을 수도 있다. 적합하게는, 본 발명에서 사용되는 실리카 크세로젤은 크세로젤의 중량%로 표현했을 때 90중량% 이상의 SiO₂를 포함한다. 그 이유는, 다른 산화물이 존재하면, 실리카 골격 구조의 약화를 초래하여, 무기 지지체 물질의 기공 구조에 높은 다공도를 얻는 것을 잠재적으로 더 어렵게 만들 수 있기 때문이다. 보다 바람직하게는, 실리카 크세로젤은 95중량% 이상의 실리카, 보다 바람직하게는 98중량% 이상의 실리카를 포함한다. 크세로젤 중의 SiO₂ 레벨은 뒤에 설명하는 바와 같이 XRF를 이용한 원소 분석에 의해 적합하게 측정된다.

[0048]  본 명세서에서, 달리 설명되지 않는 한, 중량%는 XRF를 이용한 원소 분석에 의해 측정된 퍼센트를 의미한다. 즉, 퍼센트는 XRF에 의해 측정된 총 물질에 대해 표현된다. XRF용의 샘플 제조에 이용되는 높은 온도는, 물과 같은 모든 휘발성 물질이 측정 이전에 소실되어 포함되지 않을 것임을 의미한다. XRF에 의해 측정되지 않는 붕소의 경우에, 퍼센트는 500℃에서 4시간 동안 건조된 물질을 기준으로 계산된다.

[0049]  적합하게는, 무기 지지체 물질은 0.5~4.0㎤/g 또는 0.5~3.0㎤/g, 바람직하게는 1.0~3.0㎤/g 또는 0.8~2.5㎤ /g, 보다 바람직하게는 1.0~2.0㎤/g의 다공도를 가진다.

등록특허 10-1211924

[0050]    적합하게는, 무기 지지체 물질의 표면적은 100∼1,000㎡/g, 예를 들면 200∼800㎡/g, 바람직하게는 200∼700㎡/g, 예를 들면 250∼700㎡/g, 보다 바람직하게는 250∼500㎡/g이다.    상기 표면적은 기공 체적과 함께, ASAP2420 분석기(영국 베드포드셔 던스터블 소재 Micromeritics Ltd에 의해 공급됨)를 사용하여 질소 다공도 측정법(porosimetry)에 의해 측정된다.    측정을 실시하기 전에 먼저, 상기 기기의 배기 스테이션에서 샘플을 270℃에서 적어도 1시간 동안 탈기시킨다.    샘플 튜브(배기된 샘플을 수용)를 분석 스테이션으로 옮기고, 액체 질소에 침지시키고, 질소 등온선(isotherm)을 판정한다.    0.08∼0.20 범위의 P/P₀에서의 데이터 포인트를 취하는 BET 이론을 이용하여, 멀티포인트 표면적을 계산한다.    기공 체적 측정은 적층 레그(leg) 상에 0.98의 P/P₀에 기록된다.

[0051]    촉매 전구체에 대해 다공도 및 표면적 측정이 수행될 때, 샘플은 측정되기 전에 500℃에서 4시간 동안 공기 중에 유지시킨다.

[0052]    본 발명의 제2 측면은 또한, 무기 지지체 물질의 하이드로겔로부터 물을 제거하는 용매 교환 공정에서 사용되는 용매로서, 물, C₁∼C₄ 지방족 알코올, 또는 이것들의 혼합물인 용매 중에 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액을 이용하여 구현될 수 있다.    교환되고, 그에 따라 로딩된 겔은 이어서 가열되어 용매가 증발되고, 크롬염, 알루미늄 카르복실레이트 및 붕산이 로딩된 촉매 전구체가 형성된다.    이 방법은 실리카 하이드로겔과 같은 하이드로겔과 함께 미결합 유기 용매 중에 유기금속 화합물이 사용되는 경우에 필요한 부가적 건조 단계가 필요하지 않다는 이점을 제공한다.

[0053]    본 발명의 제2 측면을 구현하는 또 다른 방법에서, 무기 지지체 물질은 본 발명의 제2 측면의 방법을 수행하기 전에 미결합 용매를 실질적으로 포함하지 않을 수 있다.    미결합 용매란 진공 오븐에서 140℃에서 1시간 동안 무기 지지체 물질을 가열함으로써 제거될 수 있는 용매를 의미한다.

[0054]    크롬염, 알루미늄 카르복실레이트 및 붕산은 무기 지지체 물질의 기공 구조 내에 적합하게 운반된다.

[0055]    이것은, 예를 들면, 용매 중에 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액을 다공질 무기 지지체 물질 상에 분무한 다음, 용매를 제거함으로써 달성될 수 있다.    예를 들면, 다공질 무기 지지체 물질이 입자상 형태로 되어 있는 경우, 입자를 더블콘 블렌더(double cone blender)와 같은 믹서 내에서 굴리면서 그 위로 용액을 분무할 수 있다.    계속해서, 입자를 오븐에서 또는 유동층 장치를 이용하여 건조시키거나, 플래시 건조기에 통과시켜 용매를 제거할 수 있다.    또 다른 방법은, 가열된 유동층에서 유동화된 입자 상에 상기 용액을 분무함으로써, 용매의 제거와 동시에 기공 구조에 대한 상기 물질의 로딩이 일어나도록 하는 방법이다.    다른 방법으로서, 예를 들면 과량의 용액 중에 입자상 물질을 분산시키고, 여과하여 과량의 용액을 제거한 다음, 용매를 제거하기 위해, 오븐 또는 유동층 장치와 같은 적절한 수단에 의해 입자를 가열하는 방법도 적합하다.    바람직하게는, 다공질 캐리어 입자를 초기에 습윤시키는 공정이 함침 방법으로서 사용되고, 용액은 모세관 힘에 의해 캐리어 입자의 기공 구조 내로 유입된다.    두 가지 용액(제1의 크롬염 용액 및 제2의 알루미늄 카르복실레이트와 붕산을 포함하는 용액)을 사용하여 본 발명의 방법을 수행할 경우, 전술한 것과 동일한 공정을 제1 용액에 대해 사용한 다음, 제2 용액으로 함침시키는 공정(또는 그 역순)을 반복할 수 있다.

[0056]    카르복실레이트란 알킬 카르복실레이트의 염을 의미한다.    적합한 알킬 카르복실레이트로는, 분자 1개당 6개 이하의 탄소 원자, 바람직하게는 4개 이하, 보다 바람직하게는 2개 이하의 탄소 원자를 가진 모노-, 디-, 및 트리-카르복시산이 포함된다.    그러한 카르복실레이트는 촉매 전구체를 활성화시킬 때, 유해하거나 독성인 흄을 과도하게 형성하지 않으면서 분해되는 것으로 밝혀졌다.

[0057]    바람직한 모노카르복실레이트로는, 포르메이트, 아세테이트, 락테이트 및 프로피오네이트가 포함된다.    바람직한 디카르복실레이트로는, 옥살레이트, 말레이트, 알레에이트, 말로네이트, 글루타레이트, 숙시네이트가 포함되고, 바람직한 트리카르복실레이트는 시트레이트이다.    카르복실레이트의 혼합물을 이용할 수도 있다.

[0058]    바람직하게는, 크롬염이 카르복실레이트일 때, 크롬은 크롬 아세테이트이다.    바람직하게는, 알루미늄 카르복실레이트는 알루미늄 아세테이트이다.

[0059]    알루미늄 카르복실레이트와 함께 붕산이 존재하면, 수성 및/또는 알코올성 용액 중의 알루미늄 카르복실레이트의 용해도가 증가되고, 용액으로부터 무기 지지체 물질 상에 적층시키는 데 필요한 농도에서 알루미늄 카르복실레이트의 침전을 초래하지 않는 것으로 밝혀졌다.    크롬염과 알루미늄 카르복실레이트 용액 중에 붕산이 존재하면, 수성 및/또는 알코올성 용액 중의 알루미늄 카르복실레이트의 용해도가 증가되고, 크롬염 또는 알루미늄염의 침전을 초래하지 않으므로, 용액으로부터 무기 지지체 물질의 로딩을 촉진시키는 것으로 밝혀졌다.    이에

등록특허 10-1211924

따라, 용매가 제거된 후 무기 지지체 물질이 붕산도 함유하게 된다.

[0060] 용액 중에 존재하는 염의 레벨은, 촉매 전구체 및 궁극적인 활성화 촉매에 대한 원하는 로딩 레벨을 얻기 위해, 무기 지지체 물질의 기공 체적을 고려하여 선택될 것이다. 요구되는 레벨은 사용되는 함침 방법 및 무기 지지체 물질의 다공도에 의존할 것이다. 크롬염, 알루미늄 카르복실레이트 및 붕산을 포함하는 용액은 적합하게는, 원소로 환산된 크롬을 0.05~2중량%, 예를 들면 0.1~1중량% 포함한다. 상기 용액은 적합하게는, 원소로 환산된 알루미늄을 0.1~4중량%, 예를 들면 0.2~2중량% 포함한다. 상기 용액은 적합하게는, 원소로 환산된 붕소를 0.01~0.4중량%, 예를 들면 0.02~0.2중량% 포함한다. 용액 중의 크롬, 알루미늄 또는 붕소의 상한은 특별히 중요하지는 않다. 적합하게는, 용액 중의 알루미늄 대 붕소의 비는, 중량 기준으로 알루미늄/붕소로 표현했을 때, 50/1 내지 3/1, 바람직하게는 40/1 내지 4/1, 보다 바람직하게는 30/1 내지 5/1이다. 적합하게는, 용액 중의 알루미늄 대 크롬의 비는, 중량 기준으로 알루미늄/크롬으로 표현했을 때, 25/1 내지 1/2, 바람직하게는 8/1 내지 2/3, 보다 바람직하게는 4/1 내지 1/1이다. 크롬염용 용액과, 알루미늄 카르복실레이트 및 붕산용 용액을 별도로 사용하는 경우, 전술한 것과 동일한, 전형적인 바람직한 레벨이 사용된다.

[0061] 붕산을 용액에 혼입시키기 위한 적합한 수단은, 본 발명의 알루미늄 카르복실레이트의 공급원으로서, 붕산에 의해 안정화된 상업적으로 입수가능한 염기성 알루미늄 아세테이트를 이용하는 방법을 포함한다. 바람직하게는, 붕산으로 안정화시킨 염기성 알루미늄 아세테이트는 본 발명의 알루미늄 카르복실레이트와 붕산의 공급원으로서 사용된다. 이 물질은, 예를 들면, 원소로 환산했을 때 전형적으로 16~20중량%의 알루미늄과 2.5중량%의 붕소를 포함하는 백색 분말의 형태로, Sigma Aldrich사로부터 상업적으로 입수가능하다.

[0062] *본 발명의 제1 측면의 촉매 전구체 또는 본 발명의 제2 측면에 의해 제조된 촉매 전구체는 적합하게는, 상기 촉매 전구체의 표면에 적층되어 있는 담지된 물질(carried material)로서 크롬을, 원소로 환산했을 때 0.01~3 중량%, 바람직하게는 0.1~2중량%, 보다 바람직하게는 0.25~1.5중량% 포함한다. 상기 촉매 전구체는 적합하게는, 상기 촉매 전구체의 표면에 적층되어 있는 담지된 물질로서 알루미늄을, 원소로 환산했을 때 0.1~8중량%, 바람직하게는 0.2~4중량%, 보다 바람직하게는 0.5~2.5중량% 포함한다. 상기 촉매 전구체는 적합하게는, 상기 촉매 전구체의 표면에 적층되어 있는 담지된 물질로서 붕소를, 원소로 환산했을 때 0.005~2중량%, 바람직하게는 0.05~0.5중량%, 보다 바람직하게는 0.1~0.3중량% 포함한다. "표면 상에"라는 용어는 임의의 외측 표면 이외에도, 촉매 전구체의 모든 기공 구조 내의 표면을 포함하는 것을 의미한다. 크롬과 알루미늄의 레벨은 Phillips PW2400 기기를 이용한 XRF(X-선 형광법)에 의해 적합하게 측정된다. 분석용 샘플은 붕산리튬 플럭스(flux)를 이용하여 용해된 비드(beads)로서 제조된다. 융해 온도는 전형적으로 1,000℃ 내지 1,250℃이다.

[0063] XRF에 의해 측정될 수 없는 붕소는 ICP(유도 결합 플라즈마) 분광법을 이용하여 용액 중에서 적합하게 측정된다. 전형적으로는, 촉매 샘플 1g에 질산 10㎤를 첨가하고, 비등시킨 다음 250㎤가 되도록 희석함으로써 추출물이 생성된다. ICP에 의해 용액을 분석하기 전에, 이 추출물을 0.45㎛의 필터를 사용하여 여과한다. 붕소 값은, Varian ICP-OES(Inductively Coupled Plasma-Optical Emission Spectrometer)를 사용하여 매칭된 산 매트릭스(matched acid matrix) 중의 붕소 표준과 비교하여 판정된다. 얻어진 값은 동일한 출처의 촉매 전구체 샘플에 대해 500℃에서의 중량 평형 중량 손실을 측정함으로써, 건조 기준으로 보정된다. 붕소 레벨은 500℃-건조 물질의 중량에 대한 붕소의 중량으로 표현된다.

[0064] 담지된 물질로서 존재하는 크롬, 알루미늄 및 붕소의 양(즉, 전형적으로는 촉매 전구체의 표면에 적층된 것)은, 함침되어 촉매 전구체를 형성하기 전에 무기 지지체 물질에서의 측정된 레벨과 비교함으로써 판정된다. 담지된 물질로서 존재하는 레벨은, 무기 지지체 물질의 구조 내에 이미 존재하는 Cr, Al 또는 B로부터 임의의 기여분(contribution)을 뺌으로써 얻어진다. "담지된 물질로서 존재하다" 및 "표면 상에 적층되다"라는 용어는 무기 지지체 물질의 모든 기공 구조 내에 함유되어 있는 표면 상의 물질을 포함한다.

[0065] 크롬염, 알루미늄 카르복실레이트 및 붕산의 용액을 제공하기 위해 사용되는 용매는, 바람직하게는 물, $C_1$~$C_4$ 지방족 알코올, 또는 이것들의 혼합물이다. 이는 용매가 제거될 때 유해한, 인화성 또는 독성인 흄을 피하기 위해서이다. 물, 메탄올, 에탄올, 이소프로판올 및 이것들의 혼합물이 바람직한 용매이고, 물, 메탄올, 에탄올 및 그 혼합물이 특히 바람직하고, 물, 메탄올 및 그의 혼합물이 더욱 바람직하다. 물은 독성과 인화성이 없기 때문에 특히 유용하다. 다른 용매도 본 발명의 성능에 방해가 되지 않는 수준에서 사용되거나, 또는 상기 바람직한 용매 내에 혼입될 수 있다.

[0066] 바람직하게는, 용매는 적층된 크롬염, 알루미늄 카르복실레이트 및 붕산을 무기 지지체 물질 중에 잔류시키도록

증발에 의해 제거된다.  앞에서 설명한 바와 같이, "제거"라 함은 자유 유동형이고 수송이 용이한 촉매 전구체가 얻어지도록 충분히 용매가 제거되는 것을 의미하고, 용매의 제거 후에 촉매 전구체의 중량%로 표현했을 때, 15중량%에 달하거나 또는 10중량% 미만의 용매가 여전히 존재할 수 있다.  대안적으로, 용매는 미결합 용매가 존재하지 않도록 실질적으로 제거될 수 있다.  미결합 용매란 진공 오븐에서 140℃에서 1시간 동안 무기 지지체 물질을 가열함으로써 제거될 수 있는 용매를 의미한다.

[0067]  본 발명의 제3 측면은, 비환원성 분위기에서 200~1,200℃의 온도, 바람직하게는 300~1,100℃, 보다 바람직하게는 400~900℃의 온도에서 30분 내지 15시간, 바람직하게는 8시간 이하, 보다 바람직하게는 6시간 이하의 시간 동안, 본 발명의 제1 측면에 따른 촉매 전구체의 가열에 의해 얻어지거나 얻을 수 있는 올레핀 중합 촉매, 또는 본 발명의 제2 측면의 방법에 의해 제조되는 올레핀 중합 촉매를 제공한다.

[0068]  바람직하게는, 상기 비환원성 분위기는 공기 또는 산소 또는 이것들의 혼합물과 같은 산소-함유 분위기이다. 이 공정은 활성 올레핀 중합 촉매를 형성하기 위해, 촉매 전구체의 활성화와 또는 하소 공정으로서 알려져 있다.

[0069]  종래 기술의 촉매, 특히 촉매 전구체가 지방족 용매로부터 전달된 유기금속 크롬 및 알루미늄 화합물에 의해 로딩된 촉매에 있어서, 이 활성화 공정은 활성화 공정중에 크롬 및 알루미늄 화합물이 분해될 때 유해한 및/또는 독성인 휘발성 성분의 형성을 초래할 수 있었다.  본 발명은 그러한 바람직하지 않은 활성화 부산물의 형성을 회피한다.

[0070]  전형적으로, 활성화된 올레핀 중합 촉매는, 촉매 전구체에 대해 전술한 바람직한 레벨과 유사한 레벨의 크롬, 알루미늄 및 붕소를 포함한다.  Cr, Al 및 B에 대한 측정 기술은, 촉매 전구체 및 활성화 촉매에 대해 측정된 레벨이 실질적으로 동일하도록, 분석 이전 또는 분석시에 전처리를 실행하는 단계를 포함한다.  촉매에 대한 활성화/하소 공정중에 열에 의해 확산이 활성화되어, 담지된 Al, Cr이 무기 지지체 물질의 표면 상에 존재하지 않고 무기 지지체 물질의 구조 내로 확산될 수 있다.  크롬과 알루미늄의 레벨은 전술한 바와 같이 XRF에 의해 적합하게 측정된다.  붕소도 전술한 바와 같이 측정된다.  촉매 상에 담지된 물질로서 존재하는 양은, 촉매 전구체를 형성하기 위한 함침 공정 이전에 무기 지지체 물질에 이미 존재하는 Cr, Al 및 B의 양으로부터 측정된 양을 뺌으로써 얻어진다.

[0071]  본 발명의 제4 측면은, 본 발명의 제3 측면에 따른 올레핀 중합 촉매의 존재 하에서 중합이 수행되는 것을 특징으로 하는, 하나 이상의 $C_2$~$C_8$ α-알켄의 중합 방법에 관한 것이다.  알켄 또는 다른 모노머와 조합을 이룬 알켄의 혼합물을 사용할 수 있다.  본 발명의 방법을 이용하여, 본 발명의 촉매 전구체로부터 제조된 촉매의 용도는 특별히 알켄 중합에 한정되는 것은 아니지만, 그 목적에 특히 적합하다.  본 발명의 전구체로부터 제조되거나 본 발명의 방법에 의해 제조된 촉매와 조합을 이룬 공촉매를 사용할 수 있다.  전형적으로는, 촉매의 활성화 후에, 주변 온도로 냉각되어 중합 공정에 바로 사용할 수 있도록 저장된다.  본 발명을 이용하여 제조된 촉매는, 용액, 슬러리-루프(slurry-loop), 용액 CSTR(continuous flow stirred tank) 또는 기상 중합과 같은 공정 경로에 의해, 예를 들면 폴리에틸렌의 제조용의 다양한 동종-중합 또는 공중합 경로에서 사용될 수 있다.

### 발명의 효과

[0072]  본 발명에 의하면, 수성 또는 알코올성 용매를 기재로 하는 용액으로부터 크롬 및 알루미늄을 적층시킴으로써 올레핀 중합용 촉매 전구체를 제조할 수 있다.  본 발명의 촉매 전구체를 사용하면 촉매 활성화시 유해하거나 독성인 흠의 형성을 초래하지 않는다.  또한, 본 발명에 의하면, 유기금속을 사용하는 방법에 의해 제조되는 종래 기술의 촉매와 유사한 활성을 가지며, 종래 기술의 촉매에 의해 얻어지는 값 이상의 멜트 인덱스를 가지는 폴리머를 형성할 수 있는 촉매를 제조할 수 있다.

### 발명을 실시하기 위한 구체적인 내용

[0073]  오직 예시로서 본 발명의 특정한 실시예를 설명하기로 한다.

[0074]  <u>실시예</u>

[0075]  이하에 상세히 설명하는 실시예에서, ASTM D-1238에 따라, 190℃에서 각각 21.6kg 및 2.16kg의 하중을 사용하여 고부하 멜트 인덱스(HLMI) 및 멜트 인덱스(MI)를 판정했다.

[0076]  사용된 실리카 크세로겔 지지체 물질은 이하에 설명하는 적층 실험을 행하기 이전에, 전술한 방법에 의해 측정했을 때, 검출 가능한 양의 크롬, 알루미늄 또는 붕소를 함유하지 않는 것으로 밝혀졌다.

등록특허 10-1211924

[0077]    **실시예 1 (비교예 – 헵탄으로부터의 유기금속 – 동종 중합 – 700℃)**

[0078]    하이드로겔의 증발 건조에 의해 실리카 크세로겔 지지체(순수 실리카) 100g을 제조했다.  상기 지지체는 Micromeritics ASAP 2420 분석기를 사용하여 전술한 바와 같이 측정했을 때, 각각 381㎡/g 및 1.76㎤/g의 표면적 및 질소 다공도 분석법에 의한 기공 체적을 가졌다.

[0079]    상기 지지체 입자는 Malvern Mastersizer$^{TM}$을 사용하여 측정했을 때 다음과 같은 입도 분포를 가졌다: $d_{90}$ 169.3 ㎛, $d_{50}$ 114.6㎛ 및 $d_{10}$ 63.4㎛($d_{90}$은 입자의 90중량%가 $d_{90}$ 미만의 직경을 가질 때의 직경이고, $d_{50}$과 $d_{10}$에 대해서도 마찬가지로 정의된다).

[0080]    교반기가 장착된 건조 반응 플라스크에 실리카 크세로겔 지지체(140℃에서 예비 건조된 것) 100g을 투입했다.  상기 플라스크에 헵탄 600㎖를 가하여 실리카/헵탄 슬러리를 형성했다.  자석 교반기가 들어 있는 또 다른 세정된 건조 플라스크에 크롬 아세틸아세토네이트 6.78g을 투입했다.  상기 크롬 아세틸아세토네이트에 헵탄 500㎖를 가하고, 크롬 아세틸아세토네이트 슬러리를 교반하면서 트리이소부틸 알루미늄 용액(헵탄 중의 1.0몰 용액) 64.3㎖를 가했다.  이 반응 혼합물을 방치하여 냉각시켰다.  그 후, Cr/Al 복합 용액을, 실리카와 헵탄이 들어 있는 플라스크에 옮겨 넣었다.  얻어진 슬러리를 추가로 1시간 동안 교반한 다음, 메탄올 6.4㎖를 슬러리에 가했다.  교반을 중단하고, 촉매 전구체 입자를 방치하여 침강시켰다.  과량의 헵탄을 제거하기 위해 슬러리를 여과하고, 용매로 습윤되어 있는 잔류 필터-케이크를 140℃의 건조 오븐에서 건조하여 자유 유동형 녹색 분말을 얻었다.  얻어진 촉매 전구체는 각각의 원소로 나타낸 값으로서 1.06%의 크롬과 1.76%의 알루미늄을 함유했다.  ASAP 2420 기기를 사용하여 촉매 전구체에 대해 측정한 표면적 및 기공 체적은 각각 358㎡/g 및 1.66㎤/g이었다.

[0081]    이 촉매 전구체 10g을, 유동층 반응기에서 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 700℃로 5시간 동안 유지했다.  활성화 촉매 0.148g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 에틸렌을 사용하는 동종중합 조건 하에서 테스트했다.  전체 반응기 압력은 40.3기압이었고, 에틸렌 분압은 16.0기압이었다.  반응기는 104℃로 유지되었다.  폴리에틸렌 370g을 제조했고, 촉매 활성은 2640g/g/hr로 계산되었다.  상기 폴리머는 0.22g/10분의 멜트 인덱스(MI), 19.7g/10분의 고부하 멜트 인덱스(HLMI) 및 0.9611g/㎤의 밀도를 가졌다.

[0082]    **실시예 2 (본 발명에 따름 – 동종중합 – 700℃)**

[0083]    자석 교반기가 들어 있는 비커에 크롬 아세테이트 1.15g과 붕산 안정화 염기성 알루미늄 아세테이트 2.84g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 메탄올 용액을 제조했다.  약 50㎖의 메탄올을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬과 알루미늄 용액을 실시예 1에서 사용한 것과 같은 건조 실리카 크세로겔 지지체 30g에 가하여, 크롬과 알루미늄 종(species)을 지지체 내로 함침시켰다.  이렇게 형성된 촉매 전구체를 140℃의 진공 오븐에서 3시간 동안 건조함으로써 메탄올을 제거했다.  얻어진 청색/녹색 촉매 전구체 분말은, 원소로 환산했을 때 크롬과 알루미늄을 각각 0.93중량% 및 1.87 중량% 함유했다.  붕소 함량은 1,720 중량ppm으로 판정되었다.  Micromeritics ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 364㎡/g 및 1.67㎤/g이었다.

[0084]    이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 700℃로 5시간 동안 유지했다.

[0085]    활성화 촉매 0.172g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 실시예 1에서와 같이 동종중합 조건(즉, 모노머로서 에틸렌을 사용함) 하에서 테스트했다.  전체 반응기 압력은 40.3기압이었고, 에틸렌 분압은 16.0기압이었다.  반응기는 104℃로 유지되었다.  폴리에틸렌 431g이 제조되었고, 촉매 활성은 2839g/g/hr로 계산되었다.  상기 폴리머는 0.22g/10분의 MI, 19.4g/10분의 HLMI 및 0.9606g/㎤의 밀도를 가졌다.

[0086]    **실시예 3 (비교예 – 순차적으로 Cr 다음에 Al 함침 – 동종중합 – 700℃)**

[0087]    7.68중량%의 크롬을 함유하는 크롬 아세테이트 용액을 추가의 물 2,201㎖로 희석하여 크롬 아세테이트 수용액을 제조했다.  이 용액을 실시예 1에 기재되어 있는 실리카 크세로겔 1,500g에 첨가했다.  물을 제거하여 크롬 함량이 0.97%인 자유 유동형 촉매를 수득했다.  표면적과 기공 체적은 각각 380㎡/g 및 1.62㎤/g이었다(ASAP 2420).

[0088]    상기 Cr 함유 실리카 70g을 140℃에서 4시간 동안 예비 건조하고, 밀봉된 플라스크에 넣었다.  헵탄 250㎖을 가

– 12 –

했다.  질소로 퍼지하면서, 헵탄 중의 1.0M 트리이소부틸 알루미늄 용액 43㎤을 가했다.  30분간 교반한 후, 상기 조성물을 여과하고, 얻어진 필터케이크를 진공 오븐에서 140℃에서 건조했다.  생성된 옅은 청색/녹색 촉매 전구체 분말은 크롬 및 알루미늄을, 원소로 환산했을 때 각각 0.95% 및 1.71% 함유했다.  ASAP 2420 분석기를 사용하여 측정한 상기 촉매 전구체의 표면적 및 기공 체적은 각각 375㎡/g 및 1.61㎤/g이었다.

[0089] 이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  온도는 냉각하여 질소로 스위칭하기 전에 700℃로 5시간 동안 유지했다.

[0090] 활성화 촉매 0.172g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 실시예 1에서 사용한 동종중합 조건 하에서 테스트했다.  전체 반응기 압력은 39.97기압이었고, 에틸렌 분압은 15.97기압이었다.  반응기는 104℃로 유지되었다.  폴리에틸렌 447g이 제조되었고, 촉매 활성은 2997g/g/hr로 계산되었다.  상기 폴리머는 0.14g/10분의 MI, 14.4g/10분의 HLMI 및 0.9602g/㎤의 밀도를 가졌다.

[0091] **실시예 4 (본 발명에 따름 - 공중합 - 600℃ 활성화)**

[0092] 비커에 크롬 아세테이트 33.5g과 붕산 안정화 염기성 알루미늄 아세테이트 96.4g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 수용액을 제조했다.  약 1.44리터의 물을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬 알루미늄 용액을, ASAP 2420 기기를 사용하여 측정한 파라미터로서 377㎡/g의 표면적과 1.75㎤/g의 기공 체적을 가진 실리카 지지체 1kg에 첨가했다.

[0093] 얻어진 촉매 전구체로부터 물을 제거하여, 크롬과 알루미늄의 함량이 원소로 환산하여 각각 1.00중량% 및 1.98중량%인 청색/회색 촉매 분말을 수득했다.  붕소 함량은 2,130ppm으로 판정되었다.  ASAP 2420을 사용하여 측정한 표면적과 기공 체적은 각각 354㎡/g 및 1.63㎤/g이었다.  Malvern Mastersizer™을 사용하여 측정한 이 촉매의 입도 분포는 다음과 같이 판정되었다: $d_{10}$ 75.1㎛, $d_{50}$ 126㎛ 및 $d_{90}$ 180.6㎛.  이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0094] 활성화 촉매 0.180g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 헥센 15㎤을 사용하여 공중합 조건 하에서 테스트했다.  전체 반응기 압력은 40.1기압이었고, 에틸렌 분압은 15.8기압이었다.  반응기는 100℃로 유지되었다.  코폴리머 468g이 제조되었고, 촉매 활성은 2643g/g/hr로 계산되었다.  상기 코폴리머는 10.8g/10분의 HLMI 및 0.9487g/㎤의 밀도를 가졌다.

[0095] **실시예 5 (비교예 - Al 사용않음 - 공중합 - 600℃ 활성화)**

[0096] 비커에 크롬 아세테이트 33.5g을 가하여 크롬 아세테이트의 수용액을 제조했다.  약 1.44리터의 물을 가하고, 크롬 아세테이트가 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬 용액을 실시예 4에 기재된 바와 같이 실리카 지지체 1kg에 첨가했다.

[0097] 얻어진 촉매 전구체로부터 물을 제거하여, 크롬 함량이 1.03%인 청색/회색 촉매 분말을 수득했다.  ASAP 2420을 사용하여 측정한 표면적과 기공 체적은 각각 376㎡/g 및 1.69㎤/g이었다.  Malvern Mastersizer™에 의한 이 촉매의 입도 분포는 다음과 같이 판정되었다: $d_{10}$ 75.4㎛, $d_{50}$ 126.2㎛ 및 $d_{90}$ 181.3㎛.  이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0098] 활성화 촉매 0.178g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 헥센 15㎤을 사용하여 공중합 조건 하에서 테스트했다.  전체 반응기 압력은 40.0기압이었고, 에틸렌 분압은 15.8기압이었다.  반응기는 100℃로 유지되었다.  코폴리머 459g이 제조되었고, 촉매 활성은 2630g/g/hr로 계산되었다.  상기 코폴리머는 5.7g/10분의 HLMI 및 0.9466g/㎤의 밀도를 가졌다.

[0099] **실시예 6 (본 발명에 따름 - 공중합 - 600℃ 활성화)**

[0100] 자석 교반기가 들어 있는 비커에 크롬 아세테이트 5.14g과 붕산 안정화 염기성 알루미늄 아세테이트 13.67g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 메탄올 용액을 제조했다.  약 240㎤의 메탄올을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  이 크롬과 알루미늄 용액을, ASAP 2420 기기를 사용하여 측정한 파라미터로서 383㎡/g의 표면적과 1.75㎤/g의 기공 체적을 가진 실리카 지지체 150g에 첨가하여, 크롬과 알루미늄 종을 실리카 내로 함침시켰다.  상기 촉매를 140℃의 진공 오븐에서 3시간

동안 건조함으로써 촉매로부터 과량의 메탄올을 제거했다.  얻어진 청색/회색 촉매 분말은, 원소로서 환산했을 때 크롬과 알루미늄을 각각 1.03중량% 및 1.92중량% 함유했다.  붕소 함량은 1,600ppm으로 판정되었다.  ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 361㎡/g 및 1.63㎤/g이었다.  Malvern Mastersizer™에 의해 측정한 입도 분포는, $d_{10}$ 65.5㎛, $d_{50}$ 118.4㎛ 및 $d_{90}$ 176.4㎛로 나타났다.

[0101]   이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0102]   활성화 촉매 0.193g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 헥센 15㎤을 사용하여 공중합 조건 하에서 테스트했다.  전체 반응기 압력은 40.0기압이었고, 에틸렌 분압은 15.8기압이었다.  반응기는 100℃로 유지되었다.  코폴리머 490g이 제조되었고, 촉매 활성은 2340g/g/hr로 계산되었다.  상기 코폴리머는 8.6g/10분의 HLMI 및 0.9503g/㎤의 밀도를 가졌다.

[0103]   **실시예 7 (비교예 - 헵탄으로부터의 유기금속 - 공중합 - 600℃ 활성화)**

[0104]   교반기가 장착된 건조 반응 플라스크에, ASAP 2420에 의한 표면적 및 기공 체적이 각각 393㎡/g 및 1.73㎤/g인 실리카 지지체(140℃에서 예비건조됨) 150g을 가했다.  상기 플라스크에 헵탄 900㎤를 가하여 실리카/헵탄 슬러리를 형성했다.  자석 교반기가 들어 있는 또 다른 세정된 건조 플라스크에 크롬 아세틸아세토네이트 9.51g을 가했다.  상기 크롬 아세틸아세토네이트에 헵탄 80㎤를 가하고, 크롬 아세틸아세토네이트 슬러리를 교반하면서 트리이소부틸 알루미늄 용액(헵탄 중의 1.0몰 용액) 100.1㎤를 가했다.  이 반응 혼합물을 방치하여 냉각시켰다.  그 후, Cr/Al 복합 용액을, 실리카와 헵탄이 들어 있는 플라스크에 옮겨 넣었다.  얻어진 슬러리를 추가로 1시간 동안 교반한 다음, 메탄올 9.6㎤을 슬러리에 가했다.  교반을 중단하고, 촉매 전구체 입자를 방치하여 침강시켰다.  과량의 헵탄을 제거하기 위해 슬러리를 여과하고, 용매로 습윤되어 있는 잔류 필터-케익을 140℃의 건조 오븐에서 건조하여 자유 유동형 녹색 분말을 얻었다.  얻어진 촉매 전구체는 각각의 원소로 나타낸 값으로서 0.99중량%의 크롬과 1.86중량%의 알루미늄을 함유했다.  ASAP 2420 기기를 사용하여 측정한 표면적 및 기공 체적은 각각 375㎡/g 및 1.63㎤/g이었다.

[0105]   이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0106]   활성화 촉매 0.190g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 공중합 조건(헥센 15㎤을 사용) 하에서 테스트했다.  전체 반응기 압력은 40.1기압이었고, 에틸렌 분압은 15.9기압이었다.  반응기는 100℃로 유지되었다.  코폴리머 484g이 제조되었고, 촉매 활성은 2215g/g/hr로 계산되었다.  상기 코폴리머는 8.0g/10분의 HLMI 및 0.9508g/㎤의 밀도를 가졌다.

[0107]   **실시예 8 (비교예 - 크롬 및 알루미늄의 질산염 사용 - 공중합 - 600℃ 활성화)**

[0108]   자석 교반기가 들어 있는 비커에 $Cr(NO_3)_3 \cdot 9H_2O$ 7.54g 및 $Al(NO_3)_3 \cdot 9H_2O$ 25.72g을 가하여 질산크롬과 질산알루미늄의 메탄올 용액을 제조했다.  약 143㎤의 메탄올을 첨가하고, 크롬염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다.  상기 크롬/알루미늄 용액을, ASAP 2420 기기를 사용하여 측정한 파라미터로서 377㎡/g의 표면적과 1.75㎤/g의 기공 체적을 가진 실리카 100g에 첨가했다.

[0109]   상기 촉매를 140℃의 진공 오븐에서 3시간 동안 건조함으로써 촉매로부터 과량의 메탄올을 제거했다.  얻어진 청색/녹색 촉매 전구체는, 원소로서 환산했을 때 크롬과 알루미늄을 각각 1.06중량% 및 1.96중량% 함유했다.  ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 362㎡/g 및 1.64㎤/g이었다.

[0110]   Malvern Mastersizer™에 의해 측정한 입도 분포는, $d_{10}$ 73.8㎛, $d_{50}$ 125.2㎛ 및 $d_{90}$ 180.4㎛로 나타났다.

[0111]   이 촉매 전구체 10g을 유동층 반응기에서, 유동화 가스로서 건조 공기를 사용하여 활성화시켰다.  냉각하여 질소로 스위칭하기 전에 온도를 600℃로 5시간 동안 유지했다.

[0112]   활성화 촉매 0.185g을 용량 5리터의 이소부탄 슬러리 중합 반응기로 옮기고, 공중합 조건(헥센 15㎤을 사용) 하에서 테스트했다.  전체 반응기 압력은 40.1기압이었고, 에틸렌 분압은 16.0기압이었다.  반응기는 100℃로 유지되었다.  코폴리머 485g이 제조되었고, 촉매 활성은 2666g/g/hr로 계산되었다.  상기 코폴리머는 6.4g/10분의 HLMI 및 0.9508g/㎤의 밀도를 가졌다.

[0113]   **실시예 9 (비교예 - 헵탄으로부터의 유기금속)**

[0114] 하이드로겔의 동결 건조에 의해 실리카 크세로겔 지지체(순수 실리카) 100g을 제조했다. 상기 지지체는 Micromeritics ASAP 2420 분석기를 사용하여 전술한 바와 같이 측정했을 때, 각각 321㎡/g 및 2.32㎤/g의 표면적 및 질소 다공도 분석법에 의한 기공 체적을 가졌다.

[0115] 상기 지지체 입자는 Malvern Mastersizer™을 사용하여 측정했을 때 다음과 같은 입도 분포를 가졌다: d$_{90}$ 182.8 ㎛, d$_{50}$ 76.5㎛ 및 d$_{10}$ 12.9㎛. 교반기가 장착된 건조 반응 플라스크에 실리카 크세로겔 지지체(140℃에서 예비 건조된 것) 25g을 투입했다. 상기 플라스크에 헵탄 150㎤를 가하여 실리카/헵탄 슬러리를 형성했다. 자석 교반기가 들어 있는 또 다른 세정된 건조 플라스크에 크롬 아세틸아세토네이트 1.82g을 투입했다. 상기 크롬 아세틸아세테네이트에 헵탄 20㎤를 가하고, 크롬 아세틸아세토네이트 슬러리를 교반하면서 트리이소부틸 알루미늄 용액(헵탄 중의 1.0몰 용액) 17.3㎤를 가했다. 이 반응 혼합물을 방치하여 냉각시켰다. 그 후, Cr/Al 복합 용액을, 실리카와 헵탄이 들어 있는 플라스크에 옮겨 넣었다. 얻어진 슬러리를 추가로 1시간 동안 교반한 다음, 메탄을 1.7㎤를 슬러리에 가했다. 교반을 중단하고, 촉매 전구체 입자를 방치하여 침강시켰다. 과량의 헵탄을 제거하기 위해 슬러리를 여과하고, 용매로 습윤되어 있는 잔류 필터-케이크를 140℃의 건조 오븐에서 건조하여 자유 유동성 녹색 분말을 얻었다. 얻어진 촉매 전구체는 각각의 원소로 나타낸 값으로서 1.05중의 크롬과 1.73중의 알루미늄을 함유했다. ASAP 2420 기기를 사용하여 촉매 전구체에 대해 측정한 표면적 및 기공 체적은 각각 301 ㎡/g 및 2.21㎤/g이었다.

[0116] **실시예 10 (본 발명에 따름)**

[0117] 자석 교반기가 들어 있는 비커에 크롬 아세테이트 1.07g과 붕산 안정화 염기성 알루미늄 아세테이트 2.85g을 가하여 크롬 아세테이트와 알루미늄 아세테이트의 메탄올 용액을 제조했다. 약 74㎤의 메탄올을 첨가하고, 크롬 염과 알루미늄염이 전부 용해되도록 상기 조성물을 1시간 동안 교반했다. 이 크롬과 알루미늄 용액을 실시예 9에서 사용한 것과 같은 실리카 크세로겔 지지체 30g에 가하여, 크롬과 알루미늄 종을 지지체 내로 함침시켰다. 이렇게 형성된 촉매 전구체를 140℃의 진공 오븐에서 3시간 동안 건조함으로써 메탄올을 제거했다. 얻어진 청색/녹색 촉매 전구체 분말은, 원소로 환산했을 때 크롬과 알루미늄을 각각 0.96중량% 및 1.76중량% 함유했다. 붕소 함량은 1,380 중량ppm(0.138%)으로 판정되었다. Micromeritics ASAP 2420 분석기를 사용하여 측정한 표면적 및 기공 체적은 각각 306㎡/g 및 2.13㎤/g이었다.

[0118] 실시예 1 내지 3은 모두 유사한 입자 크기, 기공 체적, 표면적 및 Cr과 Al의 유사한 로딩을 가지는 촉매를 사용한 700℃에서의 동등한 동종중합에 관한 것이었음을 알아야 한다. 실시예 1은 종래 기술에 따라 제조된 촉매였다. 본 발명에 따라 제조된 촉매를 사용한 실시예 2는 종래 기술의 촉매를 사용하여 얻어진 것과 유사한 호모폴리머 밀도 및 멜트 인덱스를 가졌다. 수용액으로부터 Cr을 적층시킨 다음, 유기금속 경로에 따라 Al을 적층시킴으로써 촉매를 제조한 실시예 3에서는 실시예 1 또는 2에서 얻어진 것보다 멜트 인덱스가 상당히 낮은 호모폴리머가 수득되었는데, 이는 상기 경로를 이용하여 제조된 촉매의 성질이 상이하다는 것을 나타내는 것이다. 실시예 1에서의 촉매의 활성화도 유해한 흄의 형성을 초래했다.

[0119] 실시예 4 내지 8은 모두 600℃에서의 공중합에 관한 것이었다. 여기서도 마찬가지로, Cr만이 존재한 실시예 5(Al 불포함)를 제외하고는, 촉매에 대한 입자 크기, 표면적 및 기공 체적이 Cr 및 Al 로딩과 아울러 실질적으로 동일했다. 실시예 7(비교예)은 종래 기술에 따라 유기금속 경로를 이용하여 제조된 촉매를 사용하는 방법에 해당했다. 여기서는 HLMI 값이 8.0인 코폴리머가 수득되었다. 실시예 4와 6은 본 발명의 방법의 구현예에 의해 제조된 촉매를 사용한 것으로서, Cr/Al이 각각 수용액과 메탄올 용액으로부터 적층되었다. 이들 예에서는 각각 10.8 및 8.6의 HLMI 값이 얻어졌으며, 이는 본 발명에 따라 제조된 촉매가 종래 기술의 촉매의 HLMI 값과 대등하거나 능가할 수 있음을 나타내는 것이다. 알루미늄을 사용하지 않은 실시예 5(비교예)는 요구되는 HLMI 값인 8.0 이상을 제공하지 못했다. 메탄올 용액으로부터 질산크롬 및 질산알루미늄을 적층시키는 방법을 이용하여 촉매가 제조된 실시예 8(비교예)도 적합한 HLMI 값을 제공하지 못했다(HLMI 값이 6.4에 불과했음). 또한, 실시예 7과 8에서의 촉매의 활성화는 유해한 흄의 형성을 초래했다.

[0120] 실시예 9와 10은 동결 건조 경로에 의해 제조된, 다공도가 높은 무기 캐리어 상에 촉매 전구체를 형성하기 위한, 본 발명의 제2 측면에 따른 방법의 구현예에 관한 것이다. 상기 방법을 적용함으로써 다공도의 약간의 감소가 일어나지만, 상기 방법은 캐리어의 붕괴를 일으키지 않고 높은 다공도의 캐리어에 적용가능하다는 것이 명백하다.

[0121] 따라서, 본 발명에 따른 전구체를 사용하여 제조된 활성화 촉매는, 종래의 유기금속 경로에 의해 제조된 전구체로부터 제조된 종래 기술의 촉매와 동일하거나 그보다 높은 멜트 인덱스를 제공한다는 것을 알 수 있다. 또한,

– 15 –

상기 촉매는 유사한 활성을 가지면서도, 본 발명의 촉매 전구체로부터 촉매를 활성화하는 동안 유해한 흄의 형성을 초래하지 않는다.  또한, 본 발명의 방법은 전구체를 형성하는 종래 기술의 방법에 비해서, 얻어지는 촉매 전구체에 대한 다공도의 실질적인 손실을 초래하지 않는다.

[0122]   첨부된 청구의 범위에 정의된 본 발명의 범위를 벗어나지 않고 상기 실시예에 대한 변형을 이룰 수 있음을 이해해야 할 것이다.  예를 들면, 크세로겔 지지체는, 하이드로겔을 미분하여 수성 슬러리를 형성한 다음, 하이드로겔의 직접적인 증발 건조하지 않고 분무-건조함으로써 제조될 수 있다.

# ATTACHMENT 3

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

In Re: Application of PQ Corporation for Ex Parte Order to Obtain Discovery for Use in Foreign Proceedings )
_____ )
_Plaintiff_ )
v. ) Civil Action No.
) 
) (If the action is pending in another district, state where:
_____ )         )
_Defendant_ )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:

X  _Production:_  **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

| Place: Finnegan Henderson Farabow Garrett & Dunner 3500 Sun Trust Plaza, 303 Peachtree Street NE, Atlanta Georgia 30308 | Date and Time:      February 18, 2013 |
|---|---|

X  _Inspection of Premises:_  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place:      Computer(s) used to communicate with KD (Kukdong) Corporation | Date and Time:      February 18, 2013 |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: _____

CLERK OF COURT

OR

_____                    _____
_Signature of Clerk or Deputy Clerk_                          _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_  PQ Corporation
_____ , who issues or requests this subpoena, are:

Patrick J. Coyne (patrick.coyne@finnegan.com)
Finnegan Henderson Farabow Garrett & Dunner, LLP
901 New York Avenue, N.W., Washington DC 20001, tel. (202) 408-4470

**ATTACHMENT 3**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**ATTACHMENT 3**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**ATTACHMENT 3**

**SCHEDULE A**
**TO RULE 45 SUBPOENA DUCES TECUM**
**TO THOMAS J. PULLUKAT**


**DEFINITIONS AND INSTRUCTIONS**

A.      The following definitions and instructions apply to all of PQ

Corporation's discovery requests:

1.      The terms "PQ Corporation" and "PQ" refers specifically to PQ

Corporation, its officers, directors, employees, representatives, partners, agents,

and any parent, subsidiary, or affiliate corporation(s).

2.      The terms "KD Corporation" and "KD" refer to KD

Corporation, its officers, directors, employees, representatives, partners, agents,

and any parent, subsidiary, or affiliate corporation(s), successors, and assigns.

3.      "You" and "your" means Thomas J. Pullukat.

4.      "Communication" means the transmission of information

(whether in the form of facts, ideas, inquiries, responses, or otherwise).

5.      "Document" means all things defined as documents as used in

the Federal Rules of Civil Procedure and, in particular, Fed. R. Civ. P. 34 (a), and

shall mean any and all information, whether in tangible or other form, whether

printed, typed, recorded, computerized, filmed, reproduced by any process, or

written or produced by hand, and whether or not an original, draft, master,

duplicate, copy, or annotated version thereof that is in your possession, custody, or

1

control, whether in the United States, or in any foreign country. A draft or non–identical copy is a separate document within the meaning of this term.

6.     "Person" means any natural person or any business, legal, governmental, or juridical entity or association.

7.     "Referring" or "relating to" means constituting, comprising, concerning, regarding, mentioning, containing, setting forth, showing, disclosing, describing, explaining, summarizing, evidencing, memorializing, or discussing, whether directly or indirectly and whether in whole or in part, and should be given the broadest possible scope consistent with the Federal Rules of Civil Procedure.

B.     The following rules of construction shall apply to all of PQ's discovery requests:

1.     The terms "all" and "each" shall be construed as all and each.

2.     The conjunctions "and" and "or" shall be construed conjunctively or disjunctively, as necessary to bring within the scope of these discovery requests all responses, information, and things that might otherwise be construed to be outside their scope.

3.     The use of the singular form shall include within its meaning the plural form, and vice versa.

4.     The use of the masculine form shall include within its meaning the feminine form, and vice versa.

2

**ATTACHMENT 3**

5.      The use of any tense of a verb shall include within its meaning all other tenses of the verb.

C.      Where an objection is made to any document, request, or sub–part thereof, pursuant to Fed R Civ. P 34 state with particularity and in detail all grounds for the objection. Any grounds for objection that are not stated explicitly in your objections, within the time provided by the Federal Rules of Civil Procedure or by the court including any extensions thereof, will be waived.

D.      Where you assert a claim of privilege or work product in objecting to any document request, or sub–part thereof, and you decline to answer based on the assertion, the attorney or person asserting the privilege shall in the objection to the request, or sub–part thereof:  identify the privilege being claimed; and provide the following information:

1.      For documents:

a.      the type of document;

b.      general subject matter of the document;

c.      the date of the document; and

d.      such other information as is necessary to identify the document for a subpoena duces tecum, including the author of the document, each addressee of the document, and the relationship of the author to the addressee.

3

2.    for oral communications:

    a.    the name of the person making the communication, the names of all persons present while the communication was made, and the relationship of each person to the others;

    b.    the date and place of the communication; and

    c.    the general subject matter of the communication.

E.    If any requested document is asserted to contain confidential business information, designate the allegedly confidential information and produce the document along with the designation and PQ Corporation agrees that it will limit the disclosure of such document to its outside counsel working on this matter, until such time and as an appropriate Protective Order is entered or the court rules that the document is not entitled to treatment as confidential information.

F.    Electronically stored information shall be produced in .pdf form.

**ATTACHMENT 3**

**REQUEST FOR PRODUCTION
OF DOCUMENTS AND THINGS**

1.      All documents and things relating to PQ's chrome–on–silica catalyst technology.

2.      All documents and things relating to the subject matter of the PQ's allowed chrome-on-silica catalyst technology Korean patent claims. A copy of PQ's allowed Korean claims is attached hereto as Exhibits A and B.

3.      All communications (whether or not they are memorialized in documents, things, or otherwise) between Mr. Pullukat and KD or any person representing or acting on behalf of KD, including without limitation:

      a.      any and all consulting you have done with KD;

      b.      any compensation requested or paid by KD for any work that you have done for KD; and

      c.      any documents, information, or other things that you have received from or provided to KD since retiring from PQ in September 2006.

4.      Make available for inspection and copying all electronic devices and records that include any of a series of electronic search terms that will be mutually agreed-upon by the parties, including the hard drive(s) of any devices that you have used to communicate with KD from September 2006 through the present.

5

# EXHIBIT  A

*WHAT IS CLAIMED IS:*

Claim 1
Deleted

Claim 2
Deleted

Claim 3
Deleted

Claim 4
Deleted

Claim 5
Deleted

Claim 6
Deleted

Claim 7
Deleted

Claim 8
A method of preparing the catalyst precursor for an olefin polymerization catalyst that comprises an inorganic support material carrying chromium  salt, aluminum carboxylate and boric acid, said inorganic support material is silica xerogel containing 90% ~ 100% by weight of $SiO_2$ comprising:

i) a step of providing an inorganic support material;

ii) a step of depositing chromium salt onto said inorganic support material from the first solution that contains chromium salt in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof;

iii) a step of depositing aluminum carboxylate and boric acid onto said inorganic support material from the second solution that contains aluminum carboxylate and boric acid in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof; and

iv) a step of removing said solvent to form the catalyst precursors that contain chromium salt, aluminum carboxylate and boric acid,

Here, said chromium salt is deposited onto said inorganic support material from said first solvent, and the solvent is removed before said aluminum carboxylate and boric acid are deposited onto said inorganic support material from said second solution.

Claim 9
A method of preparing the catalyst precursor for an olefin polymerization catalyst that comprises an inorganic support material carrying chromium  salt, aluminum carboxylate and boric acid, said inorganic support material is silica xerogel containing 90% ~ 100% by weight of $SiO_2$ comprising:

i) a step of providing an inorganic support material;

ii) a step of depositing chromium salt onto said inorganic support material from the first solution that contains chromium salt in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof;

- 2 -

iii) a step of depositing aluminum carboxylate and boric acid onto said inorganic support material from the second solution that contains aluminum carboxylate and boric acid in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof; and

iv) a step of removing said solvent to form the catalyst precursors that contain chromium salt, aluminum carboxylate and boric acid,

Here, after said step i), a step is carried out in which said aluminum carboxylate and boric acid in said step ii) are deposited in the first place onto said inorganic support material from said second solution.

Then, the solvent is removed from said second solution.

Subsequently, a step is carried out in which said chromium salt in said step ii) is deposited onto said inorganic support material from said first solution.

Claim 10
Deleted

Claim 11
A method of preparing a catalyst precursor according to claim 8 or claim 9, wherein
said solvent is removed by evaporation

Claim 12
A method of preparing a catalyst precursor according to claim 8 or claim 9, wherein
said inorganic support material is silica xerogel that is prepared by evaporating water from silica hydrogel

Claim 13
Deleted

Claim 14
Deleted

Claim 15
Deleted

Claim 16
Deleted

Claim 17
Deleted

Claim 18
Deleted

Claim 19
Deleted

Claim 20
Deleted

ATTACHMENT 3
EXHIBIT A

# EXHIBIT  B

Registered patent 10-1211924

### *WHAT IS CLAIMED IS:*

Claim 1
A method for preparing a catalyst precursor for an olefin polymerization catalyst, the catalyst precursor comprising an silica xerogel inorganic support material that includes $SiO_2$ having 90% ~ 100% by weight, said silica xerogel carrying a chromium salt, aluminum carboxylate and boric acid within the pore structure of the inorganic support material, said method comprising:

i) a step of providing a silica xerogel inorganic support material containing 90% ~ 100% by weight with porosity of 0.5 ~ 4.0 $cm^3$/g;

ii) a step of providing a solution containing chromium salt, aluminum carboxylate and boric acid in the solvent which is water, $C_1$~ $C_4$ aliphatic alcohol, or a mixture thereof

iii) a step of depositing said solution onto said inorganic support material; and

iv) a step of removing said solvent to form the catalyst precursor containing chromium salt, aluminum carboxylate and boric acid within said silica xerogel pore structure

Claim 2
A method for preparing a catalyst precursor according to claim 1, wherein said solvent is removed by evaporation

Claim 3
A method for preparing a catalyst precursor according to claim 1, wherein said silica xerogel is prepared by evaporating water from silica hidrogel

Claim 4
A method for preparing a catalyst precursor according to claim 1, wherein Said silica xerogel is prepared by evaporating water from silica hydrogel by solvent exchange with a water-miscible solvent and removal of said water-miscible solvent

Claim 5
A method for preparing a catalyst precursor according to claim 1, wherein said aluminum carboxylate is aluminum acetate

Claim 6
A method for preparing a catalyst precursor according to claim 5, wherein said chromium salt is carboxylate, sulphate, chloride or a mixture thereof

Claim 7
A method for preparing a catalyst precursor according to claim 6, wherein said chromium salt is chromium carboxylate

Claim 8
A method for preparing a catalyst precursor according to any of claims 1 through 7, wherein said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element

- 2 -

Claim 9
An olefin polymerization catalyst precursor including silica xerogel having 90% ~ 100% by weight of $SiO_2$ and comprising within said silica xerogel pore structure chromium salt, selected from chromium carboxylate, chromium sulphate, chromium chloride, or mixtures thereof; aluminum carboxylate; and boric acid.

Claim 10
An olefin polymerization catalyst precursor according to claim 9, wherein
said aluminum carboxylate is aluminum acetate

Claim 11
An olefin polymerization catalyst precursor according to claim 10, wherein
said chromium carboxylate is chromium carboxylate

Claim 12
An olefin polymerization catalyst precursor according to claim 11, wherein
said chromium salt is chromium acetate

Claim 13
An olefin polymerization catalyst precursor according to any of claims 9 through 12, wherein
said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element

Claim 14
A method of preparing an olefin polymerization catalyst that includes heating of the catalyst precursor according to claim 13 for 30 minutes ~ 15 hours at 200 ~ 1,200°C in a non-reducing atmosphere

Claim 15
Method of polymerizing one or more $C_2 \sim C_8$ α-alken, wherein
said polymerization process is carried out in the presence of the olefin polymerization catalyst prepared with a method according to claim 14

Claim 16

Deleted

Claim 17

Deleted

Claim 18

Deleted

Claim 19

Deleted

# ATTACHMENT  4

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

In Re: Application of PQ Corporation for Ex Parte Order to
　　Obtain Discovery for Use in Foreign Proceedings )
_____
_Plaintiff_　　　　　　　　　　　　　　 )
　　　　　　　　　v.　　　　　　　　　　 )　Civil Action No.
　　　　　　　　　　　　　　　　　　　　 )
_____　) (If the action is pending in another district, state where:
_Defendant_　　　　　　　　　　　　 )　　　　)

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:

　　　X　_Testimony:_　**YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is _not_ a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Date and Time:　　On or before March 1, 2013 |
|---|---|

　　　　　The deposition will be recorded by this method:　　Stenography, sound, and may be recorded by video

　　　☐　_Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

　　　　　The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:　_____

　　　　　　　CLERK OF COURT

　　　　　　　　　　　　　　　　　　　　OR

_____　　　_____
　_Signature of Clerk or Deputy Clerk_　　　　　　　　_Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_　PQ Corporation
　　　　　　　　　　　　　　　　　　　　　　　　　, who issues or requests this subpoena, are:

Patrick J. Coyne (patrick.coyne@finnegan.com)
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, N.W., Washington DC 20001, tel. (202) 408-4470

**ATTACHMENT 4**

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**ATTACHMENT 4**

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*

  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

  **(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;

  **(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

  **(iv)** subjects a person to undue burden.

  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information;

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

  **(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*

  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

  **(i)** expressly make the claim; and

  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it.

  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**ATTACHMENT 4**

**SCHEDULE A**
**TO RULE 45 SUBPOENA TO TESTIFY**
**TO THOMAS J. PULLUKAT**


**DEFINITIONS AND INSTRUCTIONS**

A.     The following definitions and instructions apply to all of PQ

Corporation's discovery requests:

1.     The terms "PQ Corporation" and "PQ" refers specifically to PQ

Corporation, its officers, directors, employees, representatives, partners, agents,

and any parent, subsidiary, or affiliate corporation(s).

2.     The terms "KD Corporation" and "KD" refer to KD

Corporation, its officers, directors, employees, representatives, partners, agents,

and any parent, subsidiary, or affiliate corporation(s), successors, and assigns.

3.     "You" and "your" means Thomas J. Pullukat.

4.     "Communication" means the transmission of information

(whether in the form of facts, ideas, inquiries, responses, or otherwise).

5.     "Document" means all things defined as documents as used in

the Federal Rules of Civil Procedure and, in particular, Fed. R. Civ. P. 34 (a), and

shall mean any and all information, whether in tangible or other form, whether

printed, typed, recorded, computerized, filmed, reproduced by any process, or

written or produced by hand, and whether or not an original, draft, master,

duplicate, copy, or annotated version thereof that is in your possession, custody, or

1

control, whether in the United States, or in any foreign country. A draft or non–

identical copy is a separate document within the meaning of this term.

6. "Person" means any natural person or any business, legal,

governmental, or juridical entity or association.

7. "Referring" or "relating to" means constituting, comprising,

concerning, regarding, mentioning, containing, setting forth, showing, disclosing,

describing, explaining, summarizing, evidencing, memorializing, or discussing,

whether directly or indirectly and whether in whole or in part, and should be given

the broadest possible scope consistent with the Federal Rules of Civil Procedure.

B.     The following rules of construction shall apply to all of PQ's

discovery requests:

1.     The terms "all" and "each" shall be construed as all and each.

2.     The conjunctions "and" and "or" shall be construed

conjunctively or disjunctively, as necessary to bring within the scope of these

discovery requests all responses, information, and things that might otherwise be

construed to be outside their scope.

3.     The use of the singular form shall include within its meaning

the plural form, and vice versa.

4.     The use of the masculine form shall include within its meaning

the feminine form, and vice versa.

2

ATTACHMENT 4

5.    The use of any tense of a verb shall include within its meaning all other tenses of the verb.

C.    Where an objection is made to any document, request, or sub–part thereof, pursuant to Fed R Civ. P 34 state with particularity and in detail all grounds for the objection. Any grounds for objection that are not stated explicitly in your objections, within the time provided by the Federal Rules of Civil Procedure or by the court including any extensions thereof, will be waived.

D.    Where you assert a claim of privilege or work product in objecting to any document request, or sub–part thereof, and you decline to answer based on the assertion, the attorney or person asserting the privilege shall in the objection to the request, or sub–part thereof:  identify the privilege being claimed; and provide the following information:

1.    For documents:

a.    the type of document;

b.    general subject matter of the document;

c.    the date of the document; and

d.    such other information as is necessary to identify the document for a subpoena duces tecum, including the author of the document, each addressee of the document, and the relationship of the author to the addressee.

3

    2.    for oral communications:

        a.    the name of the person making the communication, the names of all persons present while the communication was made, and the relationship of each person to the others;

        b.    the date and place of the communication; and

        c.    the general subject matter of the communication.

E.    If any requested document is asserted to contain confidential business information, designate the allegedly confidential information and produce the document along with the designation and PQ Corporation agrees that it will limit the disclosure of such document to its outside counsel working on this matter, until such time and as an appropriate Protective Order is entered or the court rules that the document is not entitled to treatment as confidential information.

F.    Electronically stored information shall be produced in .pdf form.

ATTACHMENT 4

## REQUEST FOR PRODUCTION
## OF DOCUMENTS AND THINGS

1.      All documents and things relating to PQ's chrome–on–silica catalyst technology.

2.      All documents and things relating to the subject matter of the PQ's allowed chrome-on-silica catalyst technology Korean patent claims. A copy of PQ's allowed Korean claims is attached hereto as Exhibits A and B.

3.      All communications (whether or not they are memorialized in documents, things, or otherwise) between Mr. Pullukat and KD or any person representing or acting on behalf of KD, including without limitation:

   a.      any and all consulting you have done with KD;

   b.      any compensation requested or paid by KD for any work that you have done for KD; and

   c.      any documents, information, or other things that you have received from or provided to KD since retiring from PQ in September 2006.

4.      Make available for inspection and copying all electronic devices and records that include any of a series of electronic search terms that will be mutually agreed-upon by the parties, including the hard drive(s) of any devices that you have used to communicate with KD from September 2006 through the present.

**ATTACHMENT 4**

# EXHIBIT  A

### *WHAT IS CLAIMED IS:*

Claim 1
Deleted


Claim 2
Deleted


Claim 3
Deleted


Claim 4
Deleted


Claim 5
Deleted


Claim 6
Deleted


Claim 7
Deleted


Claim 8
A method of preparing the catalyst precursor for an olefin polymerization catalyst that comprises an inorganic support material carrying chromium  salt, aluminum carboxylate and boric acid, said inorganic support material is silica xerogel containing 90% ~ 100% by weight of $SiO_2$ comprising:

i) a step of providing an inorganic support material;

ii) a step of depositing chromium salt onto said inorganic support material from the first solution that contains chromium salt in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof;

iii) a step of depositing aluminum carboxylate and boric acid onto said inorganic support material from the second solution that contains aluminum carboxylate and boric acid in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof; and

iv) a step of removing said solvent to form the catalyst precursors that contain chromium salt, aluminum carboxylate and boric acid,

Here, said chromium salt is deposited onto said inorganic support material from said first solvent, and the solvent is removed before said aluminum carboxylate and boric acid are deposited onto said inorganic support material from said second solution.


Claim 9
A method of preparing the catalyst precursor for an olefin polymerization catalyst that comprises an inorganic support material carrying chromium  salt, aluminum carboxylate and boric acid, said inorganic support material is silica xerogel containing 90% ~ 100% by weight of $SiO_2$ comprising:

i) a step of providing an inorganic support material;

ii) a step of depositing chromium salt onto said inorganic support material from the first solution that contains chromium salt in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof;

- 2 -

iii) a step of depositing aluminum carboxylate and boric acid onto said inorganic support material from the second solution that contains aluminum carboxylate and boric acid in the solvent which is water, $C_1$ ~ $C_4$ aliphatic alcohol, or mixtures thereof; and

iv) a step of removing said solvent to form the catalyst precursors that contain chromium salt, aluminum carboxylate and boric acid,

Here, after said step i), a step is carried out in which said aluminum carboxylate and boric acid in said step ii) are deposited in the first place onto said inorganic support material from said second solution.

Then, the solvent is removed from said second solution.

Subsequently, a step is carried out in which said chromium salt in said step ii) is deposited onto said inorganic support material from said first solution.

Claim 10
Deleted

Claim 11
A method of preparing a catalyst precursor according to claim 8 or claim 9, wherein said solvent is removed by evaporation

Claim 12
A method of preparing a catalyst precursor according to claim 8 or claim 9, wherein said inorganic support material is silica xerogel that is prepared by evaporating water from silica hydrogel

Claim 13
Deleted

Claim 14
Deleted

Claim 15
Deleted

Claim 16
Deleted

Claim 17
Deleted

Claim 18
Deleted

Claim 19
Deleted

Claim 20
Deleted

- 3 -

# EXHIBIT  B

Registered patent 10-1211924

*WHAT IS CLAIMED IS:*

Claim 1
A method for preparing a catalyst precursor for an olefin polymerization catalyst, the catalyst precursor comprising an silica xerogel inorganic support material that includes $SiO_2$ having 90% ~ 100% by weight, said silica xerogel carrying a chromium salt, aluminum carboxylate and boric acid within the pore structure of the inorganic support material, said method comprising:

i) a step of providing a silica xerogel inorganic support material containing 90% ~ 100% by weight with porosity of 0.5 ~ 4.0 $cm^3$/g;

ii) a step of providing a solution containing chromium salt, aluminum carboxylate and boric acid in the solvent which is water, $C_1$~ $C_4$ aliphatic alcohol, or a mixture thereof

iii) a step of depositing said solution onto said inorganic support material; and

iv) a step of removing said solvent to form the catalyst precursor containing chromium salt, aluminum carboxylate and boric acid within said silica xerogel pore structure

Claim 2
A method for preparing a catalyst precursor according to claim 1, wherein said solvent is removed by evaporation

Claim 3
A method for preparing a catalyst precursor according to claim 1, wherein said silica xerogel is prepared by evaporating water from silica hidrogel

Claim 4
A method for preparing a catalyst precursor according to claim 1, wherein Said silica xerogel is prepared by evaporating water from silica hydrogel by solvent exchange with a water-miscible solvent and removal of said water-miscible solvent

Claim 5
A method for preparing a catalyst precursor according to claim 1, wherein said aluminum carboxylate is aluminum acetate

Claim 6
A method for preparing a catalyst precursor according to claim 5, wherein said chromium salt is carboxylate, sulphate, chloride or a mixture thereof

Claim 7
A method for preparing a catalyst precursor according to claim 6, wherein said chromium salt is chromium carboxylate

Claim 8
A method for preparing a catalyst precursor according to any of claims 1 through 7, wherein said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element

- 2 -

Claim 9
An olefin polymerization catalyst precursor including silica xerogel having 90% ~ 100% by weight of $SiO_2$ and comprising within said silica xerogel pore structure chromium salt, selected from chromium carboxylate, chromium sulphate, chromium chloride, or mixtures thereof; aluminum carboxylate; and boric acid.

Claim 10
An olefin polymerization catalyst precursor according to claim 9, wherein
said aluminum carboxylate is aluminum acetate

Claim 11
An olefin polymerization catalyst precursor according to claim 10, wherein
said chromium carboxylate is chromium carboxylate

Claim 12
An olefin polymerization catalyst precursor according to claim 11, wherein
said chromium salt is chromium acetate

Claim 13
An olefin polymerization catalyst precursor according to any of claims 9 through 12, wherein
said catalyst precursor contains, as carried material, 0.001 ~ 3% by weight of chromium expressed as the element, 0.1 ~ 8% by weight of aluminum expressed as the element, and 0.005 ~ 2% by weight of boron expressed as the element

Claim 14
A method of preparing an olefin polymerization catalyst that includes heating of the catalyst precursor according to claim 13 for 30 minutes ~ 15 hours at 200 ~ 1,200°C in a non-reducing atmosphere

Claim 15
Method of polymerizing one or more $C_2 \sim C_8$ α-alken, wherein
said polymerization process is carried out in the presence of the olefin polymerization catalyst prepared with a method according to claim 14

Claim 16

Deleted

Claim 17

Deleted

Claim 18

Deleted

Claim 19

Deleted

- 3 -

ATTACHMENT 4
EXHIBIT B